# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BENJAMIN WASSON, Individually and On Behalf of All Others Similarly Situated,<br><br>                          Plaintiff,<br><br>     v.<br><br>LOGMEIN, INC., WILLIAM R. WAGNER, EDWARD K. HERDIECH, and ROBERT BRADLEY,<br><br>                          Defendants. | No. 1:18-cv-12330-ADB<br><br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ......................................................................................................1

II.     JURISDICTION AND VENUE ...............................................................................6

III.    PARTIES ..................................................................................................................6

IV.     BACKGROUND AND RELEVANT PRE-CLASS PERIOD EVENTS...........8

        A.      LogMeIn's Business and Merger with GoTo .........................................8

        B.      LogMeIn Planned to Transition GoTo Customers from Monthly to Annual
                Billing ...................................................................................................12

        C.      LogMeIn Closely Tracked and Managed Customer Renewal Before,
                During, and After the Merger ...............................................................14

V.      SUMMARY OF THE FRAUD .......................................................................16

        A.      LogMeIn Began Converting Existing GoTo Customers to Annual Payment
                Terms in Q2'17 and Assured Investors that the Process Was Proceeding
                Well.......................................................................................................16

        B.      LogMeIn Announced It Had Already Reached Its Three-Year FCF Margin
                Goal in Q3' 17, Yet Investors Remained Concerned About Revenue
                Growth ..................................................................................................19

        C.      LogMeIn Issues Disappointing Revenue Growth Guidance at Its Analyst
                Day, But Announced an Increased Dividend to Offset the News.........22

        D.      LogMeIn Surprisingly Reiterates Its Previously Issued Guidance for 2018,
                Leading Investors to Suspect a Latent Weakness Threatened the Company.........23

        E.      LogMeIn Announces Its Positive Q1'18 Results, But Investors Remained
                Concerned Regarding Revenue Growth Guidance ...............................24

        F.      The Truth Begins to Emerge Through a Partial Corrective Disclosure
                While Defendants Continued to Issue False and Misleading Statements.............25

        G.      The Truth Is Revealed: Defendants Admit They Aggressively Forced
                Customers Into Annual Contracts and Changed Payment Terms,
                Alienating Customers, and Forcing Them into Competitors' Arms.....................26

        H.      Former LogMeIn Employees Confirm LogMeIn Knew GoTo Customers
                Were Cancelling at Greater than Anticipated Levels Due to the Change in
                Payment Terms ......................................................................................33

AMENDED CLASS ACTION COMPLAINT

i

VI.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
      OMISSIONS DURING THE CLASS PERIOD ............................................................45

      A.    False and Misleading Statements and Omissions in Connection with the
            Announcement of LogMeIn's Second Quarter 2017 Results ...............................45

      B.    Defendants' False and Misleading Statements and Omissions on
            September 13, 2017 at the Deutsche Bank Technology Conference ....................55

      C.    False and Misleading Statements and Omissions in Connection with the
            Announcement of LogMeIn's Third Quarter 2017 Results ..................................58

      D.    Defendants' False and Misleading Statements and Omissions on
            December 19, 2017 at the Company's Analyst Day .............................................68

      E.    False and Misleading Statements and Omissions in Connection with the
            Announcement of LogMeIn's Full Year 2017 Results .........................................71

      F.    False and Misleading Statements in Connection with the Announcement
            of LogMeIn's First Quarter 2018 Results ...........................................................79

      G.    Defendants' False and Misleading Statements and Omissions on May 15,
            2018 at the JP Morgan Global Technology, Media and Communications
            Conference ...........................................................................................................88

      H.    Defendants' False and Misleading Statements and Omissions on June 5,
            2018 at the Robert W. Baird & Co. Global Consumer, Technology &
            Services Conference ............................................................................................89

VII.  LOSS CAUSATION ......................................................................................................90

VIII. POST-CLASS PERIOD EVENTS ...............................................................................93

IX.   ADDITIONAL SCIENTER ALLEGATIONS ..............................................................94

X.    CLASS ACTION ALLEGATIONS ..............................................................................99

XI.   UNDISCLOSED ADVERSE FACTS ..........................................................................100

XII.  APPLICABILITY OF PRESUMPTION OF RELIANCE ............................................101

XIII. NO SAFE HARBOR ...................................................................................................103

XIV.  CLAIMS ....................................................................................................................104

XV.   PRAYER FOR RELIEF ..............................................................................................109

XVI.  JURY TRIAL DEMANDED .......................................................................................109

AMENDED CLASS ACTION COMPLAINT

1.      Lead Plaintiffs Larry Pollock[1] and Robert Daub ("Plaintiffs"), by and through

their attorneys, allege the following upon information and belief, except as to those allegations

concerning Plaintiffs, which are alleged upon personal knowledge.  Plaintiffs' information and

belief is based upon, among other things, their counsel's investigation, which includes without

limitation: (a) review and analysis of regulatory filings made by LogMeIn, Inc. ("LogMeIn" or

the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b)

review and analysis of press releases and media reports issued by and disseminated by LogMeIn;

(c) review and analysis of analyst reports regarding the Company; (d) interviews with former

LogMeIn employees; and (e) review of other publicly available information concerning

LogMeIn.

## I.      INTRODUCTION

2.      This is a federal securities class action on behalf of all individuals and entities that

purchased or otherwise acquired the publicly traded securities of LogMeIn between July 27,

2017 and July 26, 2018, inclusive (the "Class Period"), seeking remedies under Sections 10(b)

and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").[2]

3.      LogMeIn is a "Software as a Service" (or "SaaS") company that offers both free

and fee-based, or premium, subscription software services used primarily by mobile

professionals to work remotely and by IT service providers to remotely manage computers and

servers.  LogMeIn derives its revenue principally from subscription fees.  LogMeIn is organized

into three segments: Communications and Collaboration, Identity and Access Management, and

Customer Engagement and Support.

---

[1] Larry Pollock died on January 31, 2019.  *See* Dkt. No. 53 (Suggestion of Death).  Counsel for
Pollock is in the process of preparing a motion to substitute an appropriate party pursuant to Rule
25(a)(1) of the Federal Rules of Civil Procedure.
[2] See the "CLASS ACTION ALLEGATIONS" section, *supra* at 103, for a more complete class
definition, including limitations.

4.     On July 26, 2016, LogMeIn announced that it would acquire the "GoTo" family of products from its primary competitor, Citrix Inc.  LogMein claimed that the acquisition (or "merger") would enable the Company's revenue "to grow in the high single digits on an organic basis" in the first year and that LogMeIn would be better positioned to expand on that growth rate over the long term.  The Company projected that after one year of realizing cost synergies it would have pro forma Adjusted EBITDA margins of approximately 35% and free cash flow of more than $250 million.

5.     After the acquisition closed on January 31, 2017, LogMeIn organized most of the GoTo assets into its Communications and Collaboration segment, which post-merger accounted for more than half of the combined entity's revenues.

6.     On February 28, 2017, the Company held an earnings call during which it discussed the status of the GoTo integration and its projected effect on the Company's 2017 performance.  The Company projected a long-term "***10% compounded annual growth rate, 40% adjusted EBITDA margins, and 30% cash flow margin.***"  Defendants also announced a three-year capital return plan to return approximately 75% of the Company's free cash flow over the period through a combination of share repurchases and dividends, beginning with a quarterly cash dividend of $0.25 per share. Defendants, however, lowered revenue growth guidance for 2017 from the high single digits to approximately 5-6%, which analysts thought was a conservative estimate.

7.     During the call, Defendants informed investors that the Company intended to boost free cash flow to fund the promised share repurchases and dividends by shifting GoTo customers' contracts, which were historically annual contracts that were billed either quarterly or monthly, to annual prepaid subscriptions.

AMENDED CLASS ACTION COMPLAINT

8.     In October 2017, the Company pleasantly surprised investors when it announced that it was increasing its full year free cash flow outlook to 30% of revenue, indicating that the Company would reach its three-year goal within the first year.

9.     Throughout the Class Period, Defendants assured investors that they would not create friction with GoTo customers when transitioning them to annual prepaid contracts, a process that would take "years" to complete.  New customers started their subscriptions as annual prepaid contracts; for existing customers,  Defendants stated that transitioning to annual prepaid contracts was optional and that they could still renew on a monthly basis.  Defendants also asserted that the Company's retention team contacted customers approximately 60 to 90 days before their subscription expired to discuss changing the terms for renewal.

10.     Throughout the Class Period, Defendants also assured investors that GoTo customers were responding positively to the changes, as evidenced by the dramatic increase in free cash flow and the stable gross renewal rate which remained at approximately 75%.

11.     Unbeknownst to investors, however, Defendants were employing aggressive practices to accelerate the transition in order to meet integration targets faster than projected and to facilitate dividend payments, results which offset investors' disappointment with LogMeIn's underwhelming revenue growth forecast.  Defendants' tactics included aggressively converting customers from monthly to annual payments; automatically charging small and medium business customers for an entire year without providing adequate notice or obtaining their affirmative consent; forcing larger customers to sign new purchase orders rather than auto-renewing on the same terms; and removing the "termination for convenience" clause, which had allowed GoTo customers to prematurely cancel their annual subscription with 30-day notice.  These practices drastically increased customer friction, as customers were compelled to accept unfavorable terms for services they required to operate their businesses, and caused customers to cancel their

subscriptions in 2018 when their annual contracts expired and to switch to LogMeIn's competitors who offered comparable services with  more flexible terms and at better prices.

12.     Contrary to reality, however, Defendants led the market to believe that the Company was only in the early stages of a slow customer transition, that much of the increase in free cash flow was attributable to merger synergies, and therefore, that the upward trend in free cash flow would continue as the Company gradually transitioned existing GoTo customers to annual payments.

13.      At the Company's December 19, 2017 Analyst Day, Defendants disappointed investors by forecasting a scant 5-6% revenue growth for 2018.  Investors envisioned growth in the "high single digits," which the Company had forecast when the merger was announced, especially given that LogMeIn had realized merger cost synergies faster than anticipated and was reportedly successfully transitioning the GoTo customers.  Analysts saw promise in the Company's cross-selling activity and potential for acquisitions to drive growth, and they continued to see a substantial upside to free cash flow as they too believed the Company was in the early stages of transitioning existing GoTo customers to annual payment terms.  Nonetheless, the investing public was unaware of the customer friction generated by the Company's aggressive tactics or of the resulting competitive vulnerability, both of which would impede the trend of growing free cash flow and exacerbate investor concerns over organic revenue growth.

14.     In a likely effort to regain investor confidence after releasing the disappointing guidance, on February 1, 2018, the Company announced a 20% dividend increase, to $0.30 per share.  Shortly thereafter, on February 8, 2018 the Company announced its acquisition of Jive Communications, which it touted as "a deal that gave us the scale and resources to expand into larger, faster growing markets."

AMENDED CLASS ACTION COMPLAINT
4

15.     Nevertheless, on the February 15, 2018 earnings call, the Company disappointed investors by maintaining its revenue growth guidance despite success with the GoTo customer transition and positive financial results.

16.     The truth regarding the Company's aggressive customer transition tactics was partially revealed to the market on May 23, 2018 when Piper Jaffray reported that competitors were gaining market share by attracting LogMeIn's customers with more flexible terms; however, the report indicated the Company had changed its terms to address the issue and expected "organic acceleration in the collaboration business as better retention combines with strong new bookings."

17.     Then, on July 26, 2018, Defendants were finally forced to acknowledge that their aggressive tactics led to dramatic customer churn.  Though investors had expected the Company to transition contracts to annual prepaid subscriptions, Defendants revealed that the Company had virtually forced customers into new terms with little notice, thereby souring customer relationships and driving them to competitors with more flexible terms. These practices caused renewal rates in the Communications and Collaboration segment to decline by 350 basis points, driving down revenue guidance by 3% for the year.

18.      The news shocked the market, driving down LogMeIn's share price by $26.60 per share, or approximately 25.47%, to close at $77.85 per share on July 27, 2018, on unusually heavy trading volume.

19.     As a result of Defendants' wrongful acts and omissions, securities law violations, Plaintiffs and the Class suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

20.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) & 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

21.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

22.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), and 15 U.S.C. § 78aa.  Substantial acts in furtherance of the alleged securities law violations, and/or the effects of the violations, occurred in this Judicial District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  The Company's principal executive offices are also located in this Judicial District

23.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

24.    Lead Plaintiff Larry Pollock,[3] as set forth in his previously-filed certification (Dkt. No. 27-2), incorporated by reference herein, purchased LogMeIn securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

---

[3] Larry Pollock died on January 31, 2019. *See* Dkt. No. 53.  Counsel for Pollock is in the process of preparing a motion to substitute an appropriate party pursuant to Rule 25(a)(1) of the Federal Rules of Civil Procedure.

25.     Lead Plaintiff Robert Daub, as set forth in his previously-filed certification (Dkt. No. 27-2), incorporated by reference herein, purchased LogMeIn securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

26.     Defendant LogMeIn is incorporated in Delaware, and its principal executive offices are in Boston, Massachusetts.  LogMeIn's shares trade under the ticker symbol "LOGM" on the NASDAQ Global Select Market (the "NASDAQ"), which is an efficient market.  During the Class Period, LogMeIn, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's shares.

27.     Defendant William R. Wagner ("Wagner") was the President, a Director, and the Chief Executive Officer ("CEO") of LogMeIn throughout the Class Period. Prior to his appointment as CEO in 2015, Wagner was the Chief Operating Officer  ("COO") of LogMeIn from 2013 to 2015.   Prior to joining LogMeIn, Wagner held executive leadership roles throughout his career, including COO and Chief Marketing Officer ("CMO") of Vocus and CMO of Fiberlink.  Wagner holds a diploma in History from Lafayette College and an M.B.A. from The Wharton School of Business.

28.     Defendant Edward K. Herdiech ("Herdiech") was the Chief Financial Officer ("CFO") of LogMeIn throughout the Class Period.  Prior to joining LogMeIn, Herdiech held a number of finance positions at Parametric Technology Corporation, Inc.  Herdiech holds a diploma in Business Administration with a concentration in Accounting from the University of Vermont.

29.     Defendant Robert Bradley ("Bradley") was the Vice President of Investor Relations of LogMeIn throughout the Class Period.   Bradley holds an M.B.A. from Carroll School of Management at Boston College.

30.     Defendants Wagner, Herdiech, and Bradley are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of LogMeIn's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   Each Individual Defendant, during their tenure, was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV.     BACKGROUND AND RELEVANT PRE-CLASS PERIOD EVENTS

### A.     LogMeIn's Business and Merger with GoTo

31.     LogMeIn offers both free and fee-based, or premium, subscription software services used primarily by mobile professionals to work remotely and by IT service providers to remotely manage computers and servers.   LogMeIn derives its revenue principally from subscription fees from customers, who range from individual consumers to small and medium businesses ("SMBs") and to multi-national enterprises.   The Company's revenue is driven

primarily by the number and the type of premium services it sells to subscribers.  The Company claimed that its high volume of new and renewed subscriptions at low transaction prices increases the predictability of its revenues compared to perpetual licensed-based software businesses.

32.     LogMeIn is organized into three segments: Communications and Collaboration, Identity and Access Management, and Customer Engagement and Support.  LogMeIn's unified communications and collaboration offerings are purportedly used by inside sales teams, customer service teams and digital marketing teams to generate sales leads, remotely engage prospective buyers, and visually demonstrate products and services in an effort to create sales opportunities, advance sales cycles, and boost overall online visit to purchase conversion rates.  LogMeIn's identity and access management services purportedly provide individuals, line-of-business teams, security professionals, as well as internal and external IT professionals with simple and secure remote access tools needed to manage and secure passwords, internet applications, remote computers and other Internet-enabled devices, and automate common IT tasks.  LogMeIn's customer engagement and support services purportedly empower companies to deliver more personalized customer engagement and support.

33.     LogMeIn's sales structure is a hunter/farmer model: hunters sell one product and bring in new customers, while farmers can sell the whole portfolio and are responsible for upselling and cross-selling to existing customers.

34.     On July 26, 2016, LogMeIn issued a press release announcing its plans to enter into a merger agreement with GetGo, Inc. ("GetGo.").  GetGo was a subsidiary of LogMeIn's primary competitor, Citrix Inc.  GetGo's family of products, which included GoToMeeting, GoToWebinar, GoToTraining, GoToMyPC, GoToAssist, Grasshopper, and OpenVoice, were referred to as GoTo by LogMeIn after the merger.  LogMeIn expected the combined entity to

AMENDED CLASS ACTION COMPLAINT
9

generate annual revenues in excess of $1 billion from more than two million customers in virtually every country around the globe.  LogMeIn stated that the strategic rationale for the merger was to quickly double the Company's revenue within three to four years, to cross-sell products across both customer bases, and to fill gaps that each company had in its product lines. When the deal was announced, the GoTo business was set to generate $680 million in revenue with free cash flow ("FCF") margins of 15% for the year, and LogMeIn was on track to record $334 million in revenue and FCF of $85 million.  LogMeIn forecast $100 million in synergies over two years, mostly from cost savings, and expected to achieve $65 million in synergies within the first 12 months on a run rate basis.  LogMeIn was expected to generate pro form adjusted EBITDA margins of approximately 35% and pro forma FCF of more than $250 million after one year.

35.     On a July 26, 2016 earnings call with investors and analysts, the Company forecast that the combined entity would grow in the ***high single digits*** on an organic basis within the first year and that it would be better positioned to expand on that growth rate over the long term.

36.     Analysts contended the merger made strategic sense because, despite the product overlap, the two companies had different customer segments.  A July 27, 2016 Barclays report noted that "GoTo allows LogMeIn to tap into the enterprise market, whereas its products had previously primarily targeted the [small business] market."  Analysts also noted that LogMeIn is built for ease-of-use and is low cost, while GoTo had fairly robust solutions at higher prices, yet higher operational costs.

37.     The GoTo merger closed on January 31, 2017.  On February 28, 2017, Defendant Wagner discussed the merger and the expectations for the combined entity during the Company's Q4'16 earnings call:[4]

> With our merger with Citrix's GoTo business now closed, we've begun the work of integrating two great companies and building the foundation of a company that we believe is unique amongst the SaaS sector, a company that can lead and redefine large markets to deliver enduring revenue growth, expanding margins, and compelling total shareholder returns. Our products are targeting markets with a combined addressable opportunity approaching $30 billion, growing in aggregate at 9% per year. And we are a company with the scale, leadership position, resources, and employee base needed to realize the potential of these markets. Over the long-term, we believe this will translate to a compelling financial profile consisting of ***10% compounded annual growth rate, 40% adjusted EBITDA margins, and 30% cash flow margin***.

38.     Defendant Wagner also highlighted the benefit to shareholders purportedly enabled by the merger, stating:

> Furthermore, this market opportunity and financial profile, along with our confidence in our ability to execute, places us in a position to commit to a meaningful capital returns program for our shareholders. To that end, I am pleased to report that our Board of Directors has approved a ***three-year capital return plan intended to return approximately 75% of the Company's free cash flow to shareholders over that time. That's up to $700 million in a three-year period returned through a combination of share repurchases and dividends***.

39.     Defendant Wagner also informed investors that LogMeIn was "focused" on avoiding any disruptive customer experience, stating: "[I]n February, we began these efforts in earnest, focusing first and foremost on areas where integration would yield quick benefits without disrupting service."  Defendant Wagner stated further: "We don't need to be disruptive and generate any kind of disruptive customer experience, so that is something we are being cautious of as we develop these product strategies."

40.     Following the merger, management purportedly focused on four priorities: integration planning, delivering synergies, integrating company culture, and forming a long-term

---

[4] All emphasis herein that is both bold and italicized is added unless otherwise noted.

strategy.  With respect to sales, LogMeIn stated that it would reduce costs by bringing the automation of its inside sales force's lead scoring, lead distribution, and lead tracking process to GoTo's sales organization.  LogMeIn also anticipated that product overlap would allow it to streamline duplicative costs.

41.    After the merger, most of the GoTo assets were organized into LogMeIn's Communications and Collaboration segment, which accounted for approximately 55-57% of the Company's revenues during the Class Period. This segment includes GoToMeeting, GoToTraining, GoToConference, GoToWebinar, OpenVoice and Grasshopper.  The GoToMyPC product was added to the Identity and Access Management ("IAM") segment, which accounted for approximately 28-30% of the Company's revenues during the Class Period. Finally, the GoToAssist product was organized under the Customer Engagement and Support segment, which  accounted for approximately 14-17% of the Company's revenues during the Class Period.

**B.    LogMeIn Planned to Transition GoTo Customers from Monthly to Annual Billing**

42.    Prior to the merger, nearly all of LogMeIn's contracts were annual and approximately 55-65% of LogMeIn's customers paid upfront for the year with a credit card ("e-commerce").  The rest were invoiced.  Typically, an annual subscription is automatically renewed unless the customer specifically terminates it prior to the end of the subscription period.

43.    To record revenue on annual contracts, LogMeIn initially records the subscription fee as deferred revenue, and then recognizes it ratably, on a daily basis, over the life of the subscription period.

44.    Prior to the merger, GoTo customers enjoyed periodic billing and a flexible cancelation arrangement.  GoTo customers would enter into an annual contract for the first year

but could thereafter cancel with a 30-day notice. When the merger closed, 30% of GoTo contracts were year-long contracts, 70% of GoTo customers were invoiced monthly, and GoTo collected cash from credit card sales in only about a third of those transactions. GoTo contracts also contained a "termination for convenience" clause that allowed customers who provided less than 30-day notice to exit the contract at the end of the month provided they pay for that month. Customers could also leave contracts early, especially in the case of a hardship.

45. LogMeIn, however, planned to transition GoTo customers to LogMeIn's annual billing system to benefit FCF. On the Company's July 26, 2016 Q2'16 earnings call, Defendant Herdiech explained:

> So I think as most people on the call or who follow us closely know that the vast majority of our subscriptions are our annual subscriptions where our customers pay us in advance. And with respect to those, approximately 55% of those are paid via credit cards. So we have a really strong cash conversion model as you allude to. The difference between us and Citrix in this area or GoTo in this area is that they enter annual contracts for a new subscription – however, a vast majority of their billing terms are either monthly or quarterly associated with that. At the same time, they're going to flip-flop between us where two-thirds of their deals are via invoices rather than credit cards. And then when their subscriptions come up for renewal, they turn to a monthly model where their customers pay monthly. ***So we see a lot of opportunity over time, as Bill mentioned, where we look to optimize the businesses over time to convert their cash conversion model to look more like ours***.

46. Analysts viewed the transition as a potential boon to LogMeIn. A July 27, 2016 Barclays report noted, "LogMeIn has better cash flow conversion, since substantially all of its contracts have annual billing terms, while GoTo was mostly billed on a monthly basis, but this represents an opportunity for FCF accretion." J.P. Morgan's July 27, 2016 report similarly stated stated, "Together the combined company is expected to be able to convert 25% of revenue to free cash flow, but that should go higher as we see the GoTo customers migrate more to the annual contract and cash collection structure of LOGM."

C.     **LogMeIn Closely Tracked and Managed Customer Renewal Before, During, and After the Merger**

47.     LogMeIn tracked renewal rates before and during the Class Period.  Gross renewal rate is calculated on an annualized dollar basis across all product lines as of the end of each period.  Throughout the Class Period, LogMeIn consistently reported that the gross renewal rate was 75%.  The Company internally tracked renewal rates by product but did not report them.  It also tracked but did not report its net renewal rate, which would take into account instances in which customers renewed at higher prices or engaged in add-on sales.

48.     Logmein had employees that focused on account services and billing who handled escalated customer concerns during the Class Period due to the problems Logmein finally disclosed at the end of the Class Period. After the termination for convenience clause was changed for smaller customers in February or March 2017, there was a lot of backlash from customers. Due to various changes described herein (and later confirmed by Logmein at the end of the Class Period), customers were calling in to cancel well in advance of their renewal, sometimes six months or the full year in advance.  Logmein employees who received these calls were required to enter the future cancellation date into the database.  The Company could run a report at any time and see which customers intended to cancel and when the cancellation would take effect.

49.     Logmein also had an internal team that was responsible for customer care analytics as well as retention analytics.  The team tracked and monitored KPIs (key performance indicators) for the Customer Success team, such as, the number of calls/chats (engagements), how long the engagements lasted, and they also analyzed performance from customer satisfaction surveys.   The Customer Success team was responsible for the onboarding of customers and retaining the accounts for customers of a certain size.  The size and name of these

AMENDED CLASS ACTION COMPLAINT
14

types of customers changed over time but the spend amount was typically around $50,000 annually and the accounts were called Major Accounts and later changed to Key Accounts.

50.     Retention analytics involved looking at individual products and trends and doing predictive modeling.  After the merger with the GoTo division of Citrix, the internal Citrix methodology and approach to data analysis indicated retention was declining much sooner than the LogMeIn data analysis.  By September 2017 there were significant changes in the metrics, and net new business and quarterly retention were net zero.  LogMeIn, however, only focused on renewal rates for customers due for renewal.

51.     Prior to the merger, LogMeIn had a history of price increases, which had a corresponding impact on renewals.  For example, in January 2016, LogMeIn increased the list price of its Pro product, causing its gross renewal rate to decline from 80% to 75%.

52.     Defendants scrutinized renewal rates.   For example, Defendant Herdiech elaborated on the Company's renewal tracking to an analyst during the Company's Q1'16 earnings conference call on April 28, 2016:

> [T]he decrease is mainly driven by a lower Pro renewal rate, which was planned. Last conference call, we discussed the repackaging of Pro designed to give more value to active users while knowing that casual users might not renew at the same rate. And that's what we saw in the quarter.
>
> . . .
>
> [O]ur renewal rate is something that we've consistent -- that we've been really consistent with and we're pretty conservative about how we calculate it. Specifically, our metric is a gross renewal rate, not a net renewal rate. So with a net renewal rate, we would get benefit when customers renew at higher prices or they have add-on sales. But with a gross renewal rate like the one that we report, we don't get that benefit.

53.     Analysts also closely monitored LogMeIn's reported renewal rate.  J.P. Morgan noted in its April 29, 2016 report, "Going forward, renewal rate trends bear watching, but for

now we take comfort in the fact that management has not assumed any improvement in renewal rates in its upwardly revised guidance."

54.    Because the gross renewal rate was measured across all products, the success of one product could drive the rate higher and mask any decline in another product.  For example, Defendant Bradley explained at the May 12, 2016 Jefferies Technology Conference that the Company's LastPass had "better renewal rates than almost we'd ever seen."

## V.    SUMMARY OF THE FRAUD

### A.    LogMeIn Began Converting Existing GoTo Customers to Annual Payment Terms in Q2'17 and Assured Investors that the Process Was Proceeding Well

55.    On July 27, 2017 Wagner announced that customer conversion to annual prepaid subscriptions was proceeding well.  During the Company's earnings call to discuss its Q2'17 financial results, Defendant Wagner stated: "In Q2, we also began testing conversion of existing customers to annual prepaid subscriptions, and *we are encouraged by the early results*." He added that the conversion this would "not only improves the company's cash flow through revenue predictability, but it also will help improve retention and simplify back-end business processes."

56.    On the same call, Defendant Herdiech reported that the combined company's gross renewal rate across all products remained at approximately 75% and reassured investors that the transition to annual payment terms was being handled well.  In particular, Defendant Herdiech engaged in the following exchange:

> **Analyst Tyler Wood**: And then one last one on those migrations from the monthly to annual. You talked about seeing some success early on. Could you give a little bit more color into what levers you've been using to kind of encourage those and maybe what you would think about using in the future there?

> **Defendant Herdiech**: Yes, sure. So the early successes, I think we're talking about is in the renewal channel. So GoTo had a passive renewal process where they relied heavily on the terms, the evergreen terms in their contract. And given they're 70% invoicing rather than e-commerce, they send invoices to their

AMENDED CLASS ACTION COMPLAINT
16

customers, and if they pay them, great. If they didn't, then they get involved after the fact. So what we've done is we've really aligned business practices around kind of the LogMeIn renewal process, where we're – *we have a team of renewal reps that 60, 90 days ahead of time will proactively reach out to customers to solidify the renewal. And at that time, they'll also work in the annual billing terms as well. So we just really started in June in earnest, and we're seeing good results so far*.

57.     Analysts took note of the Company's strategy to purportedly carefully transition GoTo customers from monthly to annual payment terms.  Northland's July 28, 2017 report noted, "the combined sales force has become more active in the GoTo renewal channel, contacting subscribers a few months ahead of renewal to lock in the renewal and attempt to get the subscriber onto annual terms."  RBC's July 28, 2017 report stated, "Importantly, we think the bias should remain to the upside given trends and as the GoTo base is moved to annual contracts, which we expect to be a several year process."

58.     As reflected in Piper Jaffray's July 28, 2017 report, analysts believed synergy realization was the primary driver of FCF growth, and migrating GoTo customers to annual payment terms would allow this trend to continue, stating: "Thus far we believe synergy realization has been the primary driver of FCF outperformance but also believe consolidation of payment terms toward annual billings can support continued, sustained FCF margin expansion."

59.     Piper Jaffray issued a report on August 6, 2017 after traveling with LogMeIn that it had a high degree of confidence in the Company's FCF targets due to the Company's purportedly careful transition to annual prepaid subscriptions, stating:

> Our biggest takeaway from travelling with management is a confirmation in our thesis that *management's targets around FCF margins carry a high degree of confidence*, which we believe will continue to be born out in results. We believe the biggest and most near term driver of FCF margin leverage will be the conversion of the company's entire customer base to annual billings terms. While the company has demonstrated meaningful success (arguably ahead of expectations) in transitioning net new customers (90% of new customers added in the period were on annual terms and 40% of the ecommerce channel), roughly 70% of the GoTo customer base is on monthly billings today. While this will

AMENDED CLASS ACTION COMPLAINT
17

clearly not happen in one fell swoop as ***the company has no interest in meaningfully disrupting retention rates and tarnishing it's shiny new brand***, we believe that this conversion will represent at least as much FCF leverage as the original synergy targets did. We also believe that management will have a better handle on this progress and comment more specifically around the analyst day in December.

60.     On September 13, 2017, Defendant Bradley stated at the Deutsche Bank Technology Conference that the Company planned to raise GoTo prices to drive growth and again reassured investors regarding the transition of GoTo Customers to annual payment terms:

So, when you look at the GoTo product space, they've not done nearly the pricing and packaging that we've utilized in the past. ***So we do believe that there's an opportunity beginning in next year to utilize price effectively as one of a few key growth drivers to try to accelerate the top line***. So, that's one of them.

* * *

***[W]e have a very deliberate plan and a specific plan to go out after these contracts, whether they are e-commerce or whether they are touch sales and convert them from a monthly payer 12 times a year to a one-time payer***.

And the first step we did was we took the new business and we changed it from the opportunity to pay it monthly, and we made it annual. And step two now is looking at this large base of renewal business and converting it over the next number of quarters.

61.     During the conference, Defendant Bradley was directly asked whether the transition would cause customer churn, and he assured investors that the Company was only taking ***willing conversions***.  He suggested that the Company may increase prices for monthly customers who refused to transition to annual payments "down the road" but assured that this practice had not yet been implemented:

[R]ight now because there – you have 12 opportunities to collect from these people, you ask the first time. If they get pushed back, you come back to them again. So ***we're just taking the willing conversions right now and down the road there's an opportunity and try to – you increase the monthly price if you don't go annual. That's an opportunity that we haven't implemented***, but certainly, I know companies that we buy subscription software from have utilized techniques like that in the past. And these are – because it's small-medium business, these aren't enormous size deals, with the exception of the customer engagement, they aren't seven-figure deals. They're often four- and five-figure deals.

AMENDED CLASS ACTION COMPLAINT

And so *it's not necessarily that much of a burden for the end-user* and in some cases, it's helpful for them as well. Instead of them chasing, 12 invoices a year, it's one. And so we've already – in the low-end it's much – it's – in some cases not even a conversation, people say okay. And we've got that expertise from doing it for 10 years at LogMeIn. So we have confidence that we can do it across a much bigger base.

**B.      LogMeIn Announced It Had Already Reached Its Three-Year FCF Margin Goal in Q3' 17, Yet Investors Remained Concerned About Revenue Growth**

62.      During the Company's earnings call on October 26, 2017 to discuss its Q3'17 financial results, Defendant Wagner touted the progress and favorable effects of the GoTo customer transition, stating:

Starting with operational integration, the third quarter saw continued progress, bringing together the teams, systems and processes that underpin our sales and marketing efforts and provide visibility into our business. That progress included, for the first time, a common view of our bookings, revenue and renewals, all key performance indicators needed to help us better manage the business.

\*\*\*

*Our sales and care teams also made very good progress driving the migration of former GoTo customers from monthly to annual payments.* Although we are early in the process, particularly with GoTo's large renewal base, *the initial results of these efforts are apparent in deferred revenue growth and stronger-than-expected cash flow in the quarter and for the full year*.

63.      On the same call, Defendant Herdiech noted that the Company's gross renewal rate across all products remained at 75% and also touted the progress and impact of the GoTo customer transition:

Additionally, these teams working with sales and customer care have made meaningful progress, driving the migration of former GoTo customers from monthly to annual billing. *We are early in the process, particularly with our large renewal base, but initial efforts are encouraging*. Our strong third quarter free cash flow was evidence of this progress. When the merger closed on February 1, we initially targeted 25% full year free cash flow margins. *After deliberate focus on this initiative, we are now raising our full year free cash flow outlook to 30% of revenue.* I'm particularly impressed when this integration work was completed while the company aggressively executed against its announced synergy plan.

AMENDED CLASS ACTION COMPLAINT
19

64.     When an analyst on the call took special note that the Company had raised its

FCF margin outlook to 30% for 2017, Defendant Wagner used it as another opportunity to praise

the GoTo customer transition:

> **Analyst Matthew George Hedberg**: The success post-GoTo has been impressive. I guess, Ed, it was great to hear you're increasing your free cash flow margins 30% this year. We didn't you'd get to that level until 2019 or later. I think when you originally closed GoTo, you talked about a 28% adjusted free cash flow margin. I believe it was by 2019. Can you help us think through, from this level, where could free cash flow go from here? Just any sort of like qualitative assistance would be helpful.

> **Defendant Wagner**: Matt, let me just jump in. I mean, clearly, from a free cash flow perspective, we are ahead of schedule. Exiting 2017, having already – we'll probably deliver close to $6 a share as we come out of the year. And yes, you were right, we had targeted originally in the upper 20s and then had kind of brought it up to saying like can we get to 30% on a run-rate basis. Certainly, that was a 3-year target, as you correctly reminded us. We've – *I think given that we've made this much progress this early and given that we've really just begun to convert the customer base, the GetGo customer base from monthly to annual, we certainly think that there's opportunity for us to expand over time*. So in terms of where we get to, I think we saw some work to do. We'll probably provide some more clarity on Analyst Day. But I think we are super pleased with the progress we've made on that front so far. *So yes, achieving a 3-year target in the first year is something we're really proud of.*

65.     On the call, Defendant Wagner also discussed the possibility for additional price

increases to help drive revenue:

> Yes, I think pricing and packaging has been part of a motion that we've introduced for – at least for the last 4-or-so years, and that's a discipline that we will continue to have as a combined business. So we will continue to kind of address it on a per case basis, product basis. So as an example, for instance, we introduced LastPass Family, which I just talked about on the call. That's an example where *it's not really a price increase per se, but it's a new tier. So it's better packaging, smarter packaging*. I'm really proud of the way the teams have thought through the different use cases of our product. *That's something we're trying to do across our portfolio*. So I do think that there are opportunities to do that, and we'll probably share more details about what plans we might have on Analyst Day.

66.     Analysts reacted positively to the Defendants' comments, believing that the

Company was accomplishing its strategy of transitioning GoTo customers from monthly to

annual payments with no indication that customers were coerced to accept annual payment terms and thus no indication that customer retention would be a concern.  As a result, analysts believed it would take several years to transition GoTo customers and the upward trend in FCF would continue.  An October 26, 2017 RBC report, for example, stated:

> FCF margins remain impressive: FCF margin was 32.8% (vs. 30.2% last qtr) and is now expected to be 30% for the year as we look for FCF margin to expand to 33%+ in 2019. Importantly, we think the bias should remain to the upside given trends and *as the GoTo base is moved to annual contracts, which we expect to be a several year process and benefit*. With FCF as our valuation metric, positive revisions could move our price target higher.

67.     Piper Jaffray likewise issued a report on October 27, 2017 similarly stating:

> While the revenue beat of 1.5% was in line with prior revenue beats of 0.7%-2.1% and exactly in-line with our expectations from our preview, the bigger surprise was the FCF beat of 40% which once again was extremely strong. Full year non-GAAP revenue and adj. FCF guidance was raised by $7M and $20M (midpoint), reflecting the beat during the quarter as well as *increasing confidence around conversion opportunity*.

> ***

> *While this will clearly not happen in one fell swoop as the company has no interest in meaningfully disrupting retention rates*, *we believe that this conversion can and will represent at least as much FCF leverage as the original synergy targets did (which is at least a 5 point tailwind).*

68.     Similarly, Cowen's November 3, 2017 report noted that, "We believe greater FCF margins should come as the co. continues to scale, and as it continues to convert more of the GoTo subscriber base from monthly contracts to annual (*which is currently in the third inning by mgmt's estimate*)."

69.     Despite the strong FCF performance, shares fell nearly 10% due to concerns over the Company's organic revenue growth.  RBC, for example, issued a report on November 9, 2017 stating, "We think the three biggest investor worries are: 1) could *organic growth be lower than expectations* at their analyst day next month? 2) does the chance of a larger acquisition signal an organic slowdown? and 3) if there is M&A activity, could FCF margins be at risk?"

70.     Stephens similarly issued a report on December 13, 2017 noting that "many investors had questions around top-line growth" and concluding that "management's primary goal at Investor Day is to clear up any questions around the sustainability of the long-term 10% revenue growth guidance."

C.      **LogMeIn Issues Disappointing Revenue Growth Guidance at Its Analyst Day, But Announced an Increased Dividend to Offset the News**

71.     At LogMeIn's Analyst Day on December 19, 2017, Defendant Herdiech discussed the impact of converting GoTo customers from monthly to annual payments, indicating that the process had just begun:

> So there's about a $30 million to $35 million impact in 2018 related to the conversion efforts that began this year. ***And as we've talked about we're still early in the process and to renew that to get through the renewal base, it's not only going take us through all of 2018. But it's going to take us into first at least the first half of 2019 as well.*** Bear in mind at the same time with regard to new business coming in the door, we're doing a great job at bringing that in on annual terms.

72.     In response to an analyst inquiry about the Company's efforts to improve retention, Defendant Wagner expressed that there was an upside in retention in the relative near term that was not factored into its guidance:

> **Bradford J. Mak**: Can you talk about the retention metrics. So 75% has been consistent for a long time, just where do you think you can get that to over time and what the leverage would be? Thanks.
>
> **Defendant Wagner**: Yeah, I think retention as I highlighted in my, it seems like a long time ago, in my opening remarks, we actually have developed the point of view that ***we think that there is upside in our retention numbers***. I think in the near term, it's, you know, we're modeling and they say where they are, especially ***as we're really focused on converting people from monthly to annual payments, and that has somewhat of a dampening effect on retention***. So we model where it is today, but ***we're optimistic that we can improve that in the relative near term***, that's not factored into any of these numbers of course, that's just not our approach, that would be upside.

73.     While the market reacted poorly to the Company's revenue guidance, analysts saw an upside due to FCF trends resulting from the GoTo transition.  J.P. Morgan issued a report

on the same day as the conference stating, "[t]he ***stock reacted negatively on management's 2018 and 2020 outlook for revenue growth*** (5-6%, 5-7% respectively) as expectations were elevated into the event based on consensus 2018 revenue of $1,166M compared to management's outlook of $1,135-1,150M." RBC reflected a similar sentiment, stating, "Net/net, while a slightly lower revenue outlook pushed shares down a few points, we like the setup for 2018 with beatable estimates (33 straight quarters beating estimates) and an attractive/improving FCF profile."

74.     On February 1, 2018, LogMeIn issued a press release announcing that it was increasing its quarterly dividend by 20% from $0.25 per share to $0.30 per share, partially, offsetting the news of the disappointing revenue guidance.

**D.      LogMeIn Surprisingly Reiterates Its Previously Issued Guidance for 2018, Leading Investors to Suspect a Latent Weakness Threatened the Company**

75.     During the Company's earnings call on February 15, 2018 to discuss its Q4'17 financial results, Defendants continued to report that the GoTo transition progressed smoothly. Defendant Herdiech reported that renewal rates remained at approximately 75% and affirmed the continued purported success of the GoTo customer transition, stating that deferred revenues were positively influenced by the "work we're doing on converting the GoTo renewal business from monthly to annual." He added, "we would expect to see [the progress] into Q2 as we continue to convert contracts and continue to work real hard selling the product."

76.     During the same call, an analyst asked if the Company intended to raise prices in 2018 and Wagner replied that the Company was open to the possibility:

> So yes, obviously, we think pricing and packaging, we think that's a lever that is not always used efficiently by a lot of SaaS companies. ***We do and something we're very scientific in our approach about. And I think we have a -- kind of we're really good at forecasting what that looks like, and it's something we consider almost a <u>proprietary expertise</u>, if you will***. But yes, I think there remains opportunity.

77.     Despite the progress with the GoTo customer transition and the positive financial results, the Company reiterated previously-issued guidance for revenue growth, leading investors to become concerned about a latent weakness.  As Piper Jaffray noted in a report on February 16, 2018, analyst Piper Jaffray reported that "[w]hile LOGM delivered another quarter of outperformance on both the top and bottom line, and slightly raised FY18 FCF guidance, *estimates for revenue growth were left unchanged* and margins ex-606 were slightly reduced which likely caused shares to trade down ~5% after hours."

78.     On this news, shares of LogMeIn declined $11.35 per share, or approximately 8.48%, to close at $122.45 per share on February 16, 2018, on unusually heavy trading volume. The next trading session, shares of LogMeIn declined $5.05 per share, or approximately 4.12%, to close at $117.40 per share on February 20, 2018, on unusually heavy trading volume.

E.     **LogMeIn Announces Its Positive Q1'18 Results, But Investors Remained Concerned Regarding Revenue Growth Guidance**

79.     During the Company's earnings call on April 26, 2018 to discuss its Q1'18 financial results, Defendant Herdiech attributed a $113 million quarter-over-quarter increase in cash to "seasonally strong renewal in our access business" and reported that the Collaboration segment grew 5% year-over-year on a pro forma basis.

80.     When analysts on the call inquired when renewal rates would return to historical levels, Defendant Wagner assured investors that renewal rates would remain consistent:

**Analyst Abhey Rattan Lamba**: Bill, on the topic of gross renewal rates, you said in the past that you would like to return that to historical levels over time. Can you talk about some of the initiatives you have in place to realize that goal? And what are some of the near-term impediments that we should be thinking of in increasing that -- those rates?

**Defendant Wagner**: Yes. So actually, our renewal rates are at our -- at the average where they've been. So that's been pretty consistent for quite some time. It's 75%. We do think and we are pleased with how renewals performed overall in the quarter. That said, as we've talked before, as we continue to migrate

customers from monthly to annual, with Jive coming onboard, which had very strong renewal rates, over the long term, we think there's opportunity to work on that and improve on that but certainly no impact this year. ***We expect renewal rates to be pretty consistent as we work through the year***.

81.     Analysts, however, continued to be concerned about the Company's revenue guidance.  On April 27, 2018, Cowen issued a report stating, "LOGM reported good 1Q upside to Street revenue and billings forecasts. Unfortunately, this was derailed by confusing 2018 guidance that reflects essentially no change to organic revenue expectations (which remain subpar), and lower than previously indicated EBITDA/EPS. LOGM shares declined 8% AH."

82.     During the JP Morgan Global Tech Conference on May 15, 2018, Defendant Wagner asserted that the Company was not insisting GoTo customers convert to annual payment terms and that it was taking its time in transitioning customers.

One of the things that we believe – and in SaaS – SaaS is a subscription that people should pay for the subscription upfront. That was LogMeIn's policy. ***The GoTo policy was monthly subscription – or annual subscriptions, but monthly pay. And customers can still do that, but we've incented the sales force to migrate those customers to annual pay***. That's obviously driven significant increase in cash flow, ***but we haven't really insisted that people do that***.

***So we're also being, I think, taking our time to do it***. We don't need to. We're expanding cash flow and margins as we go nicely. There's still a lot of runway there, but ***we're not telling people when they renew, okay, you have to move to an annual subscription. I mean, we're giving that option, giving incentive. But if people push back and don't want to do it, then that will be okay, at least in the short term***.

**F.     The Truth Begins to Emerge Through a Partial Corrective Disclosure While Defendants Continued to Issue False and Misleading Statements**

83.     On May 23, 2018, Piper Jaffray issued a report following a full day of investor meetings with Defendants Wagner and Bradley.  The report partially revealed the truth that LogMeIn had strong-armed customers into annual payment terms and was having greater than

anticipated issues retaining these customers as their contracts came up for renewal, and

competitors offered more flexible options:

> While the collaboration market appears to be growing strongly across the board, we believe that certain ***disruptive vendors such as Zoom have been able to gain some share*** in the market. While we believe that the market remains large enough to accommodate multiple successful vendors it appears that during LOGM's integration of the go to assets there existed some vulnerability that the company is focused on addressing with a combination of new product as well as pricing and packaging flexibility. We would expect and anticipate organic acceleration in the collaboration business as better retention combines with strong new bookings.

***

> ***While management had made a push on contract annualization of the GoTo base, we believe that competitive pricing flexibility has made the base a bit more vulnerable than in past years.*** We believe that these headwinds have been modest and are being directly addressed.

> Additionally, ***we believe the company has made a move to be more flexible on business terms and remove friction from its renewal process and buying experience.*** The combination of better products, better prices and more flexible contracting terms should benefit the company.

84.     On this news, shares of LogMeIn declined $2.35 per share, or approximately

2.13%, to close at $107.75 per share on May 24, 2018, on unusually heavy trading volume.

**G.     The Truth Is Revealed: Defendants Admit They Aggressively Forced Customers Into Annual Contracts and Changed Payment Terms, Alienating Customers, and Forcing Them into Competitors' Arms**

85.     On July 26, 2018 LogMeIn held an earnings call to discuss its Q2'18 financial

results. On the Call, Defendant Wagner revealed that, contrary to prior representations, the

Company "aggressively mov[ed] customers from monthly to annual payments," alienating those

customers and causing them to seek competitors' services when their contracts became due for

renewal:

> I'd like to begin my comments discussing an area where our performance in the quarter did not meet our expectations, specifically the traditional Communications & Collaboration business, where ***our combination of imperfect execution and some hangover effects of last year's merger with the GoTo business, led to disappointing renewal rates***.

AMENDED CLASS ACTION COMPLAINT
26

As we moved through the quarter, it became increasingly clear that some of those business practices we put in place following the merger were negatively impacting renewal rates. *Aggressively moving customers from monthly to annual payments, changing business terms and conditions and barriers we created to the auto-renewal process all contributed to friction for our customers and made us harder to do business with*.

In addition, we failed to deliver some planned product enhancements, and frankly, were slow to address some product quality issues that crept into the product last year as we merged and realigned engineering teams. The impact of these issues was amplified by *competitors who took advantage of these execution challenges and successfully targeted our customer base. . . . By the second half of the quarter, these performance trends became clear and we recognized the need to take corrective action*.

Heading into Q3, we made changes in leadership, and *I personally began to work more closely with the team to overhaul our business practices, made changes to pricing and packaging and increased our engineering team's focus on delivering on key product initiatives for our Collaboration products*. Many of these changes are already in place, with others expected to be fully implemented later in the second half of the year.

However, we believe it will take several quarters for these actions to meaningfully impact renewal revenue. *We therefore expect that growth in our Collaboration business will slow in the second half of the year*. This performance, combined with FX headwinds impacting our entire business, has resulted in us taking a more conservative view of the second half of 2018, and thus, we are lowering our outlook for the full year. Ed will provide more details in a few moments.

Again, *this performance is disappointing, but I feel it's mostly due to our own executional missteps*. We are confident we've identified the specific causes and have already taken steps that we believe will lead to better operational performance exiting the year. Importantly, these execution issues were limited to one area of our business, and we saw very strong performance and encouraging long-term trends across the rest of the company, especially in our key strategic growth drivers.

86.     Despite the decline in renewals in the Collaboration segment, Defendant Herdiech noted that the gross renewal rate across all products remained at approximately 75%. Revealing the misleading nature of the Company's reported gross renewal rate, Herdiech noted, "in our Collaboration business, renewal rates declined in the quarter by approximately 350 basis points, which was offset in our total company renewal rate by improved retention in our Identity and Access Management business." Defendant Wagner similarly discussed the strength in renewals

in other segments, stating, "[a]nd I think if we had actually performed, if the Collaboration business had – we had executed in Q2, I think, overall at the company we'd be looking at renewal rates that are closer to 80%."

87.     Contrary to the Company's prior false statements that switching from monthly to annual payment terms was optional to customers and that the Company was executing the transition without increasing customer friction, Defendant Wagner revealed that the Company had pushed customers from monthly to annual payments, changed business terms like the termination for convenience, and forced customers to sign new purchase orders rather than auto renewing, stating:

> [T]here are really 3 drivers that we saw really manifest themselves as we worked through the quarter. First was changes to the business practices that we made last year and earlier this year. Number two was some slipping product deliverables. And then third, I would say would be competition and taking advantage by really kind of attacking that base. So let's talk about each of those. So first, business practices. As you know, last year, we put a lot of new practices in place, namely ***pushing customers to move from monthly to annual, changing business terms, removing things like termination for convenience. We forced customers to sign new purchase orders rather than auto renewing. So I think a lot of that manifest as these customers came up for renewal in their first year, kind of post-transition. We saw that happen in the quarter***. So all those things have been addressed and already changed, and we expect to see that effect pretty quickly. On the product side, the second area, we realigned product management and engineering resources last year as part of the merger. And frankly, I think the team was a little slow to introduce the new functionality that we had planned and address some quality issues, as I mentioned in my remarks. So examples like things like connect time and audio quality. We were also late shipping a couple of enhancements that we had planned. So all those things, I think, contributed. Those are the second things that contributed. And those 2 things together, I think did open the door for competition. And keep in mind, as you know, Will, we compete in a pretty fragmented market and that really hasn't changed, from Skype for Business, WebEx, Zoom, those are certainly probably the 3 competitors we see most. We compete with them each and every day and we certainly win our fair share. In fact, our hunter teams, our new business teams, performed well in the quarter. ***On the renewal side though, I would say that probably Zoom was especially aggressive in recruiting our ex-salespeople who know our customers and going after them with really low prices and flexible business terms***. So as we work through these changes, I think it's going to take several quarters for them to play out, but a lot of them are already in place and are already in play.

\*\*\*

[S]o I made a change in the general manager, kind of the person who's running that business. And that's something which we will be backfilling this quarter. Engineering and product changes that we also made in leadership, and those are already done and new people in place in those roles. So – and they've been – they began in June and are working it already. And of course, given the performance, as you can imagine, *I personally really started digging in and to make sure that we had our arms around exactly what the cause was and we have a really clear plan on how to address them and fix them*.

88.     An analyst on the call inquired about whether the Company's changes would be

"too-little-too-late."   In his response, Defendant Wagner reiterated that the problem was an

"execution issue" and that he was confident the issue could be resolved:

> [A]s I said, *this is an execution issue*. This is not a market issue. This is not a long-term systemic issue. We didn't execute as well as we needed to in the quarter. Long term, this market is a big market. We have -- we think we have a leadership position in this space, with great products, great people and we have a plan to address the short-term execution. So while I think there is headwind in the second half of the year and I'm as disappointed as anyone, certainly, that we had to adjust guidance down. But from a plan to fix that, we feel really confident that, that's in place at a very detailed level. And *I've been personally involved*, so I feel very comfortable getting on this call and saying we will take care of that.

89.     On the call, Defendant Herdiech admitted that the Company had visibility into

this issue because it was tracking renewals "a couple different ways:"

> **Analyst Daniel Robert Bergstrom**: could you review the efforts around moving the GoTo base from monthly to annual contracts? And then how did that progress over the last year? Is there some measurement or percentage of the user base converted or some way to think about that? And then are we through with that conversion effort at this point?
>
> **Defendant Herdiech**: *So we were tracking it a couple of different ways with respect to renewals in terms of the kind of the dollar amount that we were converting*. And in Q3, Q4, Q1 and into Q2, *we converted between $10 million and $15 million a quarter. And that took the renewal base from -- in the 30% kind of annual to in the 50%*. And as you can imagine, we kind of relaxed our business rules. There's still opportunity to do that, but we're being really flexible. And so we would expect that activity to come down in the second half of the year. At the same time, we are also kind of lapping our efforts to do this. *This would be our -- the second half of the year would have been our second time through the renewal base. So we were originally planning for that to be lower anyway*. And so there'll be some impact, but that's where we're at.

90.     Moreover, contrary to prior false statements that the Company had a team of renewal representatives that contacted customers 60 to 90 days in advance of their renewal date to offer them a non-mandatory option of switching from monthly to annual payment terms, and that customers welcomed the change, Defendant Wagner admitted in an exchange that: (1) customers were renewed at the end of the quarter in 2Q'17 without understanding the new terms, and now, a full year later, they understood and were terminating their contracts; and (2) large customers were being forced to sign new purchase orders to renew:

**Analyst Alexander Kurtz**: I just want to go back to the business practices that you're mentioning on the call impacting the renewal rates. I mean, I was just going to take the other side of this. *I mean, obviously, you thought a long time about implementing -- moving customers to annual contracts and the auto renewal. So I just -- it seemed like 6 months ago, these were good strategies that you want to implement in your installed base*. And I'm just wondering if it just seems a little maybe reactive to all of a sudden just stop it or there could be value in that strategy longer term once the products are kind of brought up to speed? So I'd just like your perspective on maybe pivoting away from this stuff that maybe a couple of quarters ago seemed like reasonable business logic.

**Defendant Wagner**: Yes, I mean, first of all, I appreciate the thoughtful question. I think we certainly want to be thoughtful on our approach to this. But look, we also had done the work to identify where the friction was. *So we actually spent the better part of the second half of the quarter really talking to customers, getting that feedback, and we really knew -- and it wasn't just the monthly to annual payment issue that was driving it, but it was some other things that we did. And really the – one of the things that we uncovered was that the former LogMeIn customers were really conditioned to that. Whereas some of the GoTo customers experienced it for the first time last year and then they came up for renewal, and they found a lot of friction in that process. So that's really where we feel a lot of confidence. And again, we know because the customers told us when we dug in. And so as I dug in, saw that performance, it gave us the confidence that we should modify those business practices and terms*.

***

**Analyst Raimo Lenschow**: Can I stay on that subject, sorry? One thing that I'm kind of still confused about is why did that show up in Q2, not in Q1, if like it's been going on for a while? Can you talk to that, please?

**Defendant Wagner**: So that's really – we started this process late in – if you remember last year, *we started converting a lot of those customers late in the second quarter last year. So a lot of those customers now, for the first time, they*

*came up on to their renewal, and we -- they were coming up last year for the renewal late in the quarter. They get a notice like, time to renew and here's your terms, and they didn't have a lot of time to think about it and they renewed. Now they've come back. They've been there for a full year. They know the terms. They know their renewal is coming up, and I think it just gave them more time. In the second half of the quarter, again, is where we first started lapping those customers.* That's why we were – we wanted to adjust guidance down and make sure that we have a plan in place to eliminate that friction.

**Analyst Raimo Lenschow**: Is there – if I think about that, is there also like GoTo was slightly higher in the market – not the enterprise, as you always pointed out, but slightly higher up in the market than you did. So is there a kind of, in a way, you're discovering that there's slightly different behavior, where in the low end of the market, you were just able to squeeze it through and there was no discussion, while here in that mid side of the market, you kind of have more – you needed to be slightly more careful? Is that the right way to think about it?

**Defendant Wagner**: Yes, I think that's a fair comment. The base isn't really that different. But again, *for those larger customers, we put a lot of processes in place, like we made them sign -- go back and sign POs just to renew what they already had or to add on seats. And as we look back on that, we probably shouldn't have done that, and that's execution that's quickly fixed*. So – but I think that's a good observation.

91.    LogMeIn's pattern of aggressively forcing customers into annual contracts is confirmed by consumers who took to internet chat boards to lodge their complaints. For example, one consumer's GoToMyPC price jumped from $203 per year to $460 per year.[5] LogMeIn told the customer that the previous rate was a promotional price, even though the customer had been paying that price since 2015.  LogMeIn informed the customer that it was not removing monthly plans as an option but that discounted rates would only be applied to annual plans going forward.

92.    One angry customer reported, "[LogMeIn] raised my GOTOMYPC plans rate from $300.00 to $2,000.00. That says it all. Needles[s] to say I canceled my service. I was a customer for 13 years but that seems to not mean anything to them.  I guess since LogMeIn took

---

[5] *See* https://www.reddit.com/r/sysadmin/comments/
7na538/gotomypc_price_jump_203_a_year_to_460_a_year/

over GOTMYPC everything has changed.  It is unfortunate that companies like this just decide to become greedy and try to take advantage of their customers."[6]

93.      Another customer complained, "I have it in writing that my pricing was good as long as I was a GoToMyPC customer. LogMeIn bought GoToMyPC.  They are breaking all legal pricing agreements.  …Spent an[] hour on the phone and the[] best they could do was 40% off the[i]r heavily inflated rate of over $400.00 for only 2 computers. Which is still double then what I was paying and what I have in writing that my pricing will not go up."[7]

94.      One customer wrote "I cancelled my account due to the price increase and they billed my closed credit card[[8]] and I cannot get a refund." The customer noted "There are more than 1800 complaints about the price jack of over 400% in the past 6 months."[9]

95.      Analysts were stunned by the news, and questioned management credibility regarding the transition. A July 27, 2018 Cowen report noted that "mgmt credibility is likely at all-time lows."  It stated, "The 2Q report was a big surprise, and our bullish near-term call was clearly wrong."  On the same day, Northland issued a report noting:

---

[6] *See* https://logmein.pissedconsumer.com/huge-price-increase-201811081396650.html
[7] *See* https://logmein.pissedconsumer.com/broke-written-contract-not-to-raise-price-with-gotomypc-201811121398616.html
[8] A June 2, 2016 article in ComputerWeekly noted this practice, stating:

>Some customers have attempted to side-step LogMeIn's auto-renewal procedures by not updating their payment details when the credit card linked to their account expires, only to find their new card has been charged anyway.
>
>The company's terms and conditions do state that it will, from "time to time", take steps to check the authenticity of customers' credit card details using auto-update software to ensure the payment information they have is up to date and accurate.
>
>This practice has been called into question by forum users and customers that Computer Weekly has spoken to directly, but a LogMeIn spokesperson denied any wrongdoing.

[9] *See* https://logmein.pissedconsumer.com/scam-gotomypc-201811261408581.html

While most product lines met or exceeded plan in Q2, the largest product line consisting of the GoToMeeting offering stumbled as *the company tried to force customers to accept new contract terms* and missed shipping some product enhancements. The resulting weakness in bookings has driven down revenue guidance for the year by 3% and $0.02 off EPS.

\*\*\*

Starting this time last year, renewing GoTo collaboration customers were *required to sign annual contracts* (whereas the prior owner, Citirix, allowed monthly billing). Given the limited time to respond, many took the annual contract but some chose not to renew a year later. This impacted billings and revenues going forward and hence the guide. While the company has switched to a "however the customer wants it" billing process, we believe it will be difficult to quickly resign these customers as many went with competitors such as Zoom (which has hired some GoTo sales people).

96.     Analysts suspected that "[t]he issues [were] brewing for several quarters now with a departure from the more typical 'beat and raise' results that [analysts and investors] had been used to for years prior to the GoTo acquisition," as noted by an RBC report on July 27, 2018.

**H.     Former LogMeIn Employees Confirm LogMeIn Knew GoTo Customers Were Cancelling at Greater than Anticipated Levels Due to the Change in Payment Terms**

97.     Logmein had employees that focused on account services and billing who handled escalated customer concerns during the Class Period due to the problems Logmein finally disclosed at the end of the Class Period. After the termination for convenience clause was changed for smaller customers in February or March 2017, there was a lot of backlash from customers. Due to various changes described herein (and later confirmed by Logmein at the end of the Class Period), customers were calling in to cancel well in advance of their renewal, sometimes six months or the full year in advance.  Logmein employees who received these calls were required to enter the future cancellation date into the database.  The Company could run a report at any time and see which customers intended to cancel and when the cancellation would take effect.

AMENDED CLASS ACTION COMPLAINT

98.     Logmein also had an internal team that was responsible for customer care analytics as well as retention analytics.  The team tracked and monitored KPIs (key performance indicators) for the Customer Success team, such as, the number of calls/chats (engagements), how long the engagements lasted, and they also analyzed performance from customer satisfaction surveys.   The Customer Success team was responsible for the onboarding of customers and retaining the accounts for customers of a certain size.  The size and name of these types of customers changed over time but the spend amount was typically around $50,000 annually and the accounts were called Major Accounts and later changed to Key Accounts.

99.     Retention analytics involved looking at individual products and trends and doing predictive modeling.  After the merger with the GoTo division of Citrix, the internal Citrix methodology and approach to data analysis indicated retention was declining much sooner than the LogMeIn data analysis.  By September 2017 there were significant changes in the metrics, and net new business and quarterly retention were net zero.  LogMeIn, however, only focused on renewal rates for customers due for renewal.

100.    Confidential Witness 1 ("CW1") was an Account Executive who started with Citrix in early 2015 and continued in the role with LogMeIn following the merger until May 2018. CW1 reported to Rick Johnson, who was later replaced by Manager of Corporate Sale Jerry Ullibari.  Ullibari reported to Jesse DeMund, who reported to VP of Sales Tom Beswick.

101.    Prior to the merger, CW1 handled both new business and growing sales to existing customers.  After the merger, CW1 worked strictly on growing business with existing customers, while another team worked on obtaining new accounts.  CW1 was assigned a "book of business" in salesforce.  CW1 worked with small and medium business customers.

102.    CW1 took a leave of absence from March 2017 to July 2017, and when CW1 returned LogMeIn was transitioning monthly payment terms to annual upfront payments.  CW1

explained that Citrix customers were required to sign a 12-month contract and after the first year, customers could cancel at any point with 30 days' notice, and customers typically paid monthly. CW1 said this transition was beginning the second half of 2017 and then was pushed more aggressively beginning in 2018. CW1 said customers with credit cards on file were charged the annual amount.

103.   CW1 believed there was some communication from the Company about the change, although customers were upset.  CW1 believed the two biggest reasons for lower retention was the transition from monthly to annual contracts and the annual upfront payment.

104.   CW1 recalled that at some point in the second half of 2017, the Director of Renewals, had a meeting with CW1's sales team. CW1's sales team expressed to the Director that customers were not happy about the switch from monthly to annual and the requirement to pay annually upfront, and that customers were cancelling as a result.  The Director told CW1's team that customer losses were expected as a result of these changes.  CW1 did not believe it should have been a surprise to LogMeIn that retention rates decreased.

105.   CW1 also explained that customers purchased various services over time which were not co-terminus, meaning that there were multiple contract dates and renewal dates.  CW1 explained that this made it difficult for customers to cancel everything at once, and customers did not typically cancel all services at once.  CW1 said this was inconvenient to customers, a waste of time and a horrible way to do business.

106.   Confidential Witness 2 ("CW2") was a Customer Service representative at Citrix beginning in 2014 and continued in this position after the merger with LogMeIn until February 2018.  CW2 reported Troy Birotte, who was later promoted to a quality assurance position. CW2 then reported to Chris Gugliamo, who reported to Head of Customer Care Seth Woltz. CW2 believes Woltz reported to SVP Scott Romesser.

AMENDED CLASS ACTION COMPLAINT

107.   CW2 initially provided technical support, support to e-commerce customers and responded to customer  inquiries.  CW2 held this position two years and then was asked to head a dedicated email team that was still part of the Customer Care department.  In this position, CW2's team focused on responding to customer email inquiries or routing those inquiries to appropriate departments.  CW2 handled customer emails for GoTo products, and routed emails about LogMeIn to a person who could address those issues

108.   CW2 confirmed that LogMeIn was converting the Citrix customers from monthly to annual payment terms, which was referred to as M2A (monthly to annual).  CW2 said the switch was done in waves beginning in approximately April 2017, starting first with e-commerce customers, then the Corporate Accounts under $10,000 and later Corporate Accounts under $20,000.

109.   CW2 confirmed that emails were sent by marketing to notify customers of the change.  CW2 claimed a large number of emails "bounced back" as the Company did not have updated emails for all customers.  As such, CW2 said customers were "livid" when charged the full annual amount upfront because they did not see the notification.  CW2 said e-commerce accounts had credit cards on file so these were easy to convert first to annual payment.  CW2 said customers had 30 days after the renewal to cancel the account and a number of customers cancelled right away.  CW2 also noted that LogMeIn eliminated the termination for convenience clause which made it more difficult to cancel.

110.   CW2 said an additional problem with the auto-renewal was that if the credit card was expired, the Company cancelled the account.  This led to unhappy customers who could not access the products for business purposes and were upset that the Company did not contact them to let them know the credit card was expired.  CW2 sorted emails when he first arrived at work and customers complaining about lack of service were always first priority each day.  CW2 said

oftentimes these were expired credit cards and once a new credit card was on file, the service was restored.

111.    CW2 forwarded all requests for cancellation to Account Services.   Customers wanting to cancel were sent to a specialist that would attempt to keep the customer but if unsuccessful, the specialist would then process the cancellation.   CW2 said the email requests from customers for cancellations increased after the M2A switch began.   CW2 explained that customers included the reason they wanted to cancel in the email and he estimated 80 percent of the cancellation requests were the result of the M2A.   CW2 stated that after a long weekend, there could be 300 to 400 cancellation request emails from customers in the queue.   CW2 believed that due to the volume of cancellation requests the M2A switch must have resulted in lost revenue at LogMeIn

112.    CW2 also noted that LogMeIn also raised prices on products.   CW2 believed the price of GoToMyPc was raised twice in one year.   CW2 said that LogMeIn even raised prices for "grandfathered" contracts where the customer had been told the price would not change.   CW2 said some customers cancelled due to price increases.   CW2 recalled seeing emails in which customers requested cancellation citing the price increase and saying they did not use the product enough to justify the increase.

113.    Confidential Witness 3 ("CW3") began working with Citrix in 2008 and continued on with LogMeIn after the merger until May 2017. CW3 was Director of Sales, Western Region at the time of the merger and continued in this role with LogMeIn. CW3 reported to VP of Sales Tom Beswick (legacy Citrix located in Arizona) with a dotted line to SVP of Sales Larry D'Angelo, who reported directly to Wagner.

114.    CW3 had oversight of the inside sales teams located in Tempe, AZ and Santa Barbara, CA.   CW3 said the inside sales team was divided into Eastern and Western regions and

AMENDED CLASS ACTION COMPLAINT

CW3 was responsible for the Western division of the United States.  Hannah Young (located in Raleigh, NC) was CW3's counterpart in the Eastern division.  CW3 explained that inside sales was responsible for customers with one employee to 1,000 employees.  CW3's team sold add-on and cross-over products to existing customers.  CW3 said there was an Enterprise Sales team managed by Jeff Johnson and Tom Beswick that traveled to meet with larger customers.

115.    CW3 said the merger of GoTo with LogMeIn happened quickly, without a plan and the integration was done terribly.  CW3's division at Citrix had been told for approximately one year that it was going to spin-off into Citrix Online; however, one to two months before the merger with LogMeIn, employees were notified and it was finalized quickly.

116.    CW3 said that immediately after the merger of GoTo with LogMeIn, the sales people sold all LogMeIn and GoTo products.  Sales people were expected to sell all products with minimal training.  CW3 said three people from Boston were flown out to train inside sales about the products but these people were not trainers and there was no clear plan for training. CW3 said the training was a two to three day seminar by product personnel.  CW3 recalled that the company quickly pivoted from having the sales people sell all products to separating the products into groups (such as collaboration, chat and/or identity/access products).  CW3 said this transition was happening at the time CW3 left the company.

117.    CW3 stated there were several changes LogMeIn made immediately after the merger.  First, CW3 said LogMeIn changed the policy so that all customers needed to pay upfront with credit cards rather than be invoiced, whereas Citrix allowed for invoicing.

118.    CW3 explained that under Citrix if a customer signed up for a service on a particular date any other products or services purchased at later dates had the same renewal date. For instance, if a contract was entered into on January 1, 2018 any products or services added throughout the year also came up for renewal on January 1, 2019.  CW3 said that LogMeIn had

customers sign new contracts for each new product with a new start date.  As such, customers

had a various renewal dates to track which made it more difficult for the customer to cancel or

terminate its relationship with LogMeIn.

119.    CW3 said LogMeIn has a long history of raising prices on customers without

informing the customer, which CW3 described as price gouging.  CW3 said insides sales people

were told to escalate customer complaints to the retention team if necessary.

120.    CW3 saw indications of decreased renewal rates before CW3 left the company in

May 2017.  CW3 said renewals were continually discussed during senior leadership meetings,

which were attended by all Director-level and above personnel (in all departments not just sales).

CW3 confirmed Wagner attended these monthly meetings.  CW3 recalled that revenues were no

longer a main focus and instead, growth was the main focus during these meetings.   As an

example, CW3 said that the product LastPass was growing exponentially.   CW3 noted that

LastPass was categorized with other products that had small growth so that there was an

appearance that overall the product line was growing.

121.    CW3 said that it was often discussed during the senior leadership meetings that

the GoTo customers were unhappy with the changes noted above.  It was acknowledged that this

was resulting in a loss in revenue.  CW3 said that the leadership response was that change is

difficult and that this is the direction of the industry believing that competitors would likely

follow.  CW3 said LogMeIn felt it had "stop gaps" in place that would make up for the lost

revenue in other areas.

122.    Confidential Witness 4 ("CW4") began working with Citrix in November 2015 as

VP of Customer Success and continued in that position after the merger until October 2018.

CW4 reported to Scott Romesser, SVP of Customer Success, who reported directly to Defendant

Wagner. CW4 was responsible for customer experience and retention for accounts spending more than $10,000 annually worldwide.

123.    CW4 confirmed there were a number of practices put in place by LogMeIn right after the February 1, 2017 merger that impacted customer retention. CW4 objected to the implementation of these practices and ultimately left the company due to these practices. CW4 said there were three primary practices that resulted in decreased retention: (i) eliminating the termination for convenience clause; (ii) the shifting of customers from monthly to annual contracts; and (iii) the assignment of renewal reps to accounts.

124.    CW4 explained that Citrix essentially had annual contracts with customers but allowed termination at any time with 30 days' notice. Since customers mostly paid monthly, the contracts functioned as month-to-month contracts and customers could cancel at any time. CW4 explained that while it appeared easy for Citrix customers to cancel, it was not that easy to transition to a new tool. As such, CW4 said Citrix typically transitioned customers after cancellation such that the company would begin by decreasing the number of licenses and in actuality, the cancellation would occur over a longer period than 30 days.

125.    CW4 confirmed that LogMeIn eliminated the termination for convenience clause and transitioned customers from monthly to annual payments. CW4 said the switch from monthly to annual was supposed to be the choice of the customer, but customers only had 30 days to decide. Since it takes longer than 30 days to transition to another tool. CW4 said customers did not feel as if there really was a choice. CW4 explained that overall the price was approximately five percent higher for customers that continued paying monthly.

126.    CW4 confirmed that LogMeIn also transitioned any customers still being invoiced to credit card payments. CW4 did not recall customers objecting to credit card charges as much as the conversion from monthly to annual and eliminating the ability to terminate with 30 days'

notice.  However, CW4 said the cumulative effect of having one change after another right after a merger made customers unhappy.

127.    CW4 said LogMeIn executives were warned that these practices would result in decreased retention rates, and while executives acknowledged there would be some attrition they believed the cash flow overall would be higher and more beneficial to shareholders.  CW4 stated that when executives were presented with data about the drastic decline in retention, the reaction was "crickets."

128.    CW4 explained that in addition to the switch from monthly to annual and the elimination of termination for convenience, the third change that customers did not like was the assignment of a Renewal Representative to the account.  CW4 explained that the Renewal Representative was responsible for contacting the customer about upcoming renewals, signing a new contract and the amount that needed to be paid upfront for renewal.  CW4 said customers did not like dealing with a person other than the Sales Representative and some customers asked that the Renewal Representative stop contacting them.

129.    CW4 said Romesser fought really hard and objected to the above changes. According to CW4, Romesser was looking at the data from "day one" after the implementations and had a team analyzing data in order to illustrate the impact of these changes.  CW4 said Amy Dodge was on the team that conducted analysis for Romesser.  Romesser presented this data on numerous occasions to Defendant Wagner, Defendant Heirdiech and Chief Sales Officer Larry D'Angelo.  CW4 recalled being in Dublin with Romesser in March 2018 and Romesser showed CW4 numerous emails from these three individuals regarding the data.  CW4 did not know when Romesser first began presenting this data to these individuals but CW4 knew Romesser began looking at the data right after the changes were made.

130.    CW4 was later assigned to a Task Force assembled to fix the retention issues at the company.  CW4 believed this Task Force was formed in May 2018, but was not certain about the date.

131.    Confidential Witness 5 ("CW5") was employed at Citrix for approximately eight years before the merger, and at the time of the merger was a Senior Enterprise Account Representative.  CW5 reported to Director of Sales Jeff Johnson who reported to Chief Sales Officer Larry D'Angelo.  D'Angelo reported to Defendant Wagner.

132.    As an Enterprise Account Representative, CW5 worked on bringing in new business and add-on sales to existing accounts.  CW5 said Enterprise accounts were defined as 1,000 employees or more and $10,000 sales or more each year.  CW5 said there was also a SMB team that worked with accounts with fewer than 1,000 employees.  CW5 had customers that paid quarterly and some that paid annually and small customers typically paid monthly.

133.    With Citrix, CW5 typically had 180 accounts, approximately half of which were current or active.  After the merger LogMeIn, some of CW5's core accounts were taken away and assigned to representatives in Boston.  CW5's sales quota with Citrix was $800,000 annually divided into four quarters at the time of the merger.  CW5 was a top sales performer and always met or exceeded the quota each quarter.  LogMeIn increased CW5's sales quota to $860,000 but still divided the total into four equal parts for each quarter.  CW5 did not achieve CW5's quarterly goals in Q3'17 or Q4'17 for the first time.  CW5's Q3'17 sales were approximately 50 percent of CW5's quota and CW5's Q4'17 sales were lower than 3Q.  CW5 said there were approximately 10 to 12 people on CW5's Enterprise sales team and only two sales people met quotas in Q3'17 and Q4'17.

134.    CW5 said there were four total Enterprise sales teams in Tempe and Santa Barbara and a total of approximately 40 to 50 sales people.  At first, CW5 could see everyone on

the Enterprise sales team's sales on a dashboard in salesforce.com, but by the end of 2017, CW5 could only see sales reps in Tempe and Santa Barbara, not the sales of anyone in Boston. CW5's team only reached 50 percent of its overall sales goals in Q4'17. CW5 believed Enterprise represented more than half of LogMeIn's revenue. Despite the difficulties with the Enterprise team achieving sales quotas in Tempe and Santa Barbara, CW5 was told that the Enterprise team in Boston was achieving record numbers in QQ'17, Q3'17 and Q4'17.

135.    CW5 said the typical sales cycle for adding a new account could be six to eight months or even longer. CW5's average deal size while with Citrix was $8600 but CW5's average deal size decreased with LogMeIn to $1250. CW5 believed this was because various accounts were taken away but CW5 was also not allowed to sell all Citrix/LogMeIn products. such as, LastPass and BoldChat products. CW5 explained that these products were the most difficult for customers to cancel because it was more ingrained in the customer's system. CW5 explained that LastPass holds all of the customer passwords and automatically connects the user to various applications, and had a high renewal because people don't want to have to re-enter passwords.

136.    CW5 had been through acquisitions before and knew it could be bumpy but thought CW5 could help customers transition. CW5 was relieved when CW5 was laid off in January 2018 because it had become a nightmare. CW5 explained that customers were not happy with a number of changes made by LogMeIn right after the merger.

137.    CW5 was not notified that the Company was going to start charging customers for the entire annual amount up-front. CW5 said customers were receiving notification or bills that they were expected pay the annual amount upfront. CW5 was later told that emails were sent to customers to notify them of the changes. CW5 said customers missed these emails because it was sent to their IT person as opposed to the billing department. CW5 said IT personnel

typically don't read these as these are typically spam.   CW5 began receiving calls from customers "screaming and yelling" about these changes approximately 30 days to 60 days after the merger was finalized in February 2017.

138.   CW5 had some customers that did not have credit cards on file.   These customers were also notified through email that the contract changed to an annual upfront payment.   However, CW5 said some customers that did not see the emails and just paid their typical quarterly payment and their services were shut off because the entire annual amount was not received.   CW5 explained that this impacted the customer's business because they could not access GoTo products.

139.   CW5 explained that customers added various products over time were co-terminus, meaning no matter when products were added there was still one start date for the contract with Citrix.   However, LogMeIn implemented various start dates and end dates on each product depending upon when the licenses or products were purchased.   As a result, customers were constantly receiving bills, and it made cancelling difficult.   CW5 received calls from customers complaining about the constant receipt of bills due to the separate contracts for each service/product added.   Customers are still contacting CW5 since leaving the company asking for advice about how to terminate contracts with LogMeIn.

140.   In addition to converting customers to annual up-front payments, CW5 said LogMeIn was raising the prices on customers.   CW5 recalled one customer who already had approximately 10 licenses at $50 monthly and the customer called to add licenses at renewal time.   CW5 notified the customer that the license fee increased to $160 monthly for each license for the new licenses and the older licenses.   CW5 said this customer did not end up adding the new licenses, but kept existing licenses with the idea that they would likely cancel once they could find a replacement tool.

## VI.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### A.   False and Misleading Statements and Omissions in Connection with the Announcement of LogMeIn's Second Quarter 2017 Results

141.   On July 27, 2017, LogMeIn held a conference call with investors, analysts, and the public to discuss the Company's Q2'17 financial results and the Company's financial guidance for 2017. Therein, Defendant Wagner represented that the Company was ahead of management's expectations in its four key priorities for 2017. He stated, in relevant part:

> Looking at our 4 key priorities for 2017, operational integration, synergy capture, cultural integration and long-term strategy, we are now tracking ahead of most of our expectations. ***This accelerated progress is perhaps most evident when it comes to synergies. We had originally forecast targets of $65 million of run rate synergies in year 1 with an additional $35 million in year 2 for a total synergy target of $100 million over a 2-year time frame***. With our first full quarter as a combined company behind us, I'm pleased to report that we now expect to deliver the majority of those run rate synergies at least $90 million in the first year.

> As a result of this performance and given the progress of our integration efforts, today, we are raising our outlook for both revenue and margins for the full year.

142.   This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18.   The statement was made with scienter because

Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140.

143.    Defendant Wagner indicated that the Company was seeing positive results from transitioning GoTo contracts from monthly to annual pre-paid contracts and stated that the change would improve retention:

> Another proof point is on the adoption of common business practices, including moving the GoTo customer base to annual subscriptions. More than 90% of new sales generated from our sales force in the quarter were annual subscriptions, while approximately 40% of our online sales are now annual. ***In Q2, we also began testing conversion of existing customers to annual prepaid subscriptions, and we are encouraged by the early results. The ability to transition from monthly to annual not only improves the company's cash flow through revenue predictability, but it also will help improve retention and simplify back-end business processes.***

144.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18.  The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140.

462257.2 LOGMEIN10B

145.    Defendant Herdiech reported that "[f]or the combined company, our gross renewal rate across all products on an annualized dollar basis was approximately 75%, consistent with prior quarters."

146.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18 which was not reflected in the gross renewal rate. The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140, and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

147.    Defendant Herdiech also represented that transitioning GoTo contracts from monthly to annual yielded positive results:

**Analyst Raimo Lenschow**: Okay. And then the quick one -- one quick one on cash flow. So the move towards more annual, how does that translate -- like, is that kind of a 1-quarter event? How does that kind of translate into the cash flow statement?

**Defendant Herdiech**: Hey, this is Ed. So as you know, we've been -- started the process of transitioning GoTo's monthly business to annual contracts, primarily focused on touch or business sold through their sales force to new customers. And we're just kind of getting underway on e-commerce and on renewals. And so

we're at -- really at the really beginning of it. And so you see the impact in deferred revenue, but for Q2, it's a pretty small number, probably about $5 million. ***But the big opportunity is in really in the renewal base. As we start to renew that business and push for annual contracts, annual payment terms, that probably takes through 2018 to do, but by far it's the biggest opportunity for us***.

148.   This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18.   The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140.

149.   Defendant Herdiech stated that a team of renewal representatives was proactively reaching out to customers 60 to 90 days in advance to solidify the renewal:

**Analyst Tyler Wood**: And then one last one on those migrations from the monthly to annual. You talked about seeing some success early on. Could you give a little bit more color into what levers you've been using to kind of encourage those and maybe what you would think about using in the future there?

**Defendant Herdiech**: Yes, sure. ***So the early successes, I think we're talking about is in the renewal channel.*** So GoTo had a passive renewal process where they relied heavily on the terms, the evergreen terms in their contract. And given they're 70% invoicing rather than e-commerce, they send invoices to their customers, and if they pay them, great. If they didn't, then they get involved after the fact. ***So what we've done is we've really aligned business practices around kind of the LogMeIn renewal process, where we're -- we have a team of renewal reps that 60, 90 days ahead of time will proactively reach out to***

*customers to solidify the renewal. And at that time, they'll also work in the annual billing terms as well. So we just really started in June in earnest, and we're seeing good results so far.*

150.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing.The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18.   The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140.

151.    Defendant Herdiech represented that GoTo products had a higher renewal rate prior to the merger due to pricing:

> **Analyst Jordan Lee Zelin**: So your renewal rate has been around 75%, but we understand the GoTo business had a higher 1. And I just wanted to figure out what you expect maybe the blended renewal rate of the business to be going forward.

> **Defendant Herdiech**: Yes. So as we reported, the gross renewal rate across all products on an annualized dollar basis was about 75%. I think on the last call, we said, if you had to generalize, maybe *the GoTo products were a little on the higher side of 75%, and the LogMeIn products, a little on the lower side. We've done more pricing than -- pricing work than they have done in the past. But that said, going forward, at least through this year, we're modeling 75% for the year*.

152.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-

paid billing without providing adequate notice to SMB customers or obtaining their affirmative

consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for

customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new

purchase orders rather than auto-renewing. The statement was additionally misleading because it

failed to disclose: (i) that, as a result of these changes, a material number of customers had

decided in advance of the renewal date that they would not renew their subscriptions, and (ii)

that, as a result, the Company would experience a material increase in customer churn when their

annual pre-paid contracts expired in Q2'18 which was not reflected in the gross renewal rate.

The statement was made with scienter because Defendants knew or recklessly disregarded that

the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119,

123-126, 128, 137-140.

153.    On July 28, 2017, LogMeIn filed its Quarterly Report on Form 10-Q for the

second quarter 2017. Therein, LogMeIn stated, in relevant part:

> ***We may not realize the anticipated cost synergies and growth opportunities
> from the Merger.***
>
> We completed our merger with GetGo, Inc., or GetGo, a wholly-owned
> subsidiary of Citrix Systems, Inc., or Citrix, in January 2017, which we refer to as
> the Merger. In connection with the Merger, Citrix transferred its GoTo family of
> service offerings, or the GoTo Business, to GetGo, and then distributed the shares
> of GetGo to Citrix stockholders on a pro rata basis, which we refer to as the
> Distribution. We previously announced that we expect to realize cost synergies,
> growth opportunities and other financial and operating benefits as a result of our
> Merger. Our success in realizing these benefits, and the timing of their realization,
> depends on the successful integration of the GoTo Business and even if we are
> able to integrate the GoTo Business successfully, we cannot predict with certainty
> if or when the cost synergies, growth opportunities and benefits will occur, or the
> extent to which they will actually be achieved.

154.    This statement was materially false and/or misleading because it failed to disclose

that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-

paid billing without providing adequate notice to SMB customers or obtaining their affirmative

consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18.  The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140.

155.    LogMeIn also stated in the Form 10-Q in relevant part:

**_The integration of the GoTo Business presents significant challenges._**

There is a significant degree of difficulty inherent in the process of integrating the GoTo Business with our company. These difficulties include:

- the integration of the GoTo Business with our current businesses while carrying on the ongoing operations of all businesses;

- managing a significantly larger company than before the consummation of the Merger;

- coordinating geographically separate organizations;

- integrating the business cultures of both companies, which may prove to be incompatible;

- creating uniform standards, controls, procedures, policies and information systems and controlling the costs associated with such matters;

- integrating certain information technology, purchasing, accounting, finance, sales, billing, human resources, payroll and regulatory compliance systems; and

- the potential difficulty in retaining key officers and personnel of our company and GetGo.

The process of integrating operations could cause an interruption of, or loss of momentum in, the activities in one or more of our businesses. Members of our

senior management may be required to devote considerable amounts of time to this integration process, which will decrease the time they will have to manage the business of our company, serve the existing businesses, or develop new products or strategies. If our senior management is not able to effectively manage the integration process, or if any significant business activities are interrupted as a result of the integration process, our business could suffer.

Our successful or cost-effective integration of the GoTo Business cannot be assured. The failure to do so could have a material adverse effect on our business, financial condition or results of operations after the Merger.

156.    This statement was materially false and/or misleading because it failed to disclose

that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-

paid billing without providing adequate notice to SMB customers or obtaining their affirmative

consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for

customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new

purchase orders rather than auto-renewing. The statement was additionally misleading because it

failed to disclose: (i) that, as a result of these changes, a material number of customers had

decided in advance of the renewal date that they would not renew their subscriptions, and (ii)

that, as a result, the Company would experience a material increase in customer churn when their

annual pre-paid contracts expired in Q2'18.   The statement was made with scienter because

Defendants knew or recklessly disregarded that the Company was implementing these contract

terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140.

157.    Regarding customer retention, the Company stated in the Form 10-Q, in relevant

part:

***If we are unable to retain our existing customers, our revenue and results of operations would be adversely affected.***

The services offered by us are generally sold pursuant to agreements that are one year in duration. Customers have no obligation to renew their subscriptions after their subscription period expires, and these subscriptions may not be renewed on the same or on more profitable terms. As a result, our ability to grow depends in part on subscription renewals. We may not be able to accurately predict future trends in customer renewals, and our customers' renewal rates may decline or

fluctuate because of several factors, including their satisfaction or dissatisfaction with our services, the prices of our services, the prices of services offered by our competitors or reductions in our customers' spending levels. If our customers do not renew their subscriptions for our services, renew on less favorable terms, or do not purchase additional functionality or subscriptions, our revenue may grow more slowly than expected or decline, and our profitability and gross margins may be harmed.

158.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18.    The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140.

159.    Regarding specific risks affecting the Company's customers who are small and medium businesses (SMBs), the Company stated in the Form 10-Q, in relevant part:

***Failure to effectively and efficiently service SMBs would adversely affect our ability to increase our revenue.***

We market and sell a significant amount of our services to SMBs. SMBs are challenging to reach, acquire and retain in a cost-effective manner. To grow our revenue quickly, we must add new customers, sell additional services to existing customers and encourage existing customers to renew their subscriptions. Selling to and retaining SMBs is more difficult than selling to and retaining large enterprise customers because SMB customers generally:

▪   have high failure rates;

- are price sensitive;

- are difficult to reach with targeted sales campaigns;

- have high churn rates in part because of the scale of their businesses and the ease of switching services; and

- generate less revenue per customer and per transaction.

In addition, SMBs frequently have limited budgets and may choose to spend funds on items other than our services. Moreover, SMBs are more likely to be significantly affected by economic downturns than larger, more established companies, and if these organizations experience economic hardship, they may be unwilling or unable to expend resources on IT.

If we are unable to market and sell our services to SMBs with competitive pricing and in a cost-effective manner, our ability to grow our revenue and maintain profitability will be harmed.

160.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18.   The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140.

161.    The 10-Q also stated that "For the three months ended June 30, 2017, our gross annualized renewal rate was approximately 75%."

162.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18 which was not reflected in the gross renewal rate. The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140.

### B.    Defendants' False and Misleading Statements and Omissions on September 13, 2017 at the Deutsche Bank Technology Conference

163.    On September 13, 2017, Defendant Bradley participated in the Deutsche Bank Technology Conference. Defendant Bradley represented that pricing of GoTo products was a potential growth driver:

> So, when you look at the GoTo product space, they've not done nearly the pricing and packaging that we've utilized in the past. ***So we do believe that there's an opportunity beginning in next year to utilize price effectively as one of a few key growth drivers to try to accelerate the top line.*** So, that's one of them.

164.    This statement was materially false and/or misleading because it failed to disclose that the Company was already increasing pricing for for GoTo customers who wished to renew their subscriptions on a monthly basis. The statement was made with scienter because

Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140.

165.    Defendant Bradley stated that transitioning GoTo contracts from monthly to annual would allow for stronger cash conversion:

> *LogMeIn has a long tenure of having very, very strong cash conversion. We typically had high-20% of revenue free cash flow yields. And we did that by – from our very beginning years, having annual contracts paid in advance*. . . . Highly efficient and highly predictable, which is wonderful from a guidance standpoint. And we've been doing it for – before the company was public. So, we started really – we're free cash flow positive two years before we went public, which is like unheard of in subscription software.

> *GoTo on the other hand never focused on it. It was the same kind of rigor that we have. So in their case, 70% of their subscribers pay 12 times a year. In many, many instances, those are annual contracts that they've agreed to, but then the payment terms are once a month for the year*. So, when you look at the two companies that came together on February 1 of this year, our deferred revenue balance was higher than theirs by about $40 million, and yet their revenue was almost exactly double ours. Last year, our revenue was $336 million, and there was $682 million, and yet their deferred revenue was $40 million less than ours. *So, we have a very deliberate plan and a specific plan to go out after these contracts, whether they are e-commerce or whether they are touch sales and convert them from a monthly payer 12 times a year to a one-time payer.*

> *And the first step we did was we took the new business and we changed it from the opportunity to pay it monthly, and we made it annual. And step two now is looking at this large base of renewal business and converting it over the next number of quarters.* And so that's one of the ways we believe – it helps tremendously with efficiency improvements in terms of processing invoices. They're sending tens of thousands of invoices a month right now. It also helps with your predictability, as you look out on the course of the year . . . . And it also helps from a cash flow standpoint.

> *And so, we anticipate that that'll take a number of quarters, as I mentioned, but that's one of the ways that we believe will take the free cash flow as a percentage of revenue this year at 28% of revenue to north of 30% of revenue in short order*. And so, that's a pretty meaningful opportunity.

166.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative

consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18. The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140, and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

167.    Defendant Bradley assured that management could execute the conversion without resulting in churn:

**Analyst**: Is that a potential source of churn . . . ?

**Defendant Bradley**: It would be, but right now because there – you have 12 opportunities to collect from these people, you ask the first time. If they get pushed back, you come back to them again. ***So we're just taking the willing conversions right now and down the road there's an opportunity and try to – you increase the monthly price if you don't go annual.*** That's an opportunity that we haven't implemented, but certainly, I know companies that we buy subscription software from have utilized techniques like that in the past. ***And these are – because it's small-medium business, these aren't enormous size deals,*** with the exception of the customer engagement, they aren't seven-figure deals. They're often four- and five-figure deals.

And so ***it's not necessarily that much of a burden for the end-user and in some cases, it's helpful for them as well. Instead of them chasing, 12 invoices a year, it's one.*** And so we've already – ***in the low-end it's much – it's – in some cases not even a conversation, people say okay. And we've got that expertise from doing it for 10 years at LogMeIn. So we have confidence that we can do it across a much bigger base.***

168.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18.   The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140.

> **C.**    **False and Misleading Statements and Omissions in Connection with the Announcement of LogMeIn's Third Quarter 2017 Results**

169.    On October 26, 2017, LogMeIn reported its financial results for third quarter 2017 and increased its GAAP revenue guidance for the full year to a range of $987 million to $988 million, from a range of $978 million to $983 million. The Company also stated that it expected full year EBITDA "in the range of $201 million to $204 million, or approximately 20% of GAAP revenue" and "GAAP net income in the range of $15 million to $18 million, or $0.29 to $0.35 per diluted share."

170.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for

customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18. The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140 and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

171.    On October 26, 2017, LogMeIn held a conference call with investors, analysts, and the public to discuss the Company's Q3'17 financial results and the Company's financial guidance for 2017. Therein, Defendant Wagner represented that transitioning existing GoTo customers from monthly to annual contracts had yielded positive results:

> Starting with operational integration, the third quarter saw continued progress, bringing together the teams, systems and processes that underpin our sales and marketing efforts and provide visibility into our business. ***That progress included, for the first time, a common view of our bookings, revenue and renewals, all key performance indicators needed to help us better manage the business.***
>
> \* \* \*
>
> Speaking of sales, our sales leadership continued to work to improve the productivity of the combined sales force. This remains a work in progress, but I was pleased to see the team finish the quarter with a very strong September, which is especially encouraging as we head into the best-selling months of the year. ***Our sales and care teams also made very good progress driving the migration of former GoTo customers from monthly to annual payments.***
>
> ***Although we are early in the process, particularly with GoTo's large renewal base, the initial results of these efforts are apparent in deferred revenue growth and stronger-than-expected cash flow in the quarter and for the full year.***

172.     This statement was materially false and/or misleading because it failed to disclose

that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-

paid billing without providing adequate notice to SMB customers or obtaining their affirmative

consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for

customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new

purchase orders rather than auto-renewing. The statement was additionally misleading because it

failed to disclose: (i) that, as a result of these changes, a material number of customers had

decided in advance of the renewal date that they would not renew their subscriptions, and (ii)

that, as a result, the Company would experience a material increase in customer churn when their

annual pre-paid contracts expired in Q2'18.  The statement was made with scienter because

Defendants knew or recklessly disregarded that the Company was implementing these contract

terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140 and that its internal

retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-

104, 111, 120-121, 127, 129-130, 137, 139.

173.     Defendant Herdiech increased the Company's free cash flow guidance, citing the

positive results of transitioning GoTo customers from monthly to annual billing:

> Additionally, these teams working with sales and customer care have made
> meaningful progress, driving the migration of former GoTo customers from
> monthly to annual billing. ***We are early in the process, particularly with our
> large renewal base, but initial efforts are encouraging.*** Our strong third quarter
> free cash flow was evidence of this progress. When the merger closed on
> February 1, we initially targeted 25% full year free cash flow margins. ***After
> deliberate focus on this initiative, we are now raising our full year free cash
> flow outlook to 30% of revenue.*** I'm particularly impressed when this integration
> work was completed while the company aggressively executed against its
> announced synergy plan.

174.     This statement was materially false and/or misleading because it failed to disclose

that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-

paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18. The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140 and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

175.    Analysts, who were impressed by the margins, pressed for details, and Defendant Wagner assured that the Company would continue to see benefits from converting GoTo contracts to annual billing:

> **Analyst Matthew George Hedberg**: The success post-GoTo has been impressive. I guess, Ed, it was ***great to hear you're increasing your free cash flow margins 30% this year. We didn't think you'd get to that level until 2019 or later.*** I think when you originally closed GoTo, you talked about a 28% adjusted free cash flow margin. I believe it was by 2019. Can you help us think through, from this level, where could free cash flow go from here? Just any sort of like qualitative assistance would be helpful.

> **Defendant Bill Wagner**: Matt, let me just jump in. I mean, clearly, from a free cash flow perspective, we are ahead of schedule. Exiting 2017, having already -- we'll probably deliver close to $6 a share as we come out of the year. And yes, you were right, ***we had targeted originally in the upper 20s and then had kind of brought it up to saying like can we get to 30% on a run-rate basis. Certainly, that was a 3-year target, as you correctly reminded us. We've – I think given that we've made this much progress this early and given that we've really just begun to convert the customer base, the GetGo customer base from monthly to annual, we certainly think that there's opportunity for us to expand over time.***

So in terms of where we get to, I think we saw some work to do. We'll probably provide some more clarity on Analyst Day. But I think we are super pleased with the progress we've made on that front so far. So yes, achieving a 3-year target in the first year is something we're really proud of.

176.     This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18. The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140 and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

177.     Defendant Wagner also discussed the possibility for additional price increases:

Yes, I think pricing and packaging has been part of a motion that we've introduced for -- at least for the last 4-or-so years, and that's a discipline that we will continue to have as a combined business. So we will continue to kind of address it on a per case basis, product basis. So as an example, for instance, we introduced LastPass Family, which I just talked about on the call. That's an example where *it's not really a price increase per se, but it's a new tier. So it's better packaging, smarter packaging*. I'm really proud of the way the teams have thought through the different use cases of our product. *That's something we're trying to do across our portfolio.* So I do think that there are opportunities to do that, and we'll probably share more details about what plans we might have on Analyst Day

178. This statement was materially false and/or misleading because it failed to disclose that the Company was already increasing pricing for GoTo customers who wished to renew their subscriptions on a monthly basis. The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140.

179. On October 27, 2017, LogMeIn filed its Quarterly Report on Form 10-Q for the third quarter 2017. Therein, LogMeIn stated, in relevant part:

> ### *We may not realize the anticipated cost synergies and growth opportunities from the Merger.*
>
> We completed our merger with GetGo, Inc., or GetGo, a wholly-owned subsidiary of Citrix Systems, Inc., or Citrix, in January 2017, which we refer to as the Merger. In connection with the Merger, Citrix transferred its GoTo family of service offerings, or the GoTo Business, to GetGo, and then distributed the shares of GetGo to Citrix stockholders on a pro rata basis, which we refer to as the Distribution. We previously announced that we expect to realize cost synergies, growth opportunities and other financial and operating benefits as a result of our Merger. Our success in realizing these benefits, and the timing of their realization, depends on the successful integration of the GoTo Business and even if we are able to integrate the GoTo Business successfully, we cannot predict with certainty if or when the cost synergies, growth opportunities and benefits will occur, or the extent to which they will actually be achieved.

180. This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their

annual pre-paid contracts expired in Q2'18. The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140 and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

181.    LogMeIn also stated in the Form 10-Q in relevant part:

**_The integration of the GoTo Business presents significant challenges._**

There is a significant degree of difficulty inherent in the process of integrating the GoTo Business with our company. These difficulties include:

- the integration of the GoTo Business with our current businesses while carrying on the ongoing operations of all businesses;

- managing a significantly larger company than before the consummation of the Merger;

- coordinating geographically separate organizations;

- integrating the business cultures of both companies, which may prove to be incompatible;

- creating uniform standards, controls, procedures, policies and information systems and controlling the costs associated with such matters;

- integrating certain information technology, purchasing, accounting, finance, sales, billing, human resources, payroll and regulatory compliance systems; and

- the potential difficulty in retaining key officers and personnel of our company and GetGo.

The process of integrating operations could cause an interruption of, or loss of momentum in, the activities in one or more of our businesses. Members of our senior management may be required to devote considerable amounts of time to this integration process, which will decrease the time they will have to manage the business of our company, serve the existing businesses, or develop new products or strategies. If our senior management is not able to effectively manage the integration process, or if any significant business activities are interrupted as a result of the integration process, our business could suffer.

Our successful or cost-effective integration of the GoTo Business cannot be assured. The failure to do so could have a material adverse effect on our business, financial condition or results of operations after the Merger.

182.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18.  The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140 and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

183.    Regarding customer retention, the Company stated in the Form 10-Q, in relevant part:

*If we are unable to retain our existing customers, our revenue and results of operations would be adversely affected.*

The services offered by us are generally sold pursuant to agreements that are one year in duration. Customers have no obligation to renew their subscriptions after their subscription period expires, and these subscriptions may not be renewed on the same or on more profitable terms. As a result, our ability to grow depends in part on subscription renewals. We may not be able to accurately predict future trends in customer renewals, and our customers' renewal rates may decline or fluctuate because of several factors, including their satisfaction or dissatisfaction with our services, the prices of our services, the prices of services offered by our

competitors or reductions in our customers' spending levels. If our customers do not renew their subscriptions for our services, renew on less favorable terms, or do not purchase additional functionality or subscriptions, our revenue may grow more slowly than expected or decline, and our profitability and gross margins may be harmed.

184.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18.  The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140 and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

185.    Regarding specific risks affecting the Company's customers who are small and medium businesses (SMBs), the Company stated in the Form 10-Q, in relevant part:

***Failure to effectively and efficiently service SMBs would adversely affect our ability to increase our revenue.***

We market and sell a significant amount of our services to SMBs. SMBs are challenging to reach, acquire and retain in a cost-effective manner. To grow our revenue quickly, we must add new customers, sell additional services to existing customers and encourage existing customers to renew their subscriptions. Selling to and retaining SMBs is more difficult than selling to and retaining large enterprise customers because SMB customers generally:

- have high failure rates;

- are price sensitive;

- are difficult to reach with targeted sales campaigns;

- have high churn rates in part because of the scale of their businesses and the ease of switching services; and

- generate less revenue per customer and per transaction.

In addition, SMBs frequently have limited budgets and may choose to spend funds on items other than our services. Moreover, SMBs are more likely to be significantly affected by economic downturns than larger, more established companies, and if these organizations experience economic hardship, they may be unwilling or unable to expend resources on IT.

If we are unable to market and sell our services to SMBs with competitive pricing and in a cost-effective manner, our ability to grow our revenue and maintain profitability will be harmed.

186.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18. The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140 and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

187.    The 10-Q also stated that "For the nine months ended September 30, 2017, our gross annualized renewal rate was approximately 75%."

188.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18, which was not reflected in the gross renewal rate.  The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140, and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

**D.    Defendants' False and Misleading Statements and Omissions on December 19, 2017 at the Company's Analyst Day**

189.    Defendants Wagner and Herdiech assured analysts that the Company would continue to see benefits from converting GoTo contracts to annual billing:

**Analyst Matthew George Hedberg**: On the free cash flow guide, what are the assumptions in there? Obviously this year you've seen a benefit from moving GoTo from monthly to annually. How long is the duration of that, should that impact 2018 or 2019? How should we think about the benefit of that uplift?

**Defendant Herdiech**: Sure. *So there's about a $30 million to $35 million impact in 2018 related to the conversion efforts that began this year. And as we've talked about we're still or really in the process and to renew that to get through*

AMENDED CLASS ACTION COMPLAINT

***the renewal base, it's not only going take us through all of 2018. But it's going to take us into first at least the first half of 2019 as well.*** Bear in mind at the same time with regard to new business coming in the door, we're doing a great job at bringing that in on annual terms. So that would be really helpful as well.

190.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18.   The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140, and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

191.    Defendant Wagner stated that renewal rates were consistently at 75% despite a dampening effect caused by transitioning GoTo contracts to annual billing:

> **Analyst Bradford J. Mak**: Can you talk about the retention metrics. So 75% has been consistent for a long time, just where do you think you can get that to over time and what the leverage would be? Thanks.

> **Defendant Wagner**: Yeah, I think retention as I highlighted in my, it seems like a long time ago, in my opening remarks, we actually have developed the point of view that we think that there is upside in our retention numbers. I think in the near term, it's, you know, we're modeling and they say where they are, ***especially as we're really focused on converting people from monthly to annual payments, and that has somewhat of a dampening effect on retention. So we model where***

***it is today***, but we're optimistic that we can improve that in the relative near term, that's not factored into any of these numbers of course, that's just not our approach, that would be upside.

192.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18, which was not reflected in the gross renewal rate.   The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140, and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

193.    Defendant Herdiech also attributed the increased guidance to the positive effects of converting GoTo contracts to annual billing:

**Analyst Tim Klasell**: Just a quick question on the 2020 EBITDA and free cash guidance which looks to be about 500 basis points above the growth rate and clearly you've got some leverage points you mentioned for 2018, maybe going into 2019 and maybe some gross margin improvements. But that doesn't explain all of that going that far out. Maybe you can give us some color on what levers you can pull or where you're getting the better efficiencies in the whole year? Thank you

**Defendant Herdiech**: Sure. So I'd say its three things. ***It's the conversion of monthly base and end of base that we talk about.*** It's the expansion of our EBITDA margin, which over this period of time is coming from primarily from

sales and marketing and R&D. And then third, as we continue to grow I expect us to get more efficient with respect to CapEx and I wouldn't expect that to be at the rates the ole LogMeIn was at. I would expect that to be more on the 7%, going to 6% over time. So I'd say that those are the drivers.

194.     This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18.   The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140, and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

**E.     False and Misleading Statements and Omissions in Connection with the Announcement of LogMeIn's Full Year 2017 Results**

195.     On February 15, 2018, LogMeIn reported its financial results for fourth quarter and full year 2017. Therein, LogMeIn issued its 2018 guidance, stating: "The Company expects full year 2018 GAAP revenue to be in the range of $1.132 billion to $1.147 billion. . . . EBITDA is expected to be in the range of $387 million to $395 million, or approximately 34% of GAAP revenue. . . . [T]he Company expects to report GAAP net income in the range of $75 million to $82 million, or $1.42 to $1.54 per share."

196.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18.  The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140, and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

197.    On February 15, 2018, LogMeIn held a conference call with investors, analysts, and the public to discuss the Company's 2017 financial results and the Company's financial guidance for 2018. Therein, Defendant Herdiech stated that "across all our product lines, gross renewal rates were approximately 75% on an annualized dollar basis, consistent with each quarter of 2017."

198.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new

purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18, that was not reflected in the gross renewal rate. The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140, and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

199.    Defendant Herdiech touted strong deferred revenue growth as a result of transitioning GoTo customers to annual billing:

> **Analyst Daniel Robert Bergstrom**: And then in that context, any commentary about deferred revenue trends into the first quarter?
>
> **Defendant Herdiech**: So we had a ***strong deferred revenue number in Q4. I will note that I think it's important to be reminded that, that is influenced by the work we're doing on converting the GoTo renewal business from monthly to annual.*** And also, on a year-over-year basis, when you look at the growth, so deferred revenue grew 24% year-over-year and about $10 million of that was FX, December over December. So except for the FX, I think what you saw for an increase, we would expect to see into Q2 as we continue to convert contracts and continue to work real hard selling the product.

200.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had

decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18. The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140, and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

201.    Defendant Wagner stated that "from a collaboration perspective, that's a business that we believe will accelerate as we work through the year. . . We expect it will grow faster than the company average."

202.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers in the Colloboration segment had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18. The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140, and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

AMENDED CLASS ACTION COMPLAINT
74

203.    Defendant Wagner assured that, though the market "remains competitive, but *there is no competitive change* that we saw in the quarter."

204.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, but instead switch to LogMeIn's competitors and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18.  The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140, and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

205.    On February 20, 2018, the Company filed its Annual Report on Form 10-K for the 2017 fiscal year. The Company's Form 10-K was signed by Defendants Wagner and Herdiech. Therein, LogMeIn stated, in relevant part:

> ***The integration of the GoTo Business presents significant challenges.***
>
> On January 31, 2017, we completed our acquisition of the GoTo family of service offerings, or the GoTo Business, from a wholly–owned subsidiary of Citrix Systems, Inc., or Citrix, via a Reverse Morris Trust transaction, which we refer to herein as the Merger.
>
> There is a significant degree of difficulty inherent in the process of integrating the GoTo Business with our company. These difficulties include:

- the integration of the GoTo Business with our current businesses while carrying on the ongoing operations of all businesses;

- managing a significantly larger company than before the consummation of the Merger;

- coordinating geographically separate organizations;

- integrating the business cultures of both companies, which may prove to be incompatible;

- creating uniform standards, controls, procedures, policies and information systems and controlling the costs associated with such matters;

- integrating certain information technology, purchasing, accounting, finance, sales, billing, human resources, payroll and regulatory compliance systems; and

- the potential difficulty in retaining key officers and personnel of our company and GetGo.

The process of integrating operations could cause an interruption of, or loss of momentum in, the activities in one or more of our businesses. Members of our senior management may be required to devote considerable amounts of time to this integration process, which will decrease the time they will have to manage the business of our company, serve the existing businesses, or develop new products or strategies. If our senior management is not able to effectively manage the integration process, or if any significant business activities are interrupted as a result of the integration process, our business could suffer.

Our successful or cost-effective integration of the GoTo Business cannot be assured. The failure to do so could have a material adverse effect on our business, financial condition or results of operations after the Merger.

206.    This statement was materially false and/or misleading because it failed to disclose

that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-

paid billing without providing adequate notice to SMB customers or obtaining their affirmative

consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for

customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new

purchase orders rather than auto-renewing. The statement was additionally misleading because it

failed to disclose: (i) that, as a result of these changes, a material number of customers had

decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18. The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140, and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

207.    Regarding customer retention, the Company stated in the Form 10-K, in relevant part:

> ### *If we are unable to retain our existing customers, our revenue and results of operations would be adversely affected.*
>
> The services offered by us are generally sold pursuant to agreements that are one year in duration. Customers have no obligation to renew their subscriptions after their subscription period expires, and these subscriptions may not be renewed on the same or on more profitable terms. As a result, our ability to grow depends in part on subscription renewals. We may not be able to accurately predict future trends in customer renewals, and our customers' renewal rates may decline or fluctuate because of several factors, including their satisfaction or dissatisfaction with our services, the prices of our services, the prices of services offered by our competitors or reductions in our customers' spending levels. If our customers do not renew their subscriptions for our services, renew on less favorable terms, or do not purchase additional functionality or subscriptions, our revenue may grow more slowly than expected or decline, and our profitability and gross margins may be harmed.

208.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it

failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18. The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140, and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

209.    Regarding specific risks affecting the Company's customers who are small and medium businesses (SMBs), the Company stated in the Form 10-K, in relevant part:

> ***Failure to effectively and efficiently service SMBs would adversely affect our ability to increase our revenue.***
>
> We market and sell a significant amount of our services to SMBs. SMBs are challenging to reach, acquire and retain in a cost-effective manner. To grow our revenue quickly, we must add new customers, sell additional services to existing customers and encourage existing customers to renew their subscriptions. Selling to and retaining SMBs is more difficult than selling to and retaining large enterprise customers because SMB customers generally:
>
> - have high failure rates;
>
> - are price sensitive;
>
> - are difficult to reach with targeted sales campaigns;
>
> - have high churn rates in part because of the scale of their businesses and the ease of switching services; and
>
> - generate less revenue per customer and per transaction.
>
> In addition, SMBs frequently have limited budgets and may choose to spend funds on items other than our services. Moreover, SMBs are more likely to be significantly affected by economic downturns than larger, more established companies, and if these organizations experience economic hardship, they may be unwilling or unable to expend resources on IT.

> If we are unable to market and sell our services to SMBs with competitive pricing and in a cost-effective manner, our ability to grow our revenue and maintain profitability will be harmed.

210. This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18. The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140, and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

**F.    False and Misleading Statements in Connection with the Announcement of LogMeIn's First Quarter 2018 Results**

211. On April 26, 2018, LogMeIn reported its financial results for first quarter 2018 and increased its GAAP revenue for the full year to a range of $1.205 billion to $1.220 billion, from a range of $1.132 billion to $1.147 billion. The Company also stated that it expected full year EBITDA "in the range of $375 million to $383 million, or approximately 31% of GAAP revenue" and "GAAP net income in the range of $45 million to $51 million, or $0.85 to $0.96 per diluted share."

212.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18. The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140, and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

213.    On April 26, 2018, LogMeIn held a conference call with investors, analysts, and the public to discuss the Company's Q1'18 financial results and the Company's financial guidance for 2018. Therein, Defendant Herdiech reported a breakdown of the Company's segments and stated that access products performed well:

> Regarding our top line performance, our collaboration business grew 5% year-over-year on a pro forma basis and accounted for 54% of total company revenue. This was in line with Q4's growth rate. And while we saw some encouraging signs with our Q1 sales result, we need to continue to execute throughout the year to deliver strong results. Our identity and access management business grew 19% year-over-year on a pro forma basis and represented 30% of total company revenue. ***Strong renewals of our access products and continued growth of LastPass contributed to the increase over the prior quarter***.

214.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions; (ii) that, as a result, the Company would experience a material increase in customer churn in the Collaboration segment when their annual pre-paid contracts expired in Q2'18, which was notreflected in the Company's overall gross renewal rate; and (iii)   that strong renewals in the IAM segment masked the decline in renewals in the Collaboration segment.  The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140, and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

215.    Defendants Wagner and Herdiech represented that the gross renewal rates would remain consistent throughout the year:

> **Analyst Abhey Rattan Lamba**: Bill, on the topic of gross renewal rates, you said in the past that you would like to return that to historical levels over time. Can you talk about some of the initiatives you have in place to realize that goal? And what are some of the near-term impediments that we should be thinking of in increasing that -- those rates?

> **Defendant Wagner**: Yes. So actually, our renewal rates are at our -- at the average where they've been. So that's been pretty consistent for quite some time. ***It's 75%. We do think and we are pleased with how renewals performed overall in the quarter. That said, as we've talked before, as we continue to migrate customers from monthly to annual,*** with Jive coming onboard, which had very

strong renewal rates, over the long term, *we think there's opportunity to work on that and improve on that but certainly no impact this year.* We expect renewal rates to be pretty consistent as we work through the year

**Defendant Herdiech**: Yes. *We started that conversion work kind of in the beginning of the second half of last year. So that hasn't even come around yet for us*.

216.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions;  (ii) that the resulting customer churn would materially impact renewal rates in the Collaboration segment in Q2'18, which was not reflected in the Company's overall gross renewal rate; and (iii) that strong renewals in the IAM segment masked the decline in renewals in the Collaboration segment.  The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140, and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

217.    Defendant Herdiech acknowledged that strong performance in the identity and access management space impacted overall retention rates:

**Analyst Timothy Elmer Klasell**: . . . And then the second follow-on will be on the renewal rate. On the identity and access management, obviously, you can see some uptrends there. What maybe -- how much of an effect could you see coming

AMENDED CLASS ACTION COMPLAINT
82

from identity and access management as that continues to grow? Or is there -- how should we think about that, I guess?

**Defendant Herdiech**: Yes. So Tim, as Bill said, we're very pleased with renewals in the identity and access management space. It is -- does represent 30% of our business. ***So it does impact overall retention rates that we disclose.*** And going forward, these rates have remained relatively stable over the years. And for certainly the rest of the year, we don't see any change in that.

218.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions;  (ii) that the resulting customer churn would materially impact renewal rates in the Collaboration segment in Q2'18, which was not reflected in the Company's overall gross renewal rate; and (iii) that the strong renewals of Access products masked the decline in Collaboration segment's renewal rates

219.    On April 27, 2018, the Company filed its Quarterly Report on Form 10-Q for the first quarter 2018. Therein, LogMeIn stated, in relevant part:

*The integration of the GoTo Business presents significant challenges.*

On January 31, 2017, we completed our acquisition of the GoTo family of service offerings, or the GoTo Business, from a wholly–owned subsidiary of Citrix Systems, Inc., or Citrix, via a Reverse Morris Trust transaction, which we refer to herein as the Merger.

There is a significant degree of difficulty inherent in the process of integrating the GoTo Business with our company. These difficulties include:

▪    the integration of the GoTo Business with our current businesses while carrying on the ongoing operations of all businesses;

- managing a significantly larger company than before the consummation of the Merger;

- coordinating geographically separate organizations;

- integrating the business cultures of both companies, which may prove to be incompatible;

- creating uniform standards, controls, procedures, policies and information systems and controlling the costs associated with such matters;

- integrating certain information technology, purchasing, accounting, finance, sales, billing, human resources, payroll and regulatory compliance systems; and

- the potential difficulty in retaining key officers and personnel of our company and GetGo.

The process of integrating operations could cause an interruption of, or loss of momentum in, the activities in one or more of our businesses. Members of our senior management may be required to devote considerable amounts of time to this integration process, which will decrease the time they will have to manage the business of our company, serve the existing businesses, or develop new products or strategies. If our senior management is not able to effectively manage the integration process, or if any significant business activities are interrupted as a result of the integration process, our business could suffer.

Our successful or cost-effective integration of the GoTo Business cannot be assured. The failure to do so could have a material adverse effect on our business, financial condition or results of operations after the Merger.

220.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their

annual pre-paid contracts expired in Q2'18. The statement was made with scienter because

Defendants knew or recklessly disregarded that the Company was implementing these contract

terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140, and that its internal

retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-

104, 111, 120-121, 127, 129-130, 137, 139.

221.   Regarding customer retention, the Company stated in the Form 10-Q, in relevant

part:

> **If we are unable to retain our existing customers, our revenue and results of operations would be adversely affected.**
>
> The services offered by us are generally sold pursuant to agreements that are one year in duration. Customers have no obligation to renew their subscriptions after their subscription period expires, and these subscriptions may not be renewed on the same or on more profitable terms. As a result, our ability to grow depends in part on subscription renewals. We may not be able to accurately predict future trends in customer renewals, and our customers' renewal rates may decline or fluctuate because of several factors, including their satisfaction or dissatisfaction with our services, the prices of our services, the prices of services offered by our competitors or reductions in our customers' spending levels. If our customers do not renew their subscriptions for our services, renew on less favorable terms, or do not purchase additional functionality or subscriptions, our revenue may grow more slowly than expected or decline, and our profitability and gross margins may be harmed.

222.   This statement was materially false and/or misleading because it failed to disclose

that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-

paid billing without providing adequate notice to SMB customers or obtaining their affirmative

consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for

customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new

purchase orders rather than auto-renewing. The statement was additionally misleading because it

failed to disclose: (i) that, as a result of these changes, a material number of customers had

decided in advance of the renewal date that they would not renew their subscriptions, and (ii)

that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18.  The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140, and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

223.   Regarding specific risks affecting the Company's customers who are small and medium businesses (SMBs), the Company stated in the Form 10-Q, in relevant part:

> ***Failure to effectively and efficiently service SMBs would adversely affect our ability to increase our revenue.***
>
> We market and sell a significant amount of our services to SMBs. SMBs are challenging to reach, acquire and retain in a cost-effective manner. To grow our revenue quickly, we must add new customers, sell additional services to existing customers and encourage existing customers to renew their subscriptions. Selling to and retaining SMBs is more difficult than selling to and retaining large enterprise customers because SMB customers generally:
>
> ▪ have high failure rates;
>
> ▪ are price sensitive;
>
> ▪ are difficult to reach with targeted sales campaigns;
>
> ▪ have high churn rates in part because of the scale of their businesses and the ease of switching services; and
>
> ▪ generate less revenue per customer and per transaction.
>
> In addition, SMBs frequently have limited budgets and may choose to spend funds on items other than our services. Moreover, SMBs are more likely to be significantly affected by economic downturns than larger, more established companies, and if these organizations experience economic hardship, they may be unwilling or unable to expend resources on IT.
>
> If we are unable to market and sell our services to SMBs with competitive pricing and in a cost-effective manner, our ability to grow our revenue and maintain profitability will be harmed.

224.    This statement was materially false and/or misleading because it failed to disclose

that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-

paid billing without providing adequate notice to SMB customers or obtaining their affirmative

consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for

customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new

purchase orders rather than auto-renewing. The statement was additionally misleading because it

failed to disclose: (i) that, as a result of these changes, a material number of customers had

decided in advance of the renewal date that they would not renew their subscriptions, and (ii)

that, as a result, the Company would experience a material increase in customer churn when their

annual pre-paid contracts expired in Q2'18.  The statement was made with scienter because

Defendants knew or recklessly disregarded that the Company was implementing these contract

terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140, and that its internal

retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-

104, 111, 120-121, 127, 129-130, 137, 139.

225.    The 10-Q also stated "For the three months ended March 31, 2018, our gross

annualized renewal rate was approximately 75%."

226.    This statement was materially false and/or misleading because it failed to disclose

that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-

paid billing without providing adequate notice to SMB customers or obtaining their affirmative

consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for

customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new

purchase orders rather than auto-renewing. The statement was additionally misleading because it

failed to disclose: (i) that, as a result of these changes, a material number of customers had

decided in advance of the renewal date that they would not renew their subscriptions; (ii) that the

resulting customer churn would materially impact renewal rates in the Collaboration segment in Q2'18, which was not reflected in the Company's overall gross renewal rate; and (iii) that the strong renewals of Access products masked the decline in Collaboration segment's renewal rates. The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140, and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

### G. Defendants' False and Misleading Statements and Omissions on May 15, 2018 at the JP Morgan Global Technology, Media and Communications Conference

227.   On May 15, 2018, Defendant Wagner participated in the JP Morgan Global Technology, Media and Communications Conference. Defendant Wagner represented that GoTo customers had the option to renew with annual, rather than monthly, billing terms.

> One of the things that we believe – and in SaaS – SaaS is a subscription that people should pay for the subscription upfront. That was LogMeIn's policy. *The GoTo policy was monthly subscription – or annual subscriptions, but monthly pay. And customers can still do that, but we've incented the sales force to migrate those customers to annual pay. That's obviously driven significant increase in cash flow, but we haven't really insisted that people do that*.

> So we're also being, I think, taking our time to do it. We don't need to. We're expanding cash flow and margins as we go nicely. *There's still a lot of runway there, but we're not telling people when they renew, okay, you have to move to an annual subscription. I mean, we're giving that option, giving incentive. But if people push back and don't want to do it, then that will be okay, at least in the short term.*

228.   This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for

customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18. The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140, and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

      **H.    Defendants' False and Misleading Statements and Omissions on June 5, 2018 at the Robert W. Baird & Co. Global Consumer, Technology & Services Conference**

      229.    On June 5, 2018, Defendant Bradley participated at the Robert W. Baird & Co. Global Consumer, Technology & Services Conference. Defendant Bradley stated that "a huge amount of focus from investors is our collaboration segment." Defendant Bradley further stated:

> In the first quarter of 2018, this grew 5% year-over-year. But now we have Jive in the portfolio. And we **expect the growth to accelerate** not only with Jive's contribution but also with some of the initiatives we're doing around the piece of the business that before Jive was included. **We're on sales productivity and some other initiatives, product enhancements that we believe will continue to accelerate the growth of this business**.

      230.    This statement was materially false and/or misleading because it failed to disclose that the Company was: (i) aggressively transitioning GoTo contracts from monthly to annual pre-paid billing without providing adequate notice to SMB customers or obtaining their affirmative consent; (ii) removing the 'termination for convenience' clause ¶44; (iii) increasing the price for customers who wanted to pay monthly or quarterly; and (iv) forcing larger customers to sign new

purchase orders rather than auto-renewing. The statement was additionally misleading because it failed to disclose: (i) that, as a result of these changes, a material number of customers had decided in advance of the renewal date that they would not renew their subscriptions, and (ii) that, as a result, the Company would experience a material increase in customer churn when their annual pre-paid contracts expired in Q2'18. The statement was made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms ¶¶85, 90, 102-103, 108-109, 112, 117-119, 123-126, 128, 137-140, and that its internal retention metrics showed a material increase in contract cancellations ¶¶86, 89-90, 97-99, 103-104, 111, 120-121, 127, 129-130, 137, 139.

## VII.   LOSS CAUSATION

231.   During the Class Period, as detailed herein, Defendants made materially false and/or misleading statements and omissions, and engaged in a scheme to deceive the market. This course of wrongful conduct operated as a fraud or deceit on the Class and caused the price of LogMeIn securities to be artificially inflated. But for Defendants' misrepresentations and omissions, Plaintiffs and the other members of the Class would not have purchased LogMeIn securities or would not have purchased such securities at artificially inflated prices. Later, when Defendants' prior misrepresentations, omissions and fraudulent conduct were disclosed to the market, the price of LogMeIn shares fell significantly as the prior artificial price inflation was dissipated. As a result of their purchases and/or acquisition of LogMeIn securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, i.e. damages, under the Exchange Act. The timing and magnitude of the decline in the prices of the Company's shares negates any inference that the economic losses and damages suffered by Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

232.    The concealed risks began to materialize and/or the truth about the material misrepresentations and omissions was partially revealed to the public on February 15, 2018. After the market closed, the Company announced its financial results for fourth quarter and full year 2017, as well as 2018 guidance. Specifically, the Company reiterated that it expected 5-6% revenue growth for 2018, which it had previously announced during the December 19, 2017 Analyst Day.

233.    On this news, shares of LogMeIn declined $11.35 per share, or approximately 8.48%, to close at $122.45 per share on February 16, 2018, on unusually heavy trading volume. The next trading session, shares of LogMeIn declined $5.05 per share, or approximately 4.12%, to close at $117.40 per share on February 20, 2018, on unusually heavy trading volume.

234.    The price declines on February 16, 2018 and February 20, 2018 were the result of the nature and extent of Defendants' fraud being partially revealed to investors and the market. *Inter alia*, the disclosures on February 15, 2018 were a partial disclosure because, contrary to the Company's prior positive statements, the Company was experiencing weakness in customer retention that threatened the Company's outlook. Nevertheless, Defendants failed to disclose that they had implemented aggressive business practices affecting GoTo customers that caused the Company's problems with customer retention.

235.    On May 23, 2018, near the end of the second quarter 2018, Defendants Wagner and Bradley partially disclosed the customer friction experienced by the Company due to its changes to GoTo contracts, as well as certain corrective measures the Company had undertaken, which were published after the  market closed in a report by Piper Jaffray. Based on a full day of investor meetings with Defendants Wagner and Bradley, Piper Jaffray reported that (1) "[I]t appears that during LogMeIn's integration of the go to assets there existed some vulnerability that the company is focused on addressing with a combination of new product as well as pricing

and packaging flexibility;" (2) "While management has made a push on contract annualization of the GoTo base, we believe that competitive pricing flexibility has made the base a bit more vulnerable than in past years;" and (3) "we believe the company has made a move to be more flexible on business terms and remove friction from its renewal process and buying experience."

236.   On this news, shares of LogMeIn declined $2.35 per share, or approximately 2.13%, to close at $107.75 per share on May 24, 2018, on unusually heavy trading volume.

237.   The May 24, 2018 price decline was the result of the nature and extent of Defendants' fraud being partially revealed to investors and the market. *Inter alia*, the disclosures on May 23, 2018 were a partial disclosure because, contrary to the Company's prior positive statements, the Company had difficulty integrating the GoTo assets and the changes to GoTo contracts had exposed a competitive vulnerability that threatened customer retention.

238.   After the close of market on July 26, 2018, the Company announced its financial results for second quarter 2018. In the announcement and corresponding earnings conference call, the Company disclosed, inter alia: (a) the Company had aggressively changed business terms for GoTo contracts from monthly to annual billing; (b) the Company had removed the termination for convenience clause from GoTo contracts; (c) that the Company had created certain barriers to the auto renewal process; (d) that the Company had increased its prices; (e) that, as a result, its customers experienced friction; and (f) that, as a result, the renewal rates for the Collaboration & Communication segment declined 3.5%.

239.   On this news, shares of LogMeIn declined $26.60 per share, or approximately 25.47%, to close at $77.85 per share on July 27,2018, on unusually heavy trading volume.

240.   The July 27, 2018 price decline was the result of the nature and extent of Defendants' fraud being revealed to investors and the market. Contrary to the Company's prior positive statements, the disclosures revealed that the Company had difficulty integrating the

GoTo assets and the changes to GoTo contracts had negatively impacted renewal rates and customer retention.

## VIII.   POST-CLASS PERIOD EVENTS

241.   On October 25, 2018, LogMeIn hosted a conference call with investors, analysts, and the public to discuss its 3Q'18 results. Therein, Defendant Wagner stated that the Company "eliminate[d] the friction [it] had introduced into the renewal process for many customers." Specifically, the Company "automated more of the renewal process, while increasing [its] focus on the success of [its] customers earlier in their life cycle" and "introduced more flexible business terms." Defendant Wagner stated that, as a result of the changes, "***overall renewal rates for the Communications & Collaboration business increased to 83%*** versus the 77.5% [the Company] saw in Q2." Herdiech reported, "For the total company, our gross renewal rate across all products on an annualized dollar basis improved to approximately 80%, driven by improved retention rates in our Collaboration business."

242.   Defendant Wagner emphasized that "***the business changes we made ourselves had the biggest impact*** in helping our renewal rates go from 77.5% up to 83%," rather than any change in competitors' strategy. When analysts clarified whether he was deemphasizing the competitive challenges that he had stated in the previous earnings call, Defendant Wagner reiterated:

> It was really, as we said last quarter, really 3 things we saw as we dug in. ***It was really the business changes that we made that we expected would have the biggest impact, and that's the way it played out in the quarter. I think the other issues turned out to be less of a long-term driver.*** So we made those changes and we're pleased with the results.

243.   Defendant Wagner also stated that the Company benefitted by reducing its prices:

> We, actually, we did talk -- we did make some pricing changes in the quarter and they've yielded really positive results. ***One thing we did was to lower the entry-level price. Based on tests that we saw, we learned that lowering the entry-level***

*price, the customers actually purchase more seats. And that's exactly what we saw. This elasticity meant that, despite the lower price, overall revenue actually increased.* The second thing we did was introduce site licenses that allowed us to preserve revenue from -- and revenue at current rates, really and -- while we increase account penetration at larger accounts.

244.    On October 25, 2018, research firm RBC Capital Markets published a report

noting that the retention issues were more process than product related:

In hindsight, management believes that the Q2/18 issues were more process than product related. Coming out of last quarter, many investors had also viewed the issues as at least somewhat competitive related and management believes that isn't as impactful as feared.

245.    On October 26, 2018, research firm Piper Jaffray published a report noted renewal

rates increased due to reduced customer friction:

Management called out stabilizing renewal rates in its Collaboration segment, which increased 550 bps q/q/ from 77.5% to 83% (ex-Jive). *Overall renewal rates across the company increased for the first time since the merger, from 75% to 80%. The company attributed this to reduced friction* with a more automated renewal process, engagement with customers ahead of renewals, new pricing and packaging, flexibility with contract terms, and a number of product updates. . . . *On our call back, management also mentioned that had it maintained annual contracts (for both new customers and renewals), deferred would have otherwise been $15 – 20M higher in the quarter*.

## IX.    ADDITIONAL SCIENTER ALLEGATIONS

246.    As alleged herein, Defendants acted with scienter since they knew that the public

documents and statements issued or disseminated by Defendants, including in the name of the

Company, were materially false and/or misleading; knew that such statements or documents

would be issued or disseminated to the investing public; and knowingly or substantially

participated or acquiesced in the issuance or dissemination of such statements or documents as

primary violations of the federal securities laws. As set forth elsewhere herein in detail,

Defendants Wagner, Herdiech, and Bradley by virtue of their receipt of information reflecting

the true facts regarding LogMeIn, their control over, and/or receipt and/or modification of

LogMeIn's allegedly materially misleading statements and/or their associations with the

Company which made them privy to confidential proprietary information concerning LogMeIn, participated in the fraudulent scheme alleged herein.

247.    Defendants Wagner, Herdiech, and Bradley knew or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge and complicit or, at least, the reckless disregard of the personnel at the highest level of the Company, including Defendants Wagner, Herdiech, and Bradley.

248.    The following additional facts give rise to a strong inference that the Defendants acted with scienter.

249.    The fraud alleged herein, relating to the concealment the Company's aggressive business practices with respect to GoTo contracts and the resulting retention problems, involved LogMeIn's core operations, and knowledge of the fraud may therefore be imputed to Defendants Wagner, Herdiech, and Bradley. Specifically, the retention of GoTo's customers, in particular those in the Collaboration segment which accounted for more than half of the combined entity's revenues, was undoubtedly crucial to the Company's viability and success.   Defendants repeatedly noted the importance of transitioning the GoTo customers to LogMeIn's contract terms, stressing that they were doing so in a way that would not cause customer friction. Defendants discussed the impact of this transition on free cash flow, deferred revenue, EBITDA, and revenue when reporting the Company's financial results and guidance, and indicated they were monitoring churn.

250.    Defendants' own statements confirm that transition of the GoTo customers was core to LogMeIn's business success, and a focus of management.  For example, on the Q2'17 earnings call, discussing the progress of integrating GoTo, Defendant Herdiech noted the impact of transitioning GoTo's monthly customers to annual contracts on the Company's deferred

revenue, stating, "[T]he big opportunity is in really in the renewal base. As we start to renew that business and push for annual contracts, annual payment terms, that probably takes through 2018 to do, but *by far it's the biggest opportunity for us*."  Defendant Bradley likewise stated at the September 13, 2017 Deutsche Bank Technology Conference that, "*[W]e have a very deliberate plan and a specific plan to go out after these contracts, whether they are e-commerce or whether they are touch sales and convert them from a monthly payer 12 times a year to a one-time payer*."

251.   The Individual Defendants, as members of LogMeIn's corporate management, had access to and reviewed reports about LogMeIn's sales, renewals, and resulting revenues and cash flows, and represented to the investing public that they were tracking the metrics. Defendant Wagner noted on the October 26, 2017 earnings call that the Company had "[brought] together the teams, systems and processes that underpin our sales and marketing efforts and provide visibility into our business" and had a "common view of our bookings, revenue and renewals, all key performance indicators needed to help better manage the business."  At the Company's Analyst Day, Defendant Wagner stated that "cash flow per share is an important metric for us that we measure our success, as we think about value creation."  At the May 9, 2017 Jefferies Global Tech Conference, Defendant Bradley noted that "as we can convert those [contract] terms, there should be a corresponding improvement with the free cash flow yield."  Defendant Bradley told investors at the May 15, 2018 Needham Emerging Tech Conference that "free cash flow is one of LogMein's . . . defining characteristics."  On LogMeIn's Q4'17 earnings call on February 15, 2018, Defendant Wagner noted the Company's proprietary expertise in pricing, assuring investors they were able to forecast the impact of pricing increases:

> [P]*ricing and packaging*, we think that's a lever that is not always used efficiently by a lot of SaaS companies. We do and *something we're very scientific in our approach about.* And I think we have a – kind of we're really

good at forecasting what that looks like, and it's something ***we consider almost a proprietary expertise, if you will.***

At the May 23, 2017 JP Morgan Global Technology Conference, Defendant Wagner stated that "LogMeIn was very aggressive at implementing what I would call sales force automation.  We were early adopters of that technology back in 2013 and had really managed our sales process by very ***metrics-driven approach*** and activity-driven approach as opposed to the days of just focusing on pipeline, which I think can be illusionary at best." On the Q3' 2017 earnings call, Wagner stated that the Company was "tracking particularly the effectiveness of our ramped sales force" and noted that "sales reps productivity on a ramped basis is really the kind of key metric for us."  Defendant Herdiech indicated the Company tracked segment-specific renewal rates on the Q1'18 earnings call, stating "we're very pleased with renewals in the identity and access management space."

252.    The Defendants noted not only their access to segment specific and other retention data metrics; but also, that the they tracked this data following price increases.  On the Q1'2016 earnings call, Defendant Herdiech noted:

> As we discussed on our last call, in January, we increased the list price of Pro while in creating additional functionality for cloud storage and password management. As planned, ***Pro customers renewed at lower rates*** in the quarter, which impacted our overall gross renewal rate. We do expect our gross renewal rate to remain at this level throughout the balance of the year. That said, while our overall renewal rate was lower this quarter, the strength and broad-based performance across all our clouds not only produced a very strong Q1, but also allowed us to increase our full-year outlook.
>
> ***
>
> We continue to believe that Pro is a really valuable product, particularly for like really active customers. And if we were to report -- ***we track internally, but if we were to report renewal rates on a net basis like a lot of our other SaaS comparables do, we would be here telling you that the renewal rates on Pro went up in the quarter***.

AMENDED CLASS ACTION COMPLAINT

Defendant Wagner similarly acknowledged at Analyst Day that converting from monthly to annual payments "has somewhat of a dampening effect on retention," showing that he knew the aggressive changes to business terms could have an adverse effect on the Company's core operations.

253.    Former employees provided further detail of the extensive retention data and customer satisfaction analytics that the Defendants used to measure the impact of the contract changes on customer retention.  CW4 confirmed that SVP of Customer Success, Scott Romesser, presented the retention data showing a drastic increase in cancellations to Defendants Wagner and Herdiech.  On the Q2' 2017 earnings call, Defendant Wagner acknowledged, "In Q2, we also began testing conversion of existing customers to annual prepaid subscriptions, and we are encouraged by the early results." He added that this would "not only improves the company's cash flow through revenue predictability, but it also will help improve retention and simplify back-end business processes."

254.    Defendant Wagner, moreover, represented that he was personally involved in day-to-day operations. In the October 26, 2017 conference call, Defendant Wagner stated that he "was meeting with the sales leadership team [that day]" and that he had "been sitting on the sales floor and listening to the reps."

255.    Indeed when the truth was revealed to the market on the Q2' 2018 earnings call, Defendant Wagner stated, "I personally began to work more closely with the team to overhaul our business practices, made changes to pricing and packaging and increased our engineering team's focus on delivering on key product initiatives for our Collaboration products."  He noted, "I personally really started digging in and to make sure that we had our arms around exactly what the cause was and we have a really clear plan on how to address them and fix them." Assuring investors that he would fix the problem Defendant Wagner stated, "I've been

personally involved, so I feel very comfortable getting on this call and saying we will take care of that."

## X.      CLASS ACTION ALLEGATIONS

256.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all individuals and entities that purchased or acquired LogMeIn securities between July 27, 2017 and July 26, 2018, inclusive, seeking remedies under Sections 10(b) and 20(a) of the Exchange Act.  Excluded from the Class are Defendants, the officers and directors of the Company (at all relevant times), members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

257.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, LogMeIn's shares were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Millions of LogMeIn shares were traded publicly during the Class Period on the NASDAQ.  As of December 31, 2017, LogMeIn had approximately 52,564,000 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by LogMeIn or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

258.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

259.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

260.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of LogMeIn;

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages; and

(d)     whether the Defendants acted with scienter.

261.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs complained of herein.  Moreover, there will be no difficulty in the management of this action as a class action.

## XI.    UNDISCLOSED ADVERSE FACTS

262.    The market for LogMeIn's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements, LogMeIn's shares traded at artificially inflated prices during the Class Period.  Plaintiffs and other members

of the Class purchased or otherwise acquired LogMeIn's shares relying upon the integrity of the market price of the Company's shares and market information relating to LogMeIn, and have been damaged thereby.

263.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of LogMeIn's shares, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about LogMeIn's business, operations, and prospects as alleged herein.

264.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about LogMeIn's business and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## XII.    APPLICABILITY OF PRESUMPTION OF RELIANCE

265.    The market for LogMeIn's shares was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, LogMeIn's securities traded at artificially inflated prices during the Class Period.  On

February 15, 2018, the Company's shares closed at a Class Period high of $133.80 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's shares relying upon the integrity of the market price of LogMeIn's shares and market information relating to LogMeIn, and have been damaged thereby.

266.    During the Class Period, the artificial inflation of LogMeIn's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint, which in turn caused the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about LogMeIn's business, prospects, and operations.   These material misstatements and/or omissions created an unrealistically positive assessment of LogMeIn and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's shares at such artificially inflated prices, and each of them has been damaged as a result.

267.    At all relevant times, the market for LogMeIn's shares was an efficient market for the following reasons, among others:

(a)    LogMeIn shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, LogMeIn filed periodic public reports with the SEC and/or the NASDAQ;

(c)    LogMeIn regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases

on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

   (d) LogMeIn was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports were publicly available and entered the public marketplace.

   268. As a result of the foregoing, the market for LogMeIn's shares promptly digested current information regarding LogMeIn from all publicly available sources and reflected such information in LogMeIn's share price.  Under these circumstances, all purchasers of LogMeIn's shares during the Class Period suffered similar injury through their purchase of LogMeIn's securities at artificially inflated prices and a presumption of reliance applies.

   269. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misrepresentations and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XIII. NO SAFE HARBOR

270.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and/or there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of LogMeIn who knew that the statement was false or misleading when made.

## XIV.   CLAIMS

**FIRST CLAIM**
**Violations of Section 10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

271.   Plaintiffs repeats and re-alleges each allegation contained above as if fully set forth herein.

272.   This claim is asserted against all Defendants and is based on Section 10(b) of the Exchange Act.

273.   During the Class Period, the Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs

AMENDED CLASS ACTION COMPLAINT
104

and other members of the Class to purchase LogMeIn's shares at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Defendants took the actions set forth herein.

274. The Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for LogMeIn's shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All the Defendants were either primary participants in the wrongful and illegal conduct charged herein or were controlling persons as alleged below.

275. The Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about LogMeIn's financial well-being and prospects, as specified herein.

276. The Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of LogMeIn's value and performance and continued growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about LogMeIn and its business operations and prospects, in light of the circumstances under which they were made, not misleading, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares during the Class Period.

277.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, and operations at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

278.     The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  The Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing LogMeIn's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by the Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, the Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

279.    Because of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of LogMeIn's shares was artificially inflated during the Class Period.  In ignorance of the fact that the market price of the Company's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the shares traded, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Defendants, and not disclosed in public during the Class Period, Plaintiffs and the other members of the Class acquired LogMeIn's shares during the Class Period at artificially high prices, and were damaged thereby.

280.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the Company's misrepresentations, which were not disclosed by the Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their LogMeIn shares, or, if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

281.    Because of the foregoing, the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

282.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's shares during the Class Period.

**SECOND CLAIM**
**Violations of Section 20(a) of the Exchange Act**
**<u>Against the Individual Defendants</u>**

AMENDED CLASS ACTION COMPLAINT
107

283.    Plaintiffs repeat and re-alleges each and every allegation contained above as if fully set forth herein.

284.    This claim is asserted against the Individual Defendants and is based on Section 20(a) of the Exchange Act.

285.    The allegations in ¶¶271-282, and incorporated into this claim, demonstrate a primary violation of Sections Section 10(b) of the Exchange Act.

286.    The Individual Defendants acted as controlling persons of LogMeIn within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

287.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular statements giving rise to the securities law violations as alleged herein and exercised the same.

288.    Because of their positions as controlling persons, the Individual Defendants are thus liable pursuant to Section 20(a) of the Exchange Act for LogMeIn's primary Exchange Act

Section 10(b) violations.   As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## XV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)      A determination that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)      An award of compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained due to Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      An award to Plaintiffs and the Class of their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)      Awarding extraordinary, equitable, and/or injunctive relief as permitted by law; and

(e)      Such other and further relief as the Court may deem just and proper

## XVI.   JURY TRIAL DEMANDED

Plaintiffs hereby demands a trial by jury.

AMENDED CLASS ACTION COMPLAINT

Dated:  March 1, 2019

**BLOCK & LEVITON LLP**

By: */s/ Jason M. Leviton*
Jason M. Leviton (BBO #678331)
155 Federal Street, Suite 400
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile: (617) 507-6020
Email: jason@blockesq.com

*Liaison Counsel for Lead Plaintiffs and the Class*

-and-

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay (pro hac vice)
Lesley F. Portnoy
Charles H. Linehan
Christopher R. Fallon
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Lead Counsel for Lead Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 1st day of March, 2019.

*/s/ Jason M. Leviton*
Jason M. Leviton