UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | * | |
| | * | |
| BENJAMIN WASSON, Individually and on | * | |
| Behalf of All Others Similarly Situated, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 18-cv-12330-ADB |
| | * | |
| LOGMEIN, INC., WILLIAM R. WAGNER, | * | |
| EDWARD K. HERDIECH, and ROBERT | * | |
| BRADLEY, | * | |
| | * | |
| Defendants. | * | |
| | * | |

### MEMORANDUM AND ORDER ON MOTION TO DISMISS

BURROUGHS, D.J.

Lead Plaintiffs Larry Pollock[1] and Robert Daub and named Plaintiff Benjamin Wasson ("Plaintiffs") bring this shareholder class action on behalf of the former shareholders of LogMeIn, Inc. ("LogMeIn" or the "Company") against LogMeIn and its President, Chief Financial Officer, and Vice President of Investor Relations (the "Individual Defendants," and together with LogMeIn, "Defendants") for violating federal securities laws in connection with the acquisition of GetGo, Inc. ("GetGo") and the transition of former GetGo customers from monthly to annual billing plans.

---

[1] Larry Pollock passed away on January 31, 2019.  [ECF No. 53].  Plaintiffs have stated their intent to file a motion to substitute an appropriate party.  [Id. at 1].

Presently before the Court is Defendants' motion to dismiss.  [ECF No. 55].  For the reasons discussed below, the motion to dismiss, [ECF No. 55], is <u>GRANTED</u>.  Plaintiffs may amend the complaint within twenty-one days.

## I.      FACTS AS ALLEGED

For purposes of this motion to dismiss, the Court, as it must, "accept[s] as true all well-pleaded facts alleged in the complaint and draw[s] all reasonable inferences therefrom in the pleader's favor."  <u>A.G. ex rel. Maddox v. Elsevier, Inc.</u>, 732 F.3d 77, 80 (1st Cir. 2013) (quoting <u>Santiago v. P.R.</u>, 655 F.3d 61, 72 (1st Cir. 2011)).

LogMeIn is a Boston-based provider of cloud-based software services used by mobile professionals to work remotely and IT service providers to manage computers and servers.  [ECF No. 54 ¶¶ 3, 31].  The Company generates revenue primarily from subscription fees paid by individual consumers and small- and medium-sized businesses.  [<u>Id.</u> ¶ 31].  The Company is organized in three segments: (1) Communications and Collaboration ("C&C"), (2) Identity and Access Management ("IAM"), and (3) Customer Engagement and Support ("CES").  [<u>Id.</u> ¶ 3].  The Individual Defendants are LogMeIn's President and CEO William Wagner, CFO Edward Herdiech, and Vice President of Investor Relations Robert Bradley.  [ECF No. 54 ¶¶ 27–29].

On July 26, 2016, LogMeIn announced that it was acquiring GetGo—a subsidiary of LogMeIn's largest competitor, Citrix Inc.—and GetGo's "GoTo" family of products, including GoToMeeting, GoToWebinar, GoToTraining, GoToMyPC, GoToAssist, Grasshopper, and OpenVoice.  [ECF No. 54 ¶ 34].  Collectively, the "GoTo" family of products generated about twice as much revenue as LogMeIn's similar products.  [<u>Id.</u> ¶ 165].  While LogMeIn traditionally focused on individual consumers and small businesses, the GetGo acquisition allowed LogMeIn

to enter the enterprise market.  [<u>Id.</u> ¶ 36].  Once combined, LogMeIn and GetGo were expected

to have more than two million customers and annual revenues exceeding $1 billion.  [<u>Id.</u> ¶ 34].

    Prior to the merger, the vast majority of LogMeIn subscribers had annual contracts and

roughly 55–65% of these subscribers paid up front for the entire year with a credit card.  [ECF

No. 54 ¶ 42].  Additionally, a LogMeIn customer's annual subscription would automatically

renew for the next year unless the customer specifically terminated it prior to the end of the

subscription period.  [<u>Id.</u>].  The majority of GetGo's customers were invoiced monthly, could

cancel at any time by providing 30 days' notice, and did not pay by credit card.  [<u>Id.</u>].  GetGo's

customers could also "terminate for convenience" (i.e., terminate a contract without providing

notice if they paid a fee).  [<u>Id.</u> ¶ 44].  When LogMeIn announced the acquisition, it indicated that

it intended to transition GetGo's customers to the LogMeIn billing model (i.e., annual

subscriptions whereby customers paid in advance for an entire year by credit card).  [<u>Id.</u>

¶¶ 45–46, 165].  Analysts viewed this transition as a positive development because LogMeIn's

billing model generally did a better job of converting revenue into free cash flow (i.e., cash

available to service debt and pay dividends) than did GetGo's model.  [<u>Id.</u> ¶ 46].

    On December 13, 2016, in an SEC filing, LogMeIn disclosed that "integration of the

GoTo Business . . . may present significant challenges."  [ECF No. 57-2 at 3].  LogMeIn warned

investors that "customers' renewal rates may decline or fluctuate because of several factors,

including their satisfaction or dissatisfaction with [LogMeIn's] services, the prices of

[LogMeIn's] services, the prices of services offered by [LogMeIn's] competitors or reductions in

[LogMeIn's] customers' spending levels."  [<u>Id.</u> at 13].  LogMeIn further explained that its

"ability to renew existing customers" could affect its operating results, with the potential to cause

its stock price to "decline substantially."  [<u>Id.</u> at 9].  In particular, LogMeIn noted that small and

medium business customers were "challenging" "to retain in a cost-effective manner" and thus "have high churn rates in part because of the scale of their businesses and the ease of switching services . . . ." [Id. at 14].  Finally, LogMeIn explained that "integrati[on] [of] operations could cause an interruption of, or loss of momentum in, the activities of the GoTo Business or [LogMeIn's] business."  [Id. at 4].  LogMeIn noted that its projections "may not be able to accurately predict future trends in customer renewals . . . ."  [Id. at 13].

LogMeIn's acquisition of GetGo closed on January 31, 2017.  [ECF No. 54 ¶ 37].  Most of the newly-acquired GoTo products became part of the C&C segment but GoToMyPC became part of the IAM segment and GoToAssist became part of the CES segment.  [Id. ¶ 41].

On February 28, 2017, Wagner discussed the merger during LogMeIn's earnings call. [ECF No. 54 ¶ 37].  He explained:

> Our products are targeting markets with a combined addressable opportunity approaching $30 billion, growing in aggregate at 9% per year.  And we are a company with the scale, leadership position, resources, and employee base needed to realize the potential of these markets.  Over the long-term, we believe this will translate to a compelling financial profile consisting of 10% compounded annual growth rate, 40% adjusted EBITDA margins, and 30% cash flow margin. . . .  I am pleased to report that our Board of Directors has approved a three-year capital return plan intended to return approximately 75% of the Company's free cash flow to shareholders over that time.  That's up to $700 million in a three-year period returned through a combination of share repurchases and dividends.

[Id. ¶¶ 37–38].  Wagner noted that the Company was hoping to avoid being "disruptive and generat[ing] any kind of disruptive customer experience, so that is something [it was] being cautious of as [it] develop[ed] these product strategies."  [Id. ¶ 39].

In mid-2017, LogMeIn began transitioning GetGo's customers from monthly to annual subscriptions.  [ECF No. 54 ¶¶ 45, 55–58, 60, 102, 108].  On July 28, 2017, the company filed its Quarterly Report on Form 10-Q.  [Id. ¶ 153].  It noted that "[w]e may not realize the anticipated cost synergies and growth opportunities from the Merger" because the Company's success

"depends on the successful integration of the GoTo Business and even if we are able to integrate the GoTo Business successfully, we cannot predict with certainty if or when the cost synergies, growth opportunities and benefits will occur, or the extent to which they will actually be achieved." [Id.].  LogMeIn explained that "[t]he integration of the GoTo Business present[ed] significant challenges." [Id. ¶ 155].  Specifically, the company disclosed that if it were "unable to retain [its] existing customers, [its] revenue and results of operations would be adversely affected." [Id. ¶ 157].

The transition did not go particularly smoothly.  At points prior to May 2017, Wagner attended monthly meetings with the Company's senior executives to discuss decreased revenues resulting from former GetGo customers taking their business elsewhere when faced with price increases and annual contracts. [ECF No. 54 ¶¶ 120–21].  In September 2017, LogMeIn's own internal data analytics allegedly revealed that its new business and quarterly retentions were net zero because the company was losing as many customers as it was gaining. [Id. ¶¶ 97–99].

In October 2017, as part of a conference call with investors and analysts, Wagner explained that the Company had "made very good progress driving the migration of former GoTo customers from monthly to annual payments." [ECF No. 54 ¶ 62].  In December 2017, Wagner informed analysts that "converting people from monthly to annual payments . . . ha[d] somewhat of a dampening effect on retention." [Id. ¶ 72].  Still, he remained "optimistic that [LogMeIn] [could] improve that in the relative near term . . . ." [Id.].  In the first quarter of 2018, LogMeIn's reported retention rate remained at 75%, consistent with its retention rates before the GetGo acquisition. [Id. ¶ 80].  According to Plaintiffs, LogMeIn's reported retention rates were misleading because they did not reflect the fact that LogMeIn knew in advance that certain customers would be cancelling their contracts at the end of the annual term. [Id. ¶¶ 97, 146].

On July 26, 2018, the Company announced its 2018 Q2 results and held an earnings call to discuss them.  [ECF No. 54 ¶ 238].  Among other things, the Company announced that its 2018 Q2 renewal rate in the C&C segment had declined by 3.5%.  [Id.].  Wagner said that the Company

> started converting a lot of those customers late in the second quarter last year.  So a lot of those customers now, for the first time, they came up on to their renewal, and we—they were coming up last year for the renewal late in the quarter.  They get a notice like, time to renew and here's your terms, and they didn't have a lot of time to think about it and they renewed.  Now they've come back.  They've been there for a full year.  They know the terms.  They know their renewal is coming up, and I think it just gave them more time.  In the second half of the quarter, again, is where we first started lapping those customers.  That's why we were—we wanted to adjust guidance down and make sure that we have a plan in place to eliminate that friction.

[ECF No. 54 ¶ 90].  As further explanation, Herdiech noted that though the C&C segment was experiencing declining renewal rates, the Company's overall renewal rate remained constant because of increased retention in its IAM business.  [Id. ¶ 86].

Wagner also informed shareholders during that call that though LogMeIn had wanted to move all GetGo customers to an annual payment plan, it was ultimately allowing legacy customers to remain on monthly payment plans.  [ECF No. 54 ¶ 82].  To encourage those legacy customers to transition to an annual subscription, however, LogMeIn removed the "termination for convenience" clause that allowed customers to cancel their subscriptions upon thirty days' notice and required certain larger customers to sign new purchase orders, with different, Company-friendly terms, rather than having their terms automatically renew.  [Id. ¶¶ 82, 87].  It also converted subscriptions for which it had a credit card on file to annual subscriptions.  [Id. ¶ 109].  Customers who were automatically converted but then paid only their usual monthly fee would have their service "shut off" because they had not paid the entire annual fee.  [Id. ¶ 138].  Wagner admitted that "[a]ggressively moving customers from monthly to annual payments,

changing business terms and conditions and barriers we created to the auto-renewal process all contributed to friction for our customers and made us harder to do business with."  [Id. ¶ 85]. The day after the Company's July 26, 2018 disclosures, its share price declined 25.47%.  [Id. ¶ 239].

The complaint relies on five confidential witnesses (the "CWs"), who varied in their seniority with the Company and their areas of expertise.  [ECF No. 54 ¶¶ 100–40].  The common theme espoused by the CWs is that LogMeIn management bungled the transition and lost customers as a result.  See, e.g., [id. ¶ 105 (describing a LogMeIn policy as "inconvenient to customers, a waste of time and a horrible way to do business"); id. ¶ 115 (stating that "the merger of GoTo with LogMeIn happened quickly, without a plan and the integration was done terribly"); id. ¶ 136 (noting that "customers were not happy with a number of changes made by LogMeIn right after the merger")].

Confidential Witness One ("CW1") was an Account Executive who started at Citrix and continued at LogMeIn.  [ECF No. 54 ¶ 100].  In the second half of 2017, while the Company was transitioning customers, CW1 informed the Director of Renewals that customers were not happy about the switch from monthly to annual billing.  [ECF No. 54 ¶ 104].  The Director responded that "customer losses were expected as a result of these changes."  [Id.].

Confidential Witness Two ("CW2") worked in a dedicated email team that was part of LogMeIn's customer care department.  [ECF No. 54 ¶ 107].  According to CW2, many of the emails notifying customers about the transition from monthly to annual subscriptions bounced back, so that the customer was unaware of the transition until they were charged the full annual amount up front.  [Id. ¶ 109].  CW2 also said that LogMeIn raised prices, even for those

contracts where the customer had been told that the price would not change, which resulted in cancellations.  [Id. ¶ 112].

Confidential Witness Three ("CW3"), a Sales Director, reported that LogMeIn immediately began charging customers up front via credit card, even if they had previously been invoiced.  [ECF No. 54 ¶¶ 113, 117].  CW3 stated that LogMeIn was aware of decreased renewal rates before he left the company in May 2017 and that the rates were frequently discussed at monthly meetings, which were attended by Wagner.  [Id. ¶ 120].

Confidential Witness Four ("CW4") worked as a Vice President of Customer Success.  [ECF No. 54 ¶ 122].  He objected to the implementation of certain practices at LogMeIn, including eliminating the "termination for convenience" clause and transitioning customers to annual contracts.  [Id. ¶ 123].  He says that LogMeIn executives were warned that the practices would result in decreased retention rates.  [Id. ¶ 127].

Confidential Witness Five ("CW5"), a Senior Account Executive, said that transition emails were sent to customers' IT departments rather than their billing departments.  [ECF No. 54 ¶¶ 131, 137].  Within sixty day of the GetGo acquisition, he began receiving calls from customers who were "screaming and yelling" about the transition.  [Id. ¶ 137].  He also had customers who had their services "shut off" when they paid their regular monthly fee instead of the new annual fee.  [Id. ¶ 138].

## II.       PROCEDURAL HISTORY

Plaintiffs filed their complaint on August 20, 2018 in the Central District of California.  [ECF No. 1].  The case was then transferred to the District of Massachusetts, [ECF No. 35], and assigned to this Court on November 16, 2018, [ECF No. 40].  Plaintiffs filed their amended complaint on March 1, 2019.  [ECF No. 54].  In this operative complaint, Plaintiffs claim that

Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act")

and that the Individual Defendants violated Section 20(a) of the Exchange Act by making

fraudulent misrepresentations and omissions to shareholders regarding the process and effects of

converting GetGo customers to the LogMeIn billing model.  [ECF No. 54 ¶¶ 271–88]

On April 30, 2019, Defendants filed the instant motion to dismiss.  [ECF No. 55].

Plaintiffs opposed on June 28, 2019, [ECF No. 64], after the Court granted an extension of time,

[ECF No. 63].  Defendants replied on July 29, 2019.  [ECF No. 65].

## III.    LEGAL STANDARD

"Section 10(b) of the Securities Exchange Act of 1934 forbids the 'use or employ, in

connection with the purchase or sale of any security . . . , [of] any manipulative or deceptive

device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe

as necessary or appropriate in the public interest or for the protection of investors.'"  Tellabs,

Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 318 (2007) (alterations in original) (quoting

15 U.S.C. § 78j(b)).  In turn, SEC Rule 10b-5 implements § 10(b) by declaring it unlawful, "in

connection with the purchase or sale of any security,"

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b-5.  Therefore,

> [t]o survive a motion to dismiss under Rule 12(b)(6), a complaint alleging securities fraud under section 10(b) of the Exchange Act and Securities and Exchange Commission Rule 10b-5 must plead six elements: '(1) a material misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.'

Kader v. Sarepta Therapeutics, Inc., 887 F.3d 48, 56 (1st Cir. 2018) (quoting ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008)).[2]

To survive a motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Further, because this case involves claims of securities fraud, Plaintiff must additionally satisfy the Federal Rule of Civil Procedure 9(b) standard for alleging fraud with particularity and comply with the heightened pleading requirements imposed by the Private Securities Litigation Reform Act (the "PSLRA"). See Advest, Inc., 512 F.3d at 58. The PSLRA "requires plaintiffs' complaint to 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading.'" Id. (alteration in original) (quoting 15 U.S.C. § 78u-4(b)(1)). If a plaintiff's allegation regarding the statement or omission "is made on information and belief,

---

[2] "Claims brought under section 20(a) of the [Securities Exchange] Act, 15 U.S.C. § 78t(a), are derivative of 10b-5 claims." Hill v. Gozani, 638 F.3d 40, 53 (1st Cir. 2011). Section 20(a) provides that once a company has been found to have violated the Exchange Act's substantive provisions, "[e]very person who, directly or indirectly, controls" the company "shall also be liable jointly and severally with and to the same extent as [the company] . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). Here, Plaintiffs allege Section 20(a) claims against the Individual Defendants on the grounds that "[b]y virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of [LogMeIn]'s operations and/or intimate knowledge of the false financial statements filed by [LogMeIn] with the SEC and disseminated to the investing public," they "had the power to influence and control and did influence and control . . . the decision-making of [LogMeIn], including the content and dissemination of the various statements" which Plaintiffs claim were false and misleading. [ECF No. 54 ¶ 286]. Plaintiffs further allege that the Individual Defendants "had the ability to prevent the issuance of the statements or cause the statements to be corrected" and did not. [Id.]. Accordingly, to plead a viable Section 20(a) claim against the Individual Defendants, Plaintiffs must first plead an actionable claim under Section 10(b) of the Exchange Act and Rule 10b-5. See Winters v. Stemberg, 529 F. Supp. 2d 237, 247 (D. Mass. 2008) (quoting In re Focus Enhancements, Inc. Sec. Litig., 309 F. Supp. 2d 134, 157 (D. Mass. 2001)).

the complaint shall state with particularity all facts on which that belief is formed."  Id. (quoting

15 U.S.C. § 78u–4(b)(1)).

Finally, the PSLRA provides "safe harbor" provisions that "sharply limit liability of

companies and their management for certain 'forward-looking statements,' . . . when such

statements are accompanied by appropriate cautionary language."  In re Smith & Wesson

Holding Corp. Sec. Litig., 669 F.3d 68, 71 n.3 (1st Cir. 2012); see 15 U.S.C. § 78u-5.[3]  "[T]he

definition of a forward looking statement includes 'a statement of the plans and objectives of

management for future operations, including plans or objectives relating to the products or

services of the issuer.'"  Meyer v. Biopure Corp., 221 F. Supp. 2d 195, 203 (D. Mass. 2002)

(quoting 15 U.S.C. § 78u-5(i)(1)(B)); see Carvelli v. Ocwen Fin. Corp., 934 F.3d 1307, 1324

(11th Cir. 2019) ("A forward-looking statement is what it sounds like—a prediction, projection,

or plan.").  "On any motion to dismiss based upon subsection (c)(1), the court shall consider any

statement cited in the complaint and any cautionary statement accompanying the

forward-looking statement, which are not subject to material dispute, cited by the defendant."

15 U.S.C. § 78u-5(e).

---

[3] The safe harbor provides that

> in any private action arising under this chapter  that is based on an untrue statement
> of a material fact . . . , a person . . . shall not be liable with respect to any
> forward-looking statement, whether written or oral, if and to the extent that . . . the
> forward-looking statement is . . . identified as a forward-looking statement, and is
> accompanied by meaningful cautionary statements identifying important factors
> that could cause actual results to differ materially from those in the forward-looking
> statement . . . .

15 U.S.C. § 78u-5(c)(1)(A)(i).

**IV.       DISCUSSION**

Plaintiffs allege securities fraud in violation of both Section 10(b), <u>see</u> 15 U.S.C. § 78j(b), and Section 20(a) of the Exchange Act.  Defendants assert that the complaint should be dismissed because it (1) fails to allege that any statement was false or misleading, and (2) fails to plead scienter.  [ECF No. 56 at 7–8].

**A.       Count One: Violation of § 10(b) of the Securities Exchange Act of 1934**

In order to bring a claim under Section 10(b) of the Exchange Act, a plaintiff must allege facts that, if true, establish (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon that misrepresentation or omission; (5) economic loss; and (6) loss causation. <u>Ganem v. InVivo Therapeutics Holdings Corp.</u>, 845 F.3d 447, 454 (1st Cir. 2017).  Only the first two elements are at issue here.

For a statement to be a material misrepresentation or omission, Plaintiffs must show "that defendants made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading . . . ."  <u>Geffon v. Micrion Corp.</u>, 249 F.3d 29, 34 (1st Cir. 2001).  When bringing a claim "of securities fraud, [p]laintiffs must additionally satisfy the Fed. R. Civ. P. 9(b) standard for alleging fraud with particularity, and comply with the heightened pleading requirements imposed by the [PSLRA]."  <u>Kader v. Sarepta Therapeutics, Inc.</u>, No. 14-cv-14318, 2016 U.S. Dist. LEXIS 46025, at *40 (D. Mass. Apr. 5, 2016).  Plaintiffs must therefore provide "[each specific] statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" and "with respect to each [alleged] act or omission . . . state with particularity [the] facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(1), (2).  The complaint must

include the "who, what, when, where, and how of the alleged fraud." SEC v. Spivak, 194 F.

Supp. 3d 145, 151 (D. Mass. 2016) (quoting United States ex rel. Ge v. Takeda Pharm. Co., 737

F.3d 116, 123 (1st Cir. 2013)).

Allegedly fraudulent statements are set forth in forty-five paragraphs of the complaint.

See [ECF No. 54 ¶¶ 141, 143, 145, 147, 149, 151, 153, 155, 157, 159, 161, 163, 165, 167, 169,

171, 173, 175, 177, 179, 181, 183, 185, 187, 189, 191, 193, 195, 197, 199, 201, 203, 205, 207,

209, 211, 213, 215, 217, 219, 221, 223, 225, 227, 229].  The statements include, among others,

that LogMeIn expected the GetGo acquisition to be worth roughly $90 million in the first year,

that Wagner was encouraged by the early results of transitioning customers to an annual

subscription, and Herdiech's report that the company's overall gross renewal rate remained

consistent at around 75%.  [Id. ¶¶ 141, 143, 145].  Defendants argue that Plaintiffs have not pled

with particularly that any statement by the Defendants was materially false or misleading.  [ECF

No. 55 at 1].

In their complaint, Plaintiffs use the same basic template, with minor modifications, to

explain why each statement was materially false or misleading.  Compare [ECF No. 54 ¶ 142],

with [id. ¶ 212], and [id. ¶ 214].  The thrust of Plaintiff's argument is that the statements were

materially false or misleading because they failed to disclose that LogMeIn (1) was aggressively

transitioning GoTo customers from monthly billing to annual prepaid billing without adequate

notice, (2) was removing "termination for convenience" provisions from customer contracts,

(3) was increasing prices, (4) was forcing customers to sign new purchase orders rather than

auto-renewing their contracts, (5) knew that it would experience a significant amount of

customer churn (i.e., customers failing to renew) in the second quarter of 2018 because

customers had decided to cancel ahead of their renewal dates, and (6) was experiencing "strong

renewals in the IAM segment [that] masked the decline in renewals in the [C&C] segment."  [Id. ¶¶ 142, 214].

Defendants argue that this method of pleading is inappropriate "puzzle pleading" that requires the Court to figure out why various statements were false.  [ECF No. 56 at 12–13]. This, however, misrepresents the complaint, which sets forth background facts concerning what Defendants were doing during the time of the relevant class allegations that elucidate the allegations of falsity.  See generally [ECF No. 54].  The complaint asserts that Defendants were being hyperaggressive with their customers, engaging in coercive and misleading practices to force legacy GoTo customers to change to annual subscriptions, and then provides a list of statements that were allegedly false or misleading, given that background set of allegations.

Defendants further argue that the complaint alleges "fraud by hindsight."  [ECF No. 56 at 16].  "A plaintiff may not plead 'fraud by hindsight'; i.e., a complaint may not simply contrast a defendant's past optimism with less favorable actual results in support of a claim of securities fraud."  Ganem, 845 F.3d at 457 (internal quotation marks and citation omitted) (quoting Advest, Inc., 512 F.3d at 62).  If the complaint simply alleged that Defendants said that the GoTo acquisition would be profitable and then it proved untrue, the complaint would be insufficient. In this case, however, Plaintiffs are not alleging that Defendants must have been aware that the transition would be problematic because it eventually proved to be so.  Rather, they claim that Defendants knew that the transition was proving challenging throughout the class period based on their own internal review of anticipated cancellations, yet failed to disclose that fact to investors, as made evident by their eventual admission that retention rates had been declining for the duration of the class period.  Therefore, the complaint does not merely set out "fraud by hindsight."

      1.    <u>Material Misrepresentation or Omission: Even Taking Plaintiffs'
Allegations as True, Some Statements Are Not Fraudulent</u>

With respect to some of the allegedly fraudulent statements set forth in the complaint,

Plaintiffs do not allege any facts that would make those statements false or misleading.  Many

statements fall into specific categories and the Court will discuss those statements together.

Other statements, however, do not fit neatly into categories.  Because there is no obvious method

of organizing them, the Court will discuss those statements in chronological order.

      a.    Statements Regarding Gross Renewal Rates

On a LogMeIn earnings call on July 27, 2017, Herdiech reported that "[f]or the combined

company, our gross renewal rate across all products on an annualized dollar basis was

approximately 75%, consistent with prior quarters."  [ECF No. 54 ¶ 145].  Plaintiffs have not

argued that the gross renewal rate across all products was not approximately 75%.  To the

contrary, they note that it was accurate for the Company overall.  [<u>Id.</u> ¶ 86].  Plaintiffs'

contention that reporting the Company's overall gross renewal rate was misleading because

Herdiech failed to simultaneously disclose that "a material number of customers had decided in

advance of the renewal date that they would not renew their subscriptions" and that, "as a result,

the Company would experience a material increase in customer churn when their annual pre-paid

contracts expired in Q2'18" fails.  [<u>Id.</u> ¶ 146].  The statement, which explicitly refers to the

Company's "gross renewal rate across all products" at a given point in time was accurate as

made and therefore, it cannot support a securities fraud claim.  Because other statements

regarding the 75% gross renewal rate, [<u>id.</u> ¶¶ 151, 161, 187, 197, 215, 217, 225], were likewise

accurate, they too are not actionable.[4]

---

[4] To the extent Plaintiffs argue that the statement in paragraph 151 is misleading because
Herdiech stated that the GoTo products, as compared to the LogMeIn products, were "maybe . . .

b.      Statements Regarding Financial Projections

In some statements, Defendants were making projections about the Company's anticipated financial performance.  For example, the complaint alleges that on the Company's earnings call on October 26, 2017, the Company "increased its GAAP revenue guidance for the full year to a range of $987 million to $988 million" and "stated that it expected full year EBITDA 'in the range of $201 million to $204 million, or approximately 20% of GAAP revenue'" and "GAAP net income in the range of $15 million to $18 million, or $0.29 to $0.35 per diluted share."  [ECF No. 54 ¶ 169].  Plaintiffs allege no facts that would make these statements about the Company's projected 2017 GAAP revenue, EBITDA, or GAAP net income inaccurate or fraudulent.  Plaintiffs have not, for example, alleged that there were internal financial reports that indicated that, at the time this statement was made, 2017 EBITDA would not be in the range of $201 to $204 million.  Even accepting as true Plaintiffs' allegations that Defendants knew they were losing former GoTo customers in the process of trying to transfer those customers to annual payment plans and that this would result in a loss in revenue from those customers, Plaintiffs have not alleged facts suggesting that the full-year revenue, EBITDA, and net income projections for the entire Company were inaccurate or misleading, as presented. Indeed, CW3 stated that "LogMeIn felt it had 'stop gaps' in place that would make up for the lost revenue in other areas."  [Id. ¶ 121].  And, by definition, a firm's EBITDA and net income are sensitive to both revenue *and* operating expenses.  If a firm became more cost-effective and reduced its expenses, it could upwardly revise EBITDA and net income projections

a little on the higher side of [the] 75% [overall gross renewal rate]," Herdiech's statement is self-identified as "generalize[d]," includes the word "maybe," and follows directly from an accurate statement about the Company's overall gross renewal rate.  [ECF 54 ¶ 151].  Given the context, it was not misleading.

notwithstanding a drop in revenue.  Similar statements about Company-wide projected revenue, EBITDA, and net income, and/or expected savings in the form of synergies are also not fraudulent as pled.  See [id. ¶¶ 141, 193, 195, 211].[5]

c.      Statements Regarding Price Increases

On September 13, 2017, Bradley said that "there's an opportunity beginning in next year to utilize price effectively as one of a few key growth drivers to try to accelerate the top line." [ECF No. 54 ¶ 163].  Plaintiffs allege that this statement is misleading because Bradley failed to disclose that the Company had already begun increasing prices for GoTo customers who wanted to continue paying monthly.  [Id. ¶ 164].  Plaintiffs do not allege facts sufficient to demonstrate that the Company was raising prices at that time.  Although CW2, CW3, and CW4 all state that LogMeIn raised prices for GoTo customers, they do not state *when* those price increases occurred.  See [id. ¶¶ 112, 119, 140].

Plaintiffs take issue with another statement regarding price increases.  On the October 26, 2017 earnings call, Wagner addressed price increases, stating:

> Yes, I think pricing and packaging has been part of a motion that we've introduced for—at least for the last 4-or-so years, and that's a discipline that we will continue to have as a combined business.  So we will continue to kind of address it on a per case basis, product basis.  So as an example, for instance, we introduced LastPass Family, which I just talked about on the call.  That's an example where it's not really a price increase per se, but it's a new tier.  So it's better packaging, smarter packaging.  I'm really proud of the way the teams have thought through the different use cases of our product.  That's something we're trying to do across our portfolio.  So I do think that there are opportunities to do that, and we'll probably share more details about what plans we might have on Analyst Day.

---

[5] Plaintiffs allege that the statement in paragraph 193 is misleading because Herdiech attributed optimistic financial projections, in part, to the monthly-to-annual conversions of GoTo contracts. [ECF No. 54 ¶¶ 193–94].  Notably, the projections that Herdiech was discussing were projections *for 2020*.  [Id. ("Just a quick question on the 2020 EBITDA and free cash guidance . . . .")].  Even assuming that Defendants knew, as of December 2017, that the transition was not going smoothly, Plaintiffs have failed to allege any facts that the short-term issues attributable to the conversion would adversely affect the Company's bottom line two years into the future.

[ECF No. 54 ¶ 177].  Plaintiffs allege that this statement is misleading because Wagner failed to

disclose that the Company had already begun increasing prices for GoTo customers who wanted

to continue paying monthly.  [Id. ¶ 178].  Even assuming that fact is true, the statement is not

misleading.  Wagner explicitly stated that the Company would "continue" to address pricing

changes on "a per case basis, product basis" and was "trying to [address price changes] across

[its] portfolio," which is not inconsistent with simultaneous price increases for GoTo products.

[Id. ¶ 177].  To the extent Plaintiffs take issue with the statement that "it's not really a price

increase per se, but it's a new tier," that statement refers to LastPass Family, a non-GoTo

product.  Therefore, the allegations do not support a conclusion that these statements about price

increases were fraudulent when made.

d.      Cautionary Disclaimers

Many of the allegedly false statements were explicit disclaimers from Defendants, made

at various times during the class period, that the GetGo acquisition presented difficulties and that

the Company might not be able to realize the full expected potential of the deal.  For example,

the Company stated in its April 27, 2018 Form 10-Q,

> If we are unable to retain our existing customers, our revenue and results of
> operations would be adversely affected. . . .
>
> We may not be able to accurately predict future trends in customer renewals, and
> our customers' renewal rates may decline or fluctuate because of several factors,
> including their satisfaction or dissatisfaction with our services, the prices of our
> services, the prices of services offered by our competitors or reductions in our
> customers' spending levels.  If our customers do not renew their subscriptions for
> our services . . . our profitability and gross margins may be harmed.

[ECF No. 54 ¶ 221].  Plaintiffs have not alleged any facts that would make such a cautionary

disclaimer fraudulent.  Plaintiffs argue, instead, that the cautionary disclaimers are "boilerplate"

and misleading because they did not specifically reference the problematic transition of GoTo

18

customers.  [ECF No. 64 at 18; ECF No. 54 ¶ 222].  The Court, however, finds that these statements address precisely the types of risks that Plaintiffs allege came to pass (i.e., that Defendants alienated GetGo's customers while attempting to integrate them).  See, e.g., [ECF No. 54 ¶ 155 (outlining difficulties including with "the integration of the GoTo Business with our current businesses while carrying on the ongoing operations of all business" and "creating uniform standards, controls, procedures, policies and information systems and controlling the costs associated with such matters"); id. ¶ 207 ("We may not be able to accurately predict future trends in customer renewals, and our customers' renewal rates may decline or fluctuate because of several factors, including their satisfaction or dissatisfaction with our services, the prices of our services, the prices of services offered by our competitors or reductions in our customers' spending levels.")].  Indeed, in a conversation with analysts on December 19, 2017, Wagner explicitly said that "converting people from monthly to annual payments . . . has somewhat of a dampening effect on retention."  [Id. ¶ 191].  Thus, these disclaimers and warnings about the difficulties presented by the acquisition were not fraudulent.  See [id. ¶¶ 153, 155, 157, 159, 179, 181, 183, 185, 191, 205, 207, 209, 219, 221, 223].

e.      July 27, 2017 Statements

Plaintiffs take issue with two statements made during a July 27, 2017 earnings call.  First, Plaintiffs allege that Herdiech's statement that "a team of renewal reps that 60, 90 days ahead of time will proactively reach out to customers to solidify the renewal" was misleading.  [ECF No. ¶ 149].  Herdiech's statement is not inconsistent with the facts Plaintiffs have alleged.  To the contrary, CW4 explained that "Renewal Representatives" were assigned to customer accounts and were "responsible for contacting the customer about upcoming renewals, signing a new contract and the amount that needed to be paid upfront for renewal."  [Id. ¶ 128].  CW4 does not

offer an opinion regarding how far in advance these Renewal Representatives contacted customers with expiring contracts and Plaintiffs have alleged no facts indicating that Herdiech's sixty- to ninety-day estimate was incorrect.

Second, on the same call, Herdiech said that "the big opportunity is really in the renewal base.  As we start to renew that business and push for annual contracts, annual payment terms, that probably takes us through 2018 to do, but by far it's the biggest opportunity for us."  [Id. ¶ 147].  The complaint does not allege that the renewal base did not present a "big opportunity" for the Company.  Rather, the factual allegations amount to claims that Defendants bungled the transition to annual subscriptions and a larger annual renewal base and failed to adequately disclose their ineffective leadership to shareholders, eventually causing the Company to lose money through cancelled contracts.  If the transition had not presented an opportunity, there would have been no harm in bungling it.  The complaint therefore rests on the assumption that the renewal base did present an opportunity, which Defendants failed to realize because of their allegedly overly aggressive tactics.  Given Plaintiffs' theory of the case, a statement describing the potential benefits of the acquisition on the Company's bottom line cannot support a claim for securities fraud.[6]

f.      September 13, 2017 Statement

Next, Plaintiffs take issue with a statement made by Bradley on September 13, 2017 to the effect that transitioning customers from monthly to annual payment plans would create greater cash revenue.  [Id. ¶ 165].  More specifically, he told an audience at the Deutsche Bank Technology Conference that the Company had

---

[6] Moreover, the statement that the renewal process would "probably" take the Company through 2018, was not false for the same reason the statement in paragraph 189, discussed below, was not false.

> a very deliberate plan and a specific plan to go out after these contracts, whether they are e-commerce or whether they are touch sales and convert them from a monthly payer 12 times a year to a one-time payer.  And the first step we did was we took the new business and we changed it from the opportunity to pay it monthly, and we made it annual.  And step two now is looking at this large base of renewal business and converting it over the next number of quarters.

[Id.].  Bradley expanded, telling the audience that he expected that the transition would take "a number of quarters," but would create a greater opportunity for free cash flow.  [Id.].  The complaint claims that the statement was materially false because it did not disclose that Defendants were "aggressively transitioning" the GoTo customers to annual prepaid subscriptions, removing the "termination for convenience" clause, increasing prices, and forcing new purchase orders rather than auto-renewing, and that customers had canceled ahead of time.  [Id. ¶ 166].  Those factual allegations do not make this statement fraudulent, as Bradley was merely saying that the Defendants had a "very deliberate plan"[7] to change the contracts from "monthly" to "annual."  [Id. ¶ 165].  Though Plaintiffs may disagree with the steps taken by Defendants to transition those customers, nothing in Bradley's statement misrepresented what they were doing.  Moreover, Plaintiffs cite multiple analyst reports that confirm the unremarkable fact that annual payments are, generally, better for free cash flow.  See [id. ¶ 46].

---

[7] To the extent Plaintiffs argue that use of the phrase "deliberate plan" is misleading in light of the Company's "aggressive[] transitioning," [ECF No. 64 at 9–10],  the Court finds that argument unpersuasive.  Although the word "deliberate" can be used to describe something that is "slow, unhurried, and steady," which is arguably inconsistent with "aggressive[] transitioning," it can also be used to describe something that results from "careful and thorough consideration" or "characterized by awareness of the consequences."  See Deliberate, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/deliberate (last visited Sept. 19, 2020).  Thus, it is not necessarily inaccurate to describe a plan involving "aggressive[] transitioning" as "deliberate."

g.      December 19, 2017 Statement

Next, Plaintiffs take issue with a statement made during a LogMeIn Analyst Day on

December 19, 2017.  Herdiech told analysts, "as we've talked about we're still or really in the

process and to renew that to get through the renewal base, it's not only going to take us through

all of 2018.  But it's going to take us into first at least the first half of 2019 as well."  [ECF No.

54 ¶ 189].  Though the complaint alleges that Defendants were aggressively moving subscribers

from monthly to annual payment plans, which alienated customers, it does not allege that

Defendants misrepresented the expected timeline of the transitions.

h.      April 26, 2018 Statement

Finally, Plaintiffs take issue with a statement made on April 26, 2018.  During a call with

investors, Herdiech reported a segment-level breakdown of the Company's recent performance:

> Regarding our top line performance, our collaboration business grew 5% year-over-year on a pro forma basis and accounted for 54% of total company revenue.  This was in line with Q4's growth rate.  And while we saw some encouraging signs with our Q1 sales result, we need to continue to execute throughout the year to deliver strong results.  Our identity and access management business grew 19% year-over-year on a pro forma basis and represented 30% of total company revenue.  Strong renewals of our access products and continued growth of LastPass contributed to the increase over the prior quarter.

[ECF No. 54 ¶ 213].  Plaintiffs allege that the statement is misleading because, among other

things, "strong renewals in the IAM segment masked the decline in renewals in the [C&C]

segment."  [Id. ¶ 214].  Even if that fact is true, the statement is not rendered fraudulent.

Plaintiffs allege no facts suggesting that any of the growth or revenue figures reported are

inaccurate.  Indeed, it is evident from the statement that the IAM segment was outperforming the

C&C segment.

i.      Summary

Plaintiffs have therefore "failed to plead with particularity facts establishing the falsity

of" multiple statements alleged in the complaint.  Guerra v. Teradyne Inc., No. 01-cv-11789,

2004 U.S. Dist. LEXIS 28548, at *24 (D. Mass. Jan. 16, 2004).  Specifically, as discussed above,

even assuming the factual allegations in the complaint to be true for purposes of this motion, the

complaint does not adequately allege that the statements in the following paragraphs of the

complaint were fraudulent: ¶¶ 141, 145, 147, 149, 151, 153, 155, 157, 159, 161, 163, 165, 169,

177, 179, 181, 183, 185, 187, 189, 191, 193, 195, 197, 205, 207, 209, 211, 213, 215, 217, 219,

221, 223, 225.

2.      Material Misrepresentation or Omission: Some of the Alleged Statements
        Were Puffery and Not Fraudulent

Defendants contend that some of the allegedly fraudulent statements were mere "puffery"

and therefore are not actionable.  As noted in Section IV.A, Plaintiffs have alleged false

statements in forty-five paragraphs of the complaint.  Having concluded that thirty-five of those

paragraphs contain statements that were not false or misleading, see supra, Section IV.A.1, the

Court considers only the remaining ten.  See [ECF No. 54 ¶¶ 143, 167, 171, 173, 175, 199, 201,

203, 227, 229].

"The corporate puffery rule applies to loose optimism about both a company's current

state of affairs and its future prospects."  Fitzer v. Sec. Dynamics Techs., Inc., 119 F. Supp. 2d

12, 23 (D. Mass. 2000).  "Claims of puffery . . . require a court to consider (1) 'whether the

statement is so vague, so general, or so loosely optimistic that a reasonable investor would find it

unimportant in the total mix of information' and (2) 'whether the statement was also considered

unimportant to the total mix of information by the market as a whole.'"  In re Boston Scientific

Corp. Sec. Litig., No. 10-cv-10593, 2011 WL 4381889, at *11 (D. Mass. Sept. 19, 2011)

(quoting Brumbaugh v. Wave Sys. Corp., 416 F. Supp. 2d 239, 250 (D. Mass. 2006)).  The Court must therefore look to whether the allegedly misleading statement "offers . . . details on which a reasonable investor would rely . . . ."  Fitzer, 119 F. Supp. 2d at 26.

Some of the allegedly misleading statements were vague statements of Defendants' opinions regarding the Company's performance and are, therefore, inactionable puffery.  For example, on an investor call in October 2017, Herdiech told investors, regarding the transition to annual subscriptions, that "[w]e are early in the process, particularly with our large renewal base, but initial efforts are encouraging" and that he was "impressed" that the transition moved forward in conjunction with the company's "announced synergy plan."  [ECF No. 54 ¶ 173].  Calling the initial efforts "encouraging" and noting that he was "impressed" are textbook examples of vague puffery and the complaint does not allege facts sufficient to demonstrate that a reasonable investor would have relied upon such generalized statements.  For the same reasons, the statement in paragraph 171 is also inactionable puffery.  [Id. ¶ 171 ("I was *pleased* to see the team finish the quarter with a very strong September, which is especially *encouraging* . . . Our sales and care teams also made very good *progress* driving the migration of former GoTo customers from monthly to annual payments.  Although we are *early in the process*, particularly with GoTo's large renewal base, the *initial results* of these efforts are apparent in deferred revenue growth and *stronger-than-expected* cash flow in the quarter and for the full year.") (emphasis added)].

During the same October 2017 call, Wagner told analysts,

I think given that we've made this much progress this early and given that we've really just begun to convert the customer base, the GetGo customer base from monthly to annual, we certainly think that there's an opportunity for us to expand over time.  So in terms of where we get to, I think we saw some work to do. . . .  But I think we are super pleased with the progress we've made on that front so far.  So yes, achieving a 3-year target in the first year is something we're really proud of.

[ECF No. 54 ¶ 175].  It is difficult to imagine that an investor would act on Wagner's opinions

that the company had made "progress" converting customers from monthly to annual payment

plans or that he was "pleased" and "proud."  These statements are puffery.  As for the statement

that the company had "some work to do," that statement is vague and, if Plaintiffs' allegations

are true, accurate.  Similarly, in describing the transitioning of customers from monthly to annual

payment plans, Bradley allegedly explained that "in some cases [the transition to annual

subscriptions is] not even a conversation, people say okay.  And we've got that expertise from

doing it for 10 years at LogMeIn.  So we have confidence that we can do it across a much bigger

base."  [Id. ¶ 167].  The complaint has not alleged that there were no customers who said "okay"

to transitioning to an annual contract, and the statements that LogMeIn had ten years of

experience and was "confiden[t]" in its ability to transition "across a much bigger base" are

nonactionable puffery.  See, e.g., In re Boston Scientific Corp, 2011 WL 4381889, at *12

(finding that statements that the company's sales force was "stable, large, experienced" and

"very successful" were nonactionable puffery).  Accordingly, those portions of the statement in

paragraph 167 are not actionable.

Finally, on a February 15, 2018 call with investors and analysts, Herdiech said that the

Company

> had a strong deferred revenue number in Q4.  I will note that I think it's important
> to be reminded that, that is influenced by the work we're doing on converting the
> GoTo renewal business from monthly to annual . . . .

[ECF No. 54 ¶ 199].  Plaintiffs take issue with the fact that Herdiech "touted strong deferred

growth as a result of transitioning GoTo customers to annual billing."  [Id.]  Herdiech's

description of Q4 deferred revenue as "strong" is classic puffery (and, more importantly,

Plaintiffs have not alleged that the deferred revenue reported for that quarter was inaccurate or

fraudulent).  With respect to his statement linking deferred revenue to the transition from monthly to annual billing, his language (i.e., "influenced by the work we're doing on converting") is sufficiently vague as to be inactionable.  Wagner's February 2018 statement that "[the market] remains competitive, but there is no competitive change that we saw in the quarter," [id. ¶ 203], is likewise too vague to be actionable.  It is highly unlikely that an investor would give credence to such a milquetoast assessment of the Company's prospects in the marketplace.

        3.        <u>Material Misrepresentation or Omission: Forward-Looking Statements</u>

The PSLRA provides "safe harbor" provisions that "sharply limit liability of companies and their management for certain 'forward-looking statements,' . . . when such statements are accompanied by appropriate cautionary language."  <u>In re Smith & Wesson</u>, 669 F.3d at 71 n.3; <u>see</u> 15 U.S.C. § 78u-5.  "A forward-looking statement is what it sounds like—a prediction, projection, or plan."  <u>Carvelli</u>, 934 F.3d at 1324.  A forward-looking statement is therefore inactionable if (1) it is identified as forward-looking and accompanied by a meaningful cautionary statement or (2) a plaintiff does not show that the alleged misstatement "was made with actual knowledge."  15 U.S.C. § 78u-5(c)(1).

Having concluded that the allegedly fraudulent statements in thirty-five paragraphs of the complaint were not false or misleading, <u>see supra</u>, Section IV.A.1, and the statements in five paragraphs (and part of another) were puffery, <u>see supra</u>, Section IV.A.2, the Court considers only the remaining five allegedly fraudulent statements set forth in the complaint.  [ECF No. 54 ¶¶ 143, 167 (in part), 201, 227, 229].

On a July 27, 2017 call with investors, Wagner stated:

Another proof point is on the adoption of common business practices, including moving the GoTo customer base to annual subscriptions.  More than 90% of new

sales generated from our sales force in the quarter were annual subscriptions, while approximately 40% of our online sales are now annual.   In Q2, we also began testing conversion of existing customers to annual prepaid subscriptions, and we are encouraged by the early results.   The ability to transition from monthly to annual not only improves the company's cash flow through revenue predictability, but it also will help improve retention and simplify back-end business processes.

[ECF No. 54 ¶ 143].   Plaintiffs allege that the statement is misleading because transitioning customers from monthly to annual payment plans would harm, not help, retention.   [Id. ¶ 144]. Plaintiffs have not alleged facts sufficient to show that the forward-looking statement (i.e., that "[t]he ability to transition . . . will help improve retention") was made with actual knowledge that it was false.   Based on the complaint, as of July 27, 2017, the transition was just beginning, see [id. ¶ 102 ("this transition was beginning the second half of 2017 and then was pushed more aggressively beginning in 2018")], and the "significant changes in the metrics" indicating poor retention first became available in September 2017, see [id. ¶ 50].   Thus, even if the transition ultimately proved to be harmful to retention, Plaintiffs have not alleged facts sufficient to show that Wagner knew that when he made this statement.[8]

During a February 15, 2018 call with investors, Wagner referred to the Company's C&C segment and noted "that's a business that we believe will accelerate as we work through the year . . . .   We expect it will grow faster than the company average."   [ECF No. 54 ¶ 201]. Plaintiffs have failed to allege facts that this forward-looking statement was made with actual knowledge that it was false.   Even if Wagner knew that many GoTo customers were electing not to renew because of the Company's overly-aggressive efforts during the transition, and that such customer churn was adversely impacting the C&C segment, it does not necessarily follow that the segment, as a whole, would not "accelerate" or "grow faster than the company average."

---

[8] Wagner's statement that he was "encouraged by the early results" is inactionable puffery.

There were other products in the C&C segment, including the then-newly-acquired Jive, see [id. ¶ 229], that could have powered segment-level growth.[9]

For similar reasons, Plaintiffs' claim that the statement in paragraph 229 was false also fails.  Plaintiffs have alleged no facts that render Bradley's statement regarding growth and anticipated growth in the C&C segment false.  Even if GoTo's customers were cancelling their subscriptions, that does not necessarily mean that the overall segment, which included non-GoTo products, did not grow 5% between Q1 2017 and Q1 2018 or that the Company did not believe, in June 2018, that "sales productivity," "other initiatives," "enhancements," and the incorporation of the newly-acquired Jive into the segment would "accelerate growth."  Therefore, this statement is not actionable.

### 4.   Material Misrepresentation or Omission:  Close Calls

Having culled the forty-five paragraphs containing allegedly fraudulent statements by eliminating those that were (1) not false or misleading based on the facts pled, [ECF No. 54 ¶¶ 141, 145, 147, 149, 151, 153, 155, 157, 159, 161, 163, 165, 169, 177, 179, 181, 183, 185, 187, 189, 191, 193, 195, 197, 205, 207, 209, 211, 213, 215, 217, 219, 221, 223, 225], (2) puffery, [id. ¶¶ 167 (in part), 171, 173, 175, 199, 203], or (3) inactionable forward-looking statements, [id. ¶¶ 143, 201, 229], the statements in two paragraphs, paragraphs 167 (in part) and 227, remain, [id. ¶¶ 167 (in part), 227].

---

[9] Moreover, one of Plaintiffs' key assertions is that "the Company would experience a material increase in customer churn when their annual pre-paid contracts expired *in Q2'18*."  [ECF No. 54 ¶ 148 (emphasis added)].  Assuming there was a material increase in customer churn in Q2 2018, there would still be two quarters that year in which the Company could make up for lost revenue.  Thus, even if Wagner knew that the C&C segment, as a whole, would be hampered by the Q2 transition-related churn, he could still have made a prediction about the entire year in good faith.

With regard to paragraph 167, on September 13, 2017, at the Deutsche Bank Technology Conference, Bradley allegedly stated:

> So we're just taking the willing conversions right now and down the road there's an opportunity and try to—you increase the monthly price if you don't go annual. That's an opportunity that we haven't implemented, but certainly I know companies that we buy subscription software from have utilized techniques like that in the past.

[ECF No. 54 ¶ 167].

Similarly, as set forth in paragraph 227, on May 15, 2018, at the JPMorgan Global Technology, Media and Communications Conference, Wagner allegedly stated:

> That's obviously driven significant increase in cash flow, but we haven't really insisted that people do that. So we're also being, I think, taking our time to do it. We don't need to. We're expanding cash flow and margins as we go nicely. There's still a lot of runway there, but we're not telling people when they renew, okay, you have to move to an annual subscription. I mean, we're giving that option, giving incentive. But if people push back and don't want to do it, then that will be okay, at least in the short term.

[ECF No. 54 ¶ 227].

Whether these statements were materially false or misleading is a difficult question. Plaintiffs have alleged the following:

- "customers with credit cards on file were charged the annual amount";

- "emails were sent by marketing to notify customers of the change. CW2 claimed a large number of emails 'bounced back' as the Company did not have updated emails for all customers. As such, CW2 said customers were 'livid' when charged the full annual amount upfront because they did not see the notification";

- "LogMeIn changed the policy so that all customers needed to pay upfront with credit cards rather than be invoiced, whereas Citrix allowed for invoicing";

- "LogMeIn also transitioned any customers still being invoiced to credit card payments";

- "customers were receiving notification or bills that they were expected pay the annual amount upfront.  CW5 was later told that emails were sent to customers to notify them of the changes.  CW5 said customers missed these emails because it was sent to their IT person as opposed to the billing department"; and

- "CW5 had some customers that did not have credit cards on file.  These customers were also notified through email that the contract changed to an annual upfront payment.  However, CW5 said some customers that did not see the emails and just paid their typical quarterly payment and their services were shut off because the entire annual amount was not received."

[ECF No. 54 ¶¶ 102, 109, 117, 126, 137, 138].  These allegations, taken together, indicate that the Company was employing aggressive techniques to transition customers but do not indicate that the Company was unilaterally transitioning customers from monthly to annual payment plans against their will or without other options.  That is, although Plaintiffs assert that the Company's statements that it was "just taking the willing conversions," [id. ¶ 167], and "not telling people when they renew, okay, you have to move to an annual subscription," [id. ¶ 227], were false, the facts in the complaint do not support their assertion.

First, each of the CWs stops short of saying that the Company was transitioning customers against their will.  What they do say is that the Company was creating frustrating hoops for customers to jump through and being overly aggressive.  Making it challenging for customers or otherwise aggravating them is not the same as transitioning unwilling customers.

Second, there are allegations in the complaint that make clear that customers did have a choice and that they could continue paying a monthly rate, see [id. ¶ 125 ("CW4 said the switch from monthly to annual was supposed to be the choice of the customer, *but customers only had*

*30 days to decide*.  Since it takes longer than 30 days to transition to another tool[,] CW4 said

customers *did not feel as if there really was a choice*.  CW4 explained that *overall the price was*

*approximately five percent higher for customers that continued paying monthly*." (emphasis

added))].  That the choice was made difficult by the Company's abrasive techniques does not

mean that it was not a choice.  Thus, although it is a close call, the Court concludes that, based

on the allegations in Plaintiffs' complaint, these statements were not false or misleading.

     5.   <u>Scienter</u>

Notwithstanding the Court's conclusion that none of the allegedly fraudulent statements

are actionable, it will consider scienter as to the two statements it views as the most problematic

because a failure to adequately allege scienter is an independent ground for dismissal.  Here,

even assuming that the Company was forcing customers to transition to annual plans and that the

statements were therefore false, Plaintiffs have failed to plead sufficient facts to support the

conclusion that the Company acted with the requisite state of mind.

"[T]he PSLRA requires that complaints 'state with particularity facts giving rise to a

<u>strong inference</u> that the defendant acted with the required state of mind.'"  <u>Kader</u>, 887 F.3d at

57 (quoting 16 U.S.C. § 78u-4(b)(2)(A)).  "[P]laintiff[s] must show either that the defendants

consciously intended to defraud, or that they acted with a high degree of recklessness."  <u>Aldridge</u>

<u>v. A.T. Cross Corp.</u>, 284 F.3d 72, 82 (1st Cir. 2002).  Defendants are reckless under the PSLRA

when they make "a highly unreasonable omission, involving not merely simple, or even

inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which

presents a danger of misleading buyers or sellers that is either known to the defendant or is so

obvious the actor must have been aware of it."  <u>City of Dearborn Heights Act 345 Police & Fire</u>

<u>Ret. Sys. v. Waters Corp.</u>, 632 F.3d 751, 757 (1st Cir. 2011) (quoting <u>Greebel v. FTP Software,</u>

Inc., 194 F.3d 185, 198 (1st Cir.1999)).  "[P]roviding warnings to investors, or otherwise disclosing potential risks, erodes inferences of scienter."  Kader, 887 F.3d at 58 (first citing Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc., 778 F.3d 228, 244 (1st Cir. 2015); then citing Waters Corp., 632 F.3d at 760).  In determining whether a plaintiff has adequately pled scienter, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."  Tellabs, 551 U.S. at 326.

With respect to the statements concerning transitioning unwilling customers as set forth in paragraphs 167 and 227 of the complaint, [ECF No. 54 ¶¶ 167 (in part), 227], Plaintiffs claim that the statements were "made with scienter because Defendants knew or recklessly disregarded that the Company was implementing these contract terms."  [Id. ¶¶ 168, 228].  For the Individual Defendants, Plaintiffs maintain that they acted with scienter "[b]ecause of their positions" as "members of LogMeIn's corporate management . . . ."  [Id. ¶¶ 30, 251].

"A vague assertion that defendants must have known something by virtue of their position of authority does not suffice to adequately allege a strong inference of scienter."  Sousa v. Sonus Networks, Inc., 261 F. Supp. 3d 112, 120 (D. Mass. 2017); see also Maldonado v. Dominguez, 137 F.3d 1, 10 (1st Cir. 1998) ("At most, the complaint contains general inferences that [defendants] 'must have known' about the risks . . . [but] these are precisely the types of inferences which [the First Circuit] . . . has determined to be inadequate . . . ."); Smith v. First Marblehead Corp., 55 F. Supp. 3d 223, 232 (D. Mass. 2014) ("Plaintiffs attempt to prove [CFO's] scienter through his title in the company and background in accounting, but such generalized allegations are insufficient under the PSLRA.").

The CWs do not offer any evidence that Defendants consciously intended to defraud investors.  Thus, with respect to scienter, the inquiry focuses on whether the statements of the

CWs are sufficient to show that Defendants acted recklessly in making certain statements to investors.

As a preliminary matter, none of the CWs are alleged to have ever even interacted with the Individual Defendants. CW3 allegedly attended meetings where "renewals were continually discussed" and alleged that "it was often discussed during the senior leadership meetings that the GoTo Customers were unhappy with the changes noted above." [ECF No. 54 ¶¶ 120–21]. "[C]onclusory statements that . . . defendants . . . attended unspecified management and/or board of directors meetings[] fail to give rise to a strong inference of scienter." Isham v. Perini, 665 F. Supp. 2d 28, 35–36 (D. Mass. 2009) (internal quotation marks omitted). CW4 claims that LogMeIn "executives were warned that the [customer integration tactics] would result in decreased retention rates," but does not specify who the executives were or what they were told. [ECF No. 54 ¶ 127]. He further claims that data was presented to Wagner and Herdiech but does not specify what data. [Id. ¶ 129]. The mere fact that the executives may have been told that they could lose customers because of transitioning tactics is insufficient to establish that they knew that customers were being forced to transition and purposefully misrepresented that fact to shareholders. See, e.g., In re Praecis Pharms., Inc. Sec. Litig., No. 04-cv-12581, 2007 U.S. Dist. LEXIS 22222, at *37 n.14 (D. Mass. Mar. 28, 2007) ("Assuming it to be true that the source had so informed management, more than that would be needed to support an allegation that management itself knew the structure to be flawed, as opposed to knowing simply that someone else (of unclear qualifications) thought that to be the case." (internal quotation marks omitted)).

The CWs do not allege that the Individual Defendants directed the Company's salespeople to force customers to transition or that the Individual Defendants were told that customers were being forced to transition. Thus, even if customers were being forced to

transition against their will, Plaintiffs have failed to plead facts sufficient to give rise a strong inference of scienter on the part of the Individual Defendants.  Additionally, the Company's disclosures before, during, and after the transition, including its disclosure that its aggressive transitioning techniques were impacting the Company's performance, see [ECF No. 54 ¶¶ 85, 87–90], undermines the inference of scienter.  Kader, 887 F.3d at 58.

The Supreme Court has held that "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Tellabs, 551 U.S. at 314.  Defendants argue that "the far more compelling inference is that LogMeIn anticipated at the time of the acquisition that renewals presented one of many integration risks (which it disclosed), and that over time it recognized that certain renewal risks had actually manifested (which it then promptly disclosed)."  [ECF No. 56 at 25].  The Court agrees that the nonculpable inference is more compelling.  See Tellabs, 551 U.S. at 314.  Taking all the factual allegations as true, Plaintiffs make out a convincing story of corporate mismanagement and poor customer service but fall short of making out a claim for securities fraud.

### B.      Count Two: "Control" Person under § 20(a)

Finally, as Defendants argue, because Plaintiffs have failed to state a claim under § 10(b), the Court must dismiss the related § 20(a) claim against the Individual Defendants.  See City of Dearborn Heights, 632 F.3d at 762 ("Because the plaintiff's Section 20(a) claim was derivative of the Rule 10b-5 claim, it was properly dismissed as well." (citing 15 U.S.C. §§ 78t(a), 78t-1)).

## V.      CONCLUSION

Accordingly, the motion to dismiss, [ECF No. 55], is GRANTED.  The Court finds that, even taking all facts alleged as true, most of the challenged statements were not material misrepresentations or omissions.  [ECF No. 54 ¶¶ 141, 145, 147, 149, 151, 153, 155, 157, 159,

161, 163, 165, 169, 177, 179, 181, 183, 185, 187, 189, 191, 193, 195, 197, 205, 207, 209, 211, 213, 215, 217, 219, 221, 223, 225].  Other statements were mere puffery, [id. ¶¶ 167 (in part), 171, 173, 175, 199, 203], or inactionable forward-looking statements, [id. ¶ 143, 201, 229].  The Court also finds that Plaintiffs have failed to adequately plead scienter relative to the allegations that Plaintiffs fraudulently misrepresented that the transitions were all voluntary.  Nonetheless, because the allegations set forth in paragraphs 167 and 227 of the complaint concerning whether customers were being transitioned to the new payment regime against their will present a close call, with respect to those allegations only, [id. ¶¶ 167 (in part), 227)], Plaintiffs may amend their complaint within twenty-one days.

**SO ORDERED.**

October 7, 2020                                                    /s/ Allison D. Burroughs
                                                                   ALLISON D. BURROUGHS
                                                                   U.S. DISTRICT JUDGE