**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BENJAMIN WASSON, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>LOGMEIN, INC., WILLIAM R. WAGNER, EDWARD K. HERDIECH, and ROBERT BRADLEY,<br><br>Defendants. | No. 1:18-cv-12330-ADB<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

# TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE ..... 5

III. PARTIES ..... 6

A. Plaintiff ..... 6

B. Defendants ..... 6

IV. RELEVANT NON-PARTIES ..... 7

V. BACKGROUND AND RELEVANT PRE-CLASS PERIOD EVENTS ..... 9

A. LMI's Business and Merger with GoTo ..... 9

B. LMI's Types Of Customers And Accounts ..... 11

C. Differences Between GoTo and LMI Contractual Terms And Conditions ..... 12

D. LMI Closely Tracked And Managed Customer Renewals Before And During The Class Period ..... 13

E. LMI Began Converting Former GoTo Customers To Annual Billing And Commitments In Q2'17 ..... 14

VI. DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT ..... 15

A. Defendants False/Misleading Statements During the Class Period Misled Investors About The Manner In Which LMI Was Transitioning Former GoTo Customers To Annual Billing ..... 15

1. The First Materially False/Misleading Statement ..... 16

2. The Second Materially False/Misleading Statement ..... 17

B. LMI Forced Former GoTo Customers To Switch To Annual Upfront Commitments Against Their Will ..... 18

1. Many Former GoTo Customers Did Not Receive Notice Of The Conversion ....... 19

2. Customers That Did Receive A Notice Felt Forced To Switch To Annual Billing ....... 21

a. Customer Complaints Show that GoTo Customers Believed They Did Not Have a Choice About the Contract Changes ....... 22

b. The Notice Obfuscated That LMI Was Eliminating The Termination For Convenience Clause ....... 25

c. Even If Customers Received The Notice, LMI Made It Extremely Difficult To Contact Customer Service To Seek Clarification Or Cancellation ....... 27

d. Customers Who Could Remain "Monthly" Merely Paid Monthly But Were Still Being Converted To Annual Terms/Commitments ....... 31

3. LMI Admittedly Forced Former GoTo Enterprise Customers To Switch To Annual Billing And Annual Commitments ....... 31

C. The Immediate Flood Of Churned Accounts Exactly One Year After LMI Began The Conversion Is Strong Evidence That LMI Forced Former GoTo Customers To Transition Against Their Will ....... 34

D. The Truth Is Revealed: Defendants Admit They Aggressively Forced Customers Into Annual Contracts and Changed Payment Terms, Alienating Customers, and Forcing Them into Competitors' Arms ....... 35

VII. LOSS CAUSATION ....... 40

VIII. POST-CLASS PERIOD EVENTS ....... 41

IX. ADDITIONAL SCIENTER ALLEGATIONS ....... 43

A. Defendants Had A "Deliberate" Plan To Convert Customers ....... 43

B. Defendants Reviewed Data Reflecting Declining Retention ....... 46

C. Defendant Bradley Was Actively Involved in Evaluating Customers' Response To Business Changes ....... 50

D. Core Operations Doctrine ....... 51

X. CLASS ACTION ALLEGATIONS ....................53

XI. UNDISCLOSED ADVERSE FACTS ....................55

XII. APPLICABILITY OF PRESUMPTION OF RELIANCE ....................56

XIII. NO SAFE HARBOR ....................58

XIV. CLAIMS ....................59

XV. PRAYER FOR RELIEF ....................63

XVI. JURY TRIAL DEMANDED ....................64

1. Lead Plaintiff Robert Daub ("Plaintiff"),[1] by and through his attorneys, alleges[2] the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by LogMeIn, Inc. ("LogMeIn," "LMI," or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by LMI; (c) review and analysis of analyst reports regarding the Company; (d) interviews with former LMI employees; and (e) review of other publicly available information concerning LMI.

## I. INTRODUCTION

2. This is a federal securities class action on behalf of all individuals and entities that purchased or otherwise acquired the securities (including but not limited to common stock and options) of LMI between September 13, 2017 and July 26, 2018, inclusive (the "Class Period"), seeking remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

3. LMI is a "Software as a Service" (or "SaaS") company that offers both free and fee-based, or premium, subscription software services used primarily by mobile professionals to

---

[1] Former Co-Lead Plaintiff Larry Pollock died on January 31, 2019. *See* Dkt. No. 53 (Suggestion of Death).

[2] Plaintiff is filing this amended complaint pursuant to the Court's Memorandum and Order On Motion To Dismiss, which granted Plaintiff leave to amend specific allegations "with respect to those allegations only." Dkt. #72 at 35. Pursuant to the Court's express instruction, Plaintiff has limited the allegations in this amended complaint accordingly. By removing the other allegations as to which the Court did not grant leave to amend, Plaintiff does not intend to waive his right to later appeal the dismissal of any portion of the prior Amended Class Action Complaint For Violations Of The Federal Securities Laws.

work remotely and by IT service providers to remotely manage computers and servers. LMI derives its revenue principally from subscription fees. LMI is organized into three segments: Communications and Collaboration, Identity and Access Management, and Customer Engagement and Support.

4. On July 26, 2016, LMI announced that it would acquire the "GoTo" family of products from its primary competitor, Citrix Inc. LMI claimed that the acquisition (or "merger") would enable the Company's revenue "to grow in the high single digits on an organic basis" in the first year and that LMI would be better positioned to expand on that growth rate over the long term.

5. After the merger closed on January 31, 2017, LMI organized most of the GoTo assets into its Communications and Collaboration segment, which post-merger accounted for more than half of the combined entity's revenues. To boost free cash flow to fund the promised share repurchases and dividends following the merger, Defendants planned to shift GoTo customers' contracts, which were historically billed either quarterly or monthly, to annual prepaid subscriptions.

6. After the Merger, Defendants assured investors that they would not create friction with GoTo customers when transitioning them to annual prepaid contracts, a process that would take "years" to complete. New customers would start their subscriptions as annual prepaid contracts; for existing customers, Defendants told investors that the transition to annual prepaid contracts was optional and that these customers could choose to renew on a monthly basis.

7. LMI began converting former GoTo customers to annual billing in Q2'17. During a July 27, 2017, conference call to discuss the Company's Q2'17 financial results, Defendant Wagner told investors that "In Q2, we also began testing conversion of existing customers to

annual prepaid subscriptions, and we are encouraged by the early results." Throughout the Class Period, Defendants assured investors that the former GoTo customers were responding positively to the changes, as evidenced by the dramatic increase in free cash flow and the stable gross renewal rate which remained at approximately 75%.

8. Defendants misleadingly suggested that GoTo customers had a choice to transition to the new contract terms. On September 13, 2017, Defendant Rob Bradley falsely stated that LMI was "just taking the willing conversions right now." Similarly, on May 15, 2018, Defendant William Wagner asserted that the Company was "not telling people when they renew, okay, you have to move to an annual subscription. I mean, we're giving that option, giving incentive."

9. Unbeknownst to investors, however, LMI was forcing former GoTo customers to transition to annual billing against their will and forcing customers to switch to annual commitments/terms. Many individual and small and medium business ("SMB") customers were transitioned without receiving notice. For those customers that did receive advanced notice, they were led to believe that they were being forced to convert to annual billing without a choice; and the notice did not clearly indicate that they were being converted to annual commitments/terms and would no longer have the option to cancel upon 30 days' notice. Similarly, LMI also admittedly forced larger customers to sign new purchase orders rather than auto-renewing on the same terms and removed the "termination for convenience" clause, which had allowed GoTo customers to prematurely cancel their annual subscription with 30-day notice after the first year. These practices immediately and drastically increased customer friction, as customers were compelled to accept or unknowingly accept unfavorable terms for services they required to operate their businesses, and caused customers to not renew their subscriptions in 2018 when

their annual contracts expired and to switch to LMI's competitors who offered comparable services with more flexible terms and at better prices.

10. As a result of forcing former GoTo customers into annual billing and annual commitments, these irate and upset customers were locked into a full year of service and unable to get a refund. These customers were quickly cancelling their service, however, because they had been locked into annual terms, the practical effect of cancelling their service was that that their subscription would just end at the conclusion of their annual period and they would not be renewed. During this time, Defendants were admittedly paying attention to customer retention and received reports that would have alerted them to the growing wave of cancellations being artificially masked by the annual terms they had imposed on these customers. Nonetheless, the investing public was unaware of the customer friction resulting in competitive vulnerability.

11. Exactly one year after LMI started the conversion to annual billing, in Q2'18 a wave of churn hit LMI as the initial cohort of angry customers that had been forced to convert to annual billing in Q2'17 did not renew. This was the same cohort of customers that Defendant Wagner had described in July 2017 as having responded favorably to the transition: "In Q2 [2017], ***we also began testing conversion*** of existing customers to annual prepaid subscriptions, and ***we are encouraged by the early results***."[3]

12. On July 26, 2018, when LMI reported its Q2'18 financial results, Defendants were finally forced to admit what they had known throughout the Class Period – LMI's efforts to force customers to convert to annual billing and annual commitment/terms against their will was causing dramatic customer churn. Though investors had expected the Company to exercise care when transitioning contracts to annual prepaid subscriptions, Defendants revealed that the

[3] All emphasis herein that is both bold and italicized is added unless otherwise noted.

Company had effectively forced customers into new terms with little notice, thereby souring customer relationships and driving them to competitors with more flexible terms. These practices caused renewal rates in the Communications and Collaboration segment to decline by 350 basis points, driving down revenue guidance by 3% for the year.

13. On this news, LMI's stock price plummeted by $26.60 per share, or approximately 25.47%, to close at $77.85 per share on July 27, 2018, on unusually heavy trading volume.

14. As a result of Defendants' wrongful acts and omissions, securities law violations, Plaintiff and the Class suffered significant losses and damages.

## II. JURISDICTION AND VENUE

15. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) & 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

17. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), and 15 U.S.C. § 78aa. Substantial acts in furtherance of the alleged securities law violations, and/or the effects of the violations, occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. The Company's principal executive offices are also located in this Judicial District

18. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the

United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Plaintiff

19. Lead Plaintiff Robert Daub, as set forth in his previously-filed certification (Dkt. No. 27-2), incorporated by reference herein, purchased LMI securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

### B. Defendants

20. Defendant LMI is incorporated in Delaware, and its principal executive offices are in Boston, Massachusetts. At all times relevant hereto, shares of LMI's common stock traded under the ticker symbol "LOGM" on the NASDAQ Global Select Market (the "NASDAQ"), which is an efficient market. During the Class Period, LMI, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's shares.

21. Defendant William R. Wagner ("Wagner") was the President, a Director, and the Chief Executive Officer ("CEO") of LMI throughout the Class Period. Prior to his appointment as CEO in 2015, Wagner was the Chief Operating Officer ("COO") of LMI from 2013 to 2015. Prior to joining LMI, Wagner held executive leadership roles throughout his career, including COO and Chief Marketing Officer ("CMO") of Vocus and CMO of Fiberlink. Wagner holds a diploma in History from Lafayette College and an M.B.A. from The Wharton School of Business.

22. Defendant Robert Bradley ("Bradley") was the Vice President of Investor Relations of LMI throughout the Class Period. Bradley holds an M.B.A. from Carroll School of Management at Boston College.

23. Defendants Wagner and Bradley are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of LMI's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each Individual Defendant, during their tenure, was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV. RELEVANT NON-PARTIES

24. Edward K. Herdiech ("Herdiech") was the Chief Financial Officer ("CFO") of LMI throughout the Class Period. Prior to joining LMI, Herdiech held a number of finance positions at Parametric Technology Corporation, Inc. Herdiech holds a diploma in Business Administration with a concentration in Accounting from the University of Vermont.

25. Confidential Witness 1 ("CW1") was an Account Executive who started with Citrix in early 2015 and continued in the role with LMI following the merger until May 2018. CW1 reported to Rick Johnson, who was later replaced by Manager of Corporate Sale Jerry Ullibari. Ullibari reported to Jesse DeMund, who reported to VP of Sales Tom Beswick. CW1 worked with small and medium business customers.

26. Confidential Witness 2 ("CW2") was a Customer Service representative at Citrix beginning in 2014 and continued in this position after the merger with LMI until February 2018. CW2 reported Troy Birotte, and later to Chris Guigliano, who reported to Head of Customer Care Seth Woltz. CW2 believes Woltz reported to SVP Scott Romesser. CW2 initially provided technical support, support to e-commerce customers and responded to customer inquiries. CW2 held this position two years and then was asked to head a dedicated email team that was still part of the Customer Care department. In this position, CW2's team focused on responding to customer email inquiries or routing those inquiries to appropriate departments. CW2 handled customer emails for GoTo products, and routed emails about LMI to a person who could address those issues.

27. Confidential Witness 3 ("CW3") began working with Citrix in 2008 and continued on with LMI after the merger until May 2017. CW3 was Director of Sales, Western Region at the time of the merger and continued in this role with LMI. CW3 reported to VP of Sales Tom Beswick (legacy Citrix located in Arizona) with a dotted line to SVP of Sales Larry D'Angelo, who reported directly to Wagner.

28. Confidential Witness 4 ("CW4") began working with Citrix in November 2015 as VP of Customer Success and continued in that position after the merger until October 2018. CW4 reported to Scott Romesser, SVP of Customer Success, who reported directly to Defendant

Wagner. CW4 was responsible for customer experience and retention for accounts spending more than $10,000 annually worldwide.

29. Confidential Witness 5 ("CW5") was employed at Citrix for approximately eight years before the merger, and at the time of the merger was a Senior Enterprise Account Representative. CW5 reported to Director of Sales Jeff Johnson who reported to Chief Sales Officer Larry D'Angelo. D'Angelo reported to Defendant Wagner.

30. Confidential Witness 6 ("CW6") began working for Citrix in August 2014 as Director of Pricing & Monetization and remained in the same position at LMI from February 2017 until summer 2018. At LMI, CW6 reported to VP of Product Marketing Meeghn Hanson, who reported to CMO Sean Ford. Ford reported to Defendant Wagner.

## V. BACKGROUND AND RELEVANT PRE-CLASS PERIOD EVENTS

### A. LMI's Business and Merger with GoTo

31. LMI offers both free and fee-based, or premium, subscription software services used primarily by mobile professionals to work remotely and by IT service providers to remotely manage computers and servers. LMI derives its revenue principally from subscription fees from customers, who range from individual consumers to small and medium businesses ("SMBs") and to multi-national enterprises. The Company's revenue is driven primarily by the number and the type of premium services it sells to subscribers. The Company claimed that its high volume of new and renewed subscriptions at low transaction prices increases the predictability of its revenues compared to perpetual licensed-based software businesses.

32. LMI is organized into three segments: Communications and Collaboration, Identity and Access Management, and Customer Engagement and Support. LMI's unified communications and collaboration offerings are purportedly used by inside sales teams, customer

service teams and digital marketing teams to generate sales leads, remotely engage prospective buyers, and visually demonstrate products and services in an effort to create sales opportunities, advance sales cycles, and boost overall online visit to purchase conversion rates. LMI's identity and access management services purportedly provide individuals, line-of-business teams, security professionals, as well as internal and external IT professionals with simple and secure remote access tools needed to manage and secure passwords, internet applications, remote computers and other Internet-enabled devices, and automate common IT tasks. LMI's customer engagement and support services purportedly empower companies to deliver more personalized customer engagement and support.

33. On July 26, 2016, LMI issued a press release announcing its plans to enter into a merger agreement with GetGo, Inc. ("GetGo."). GetGo was a subsidiary of LMI's primary competitor, Citrix Inc. GetGo's family of products, which included GoToMeeting, GoToWebinar, GoToTraining, GoToMyPC, GoToAssist, Grasshopper, and OpenVoice, were referred to as GoTo by LMI after the merger. LMI expected the combined entity to generate annual revenues in excess of $1 billion from more than two million customers in virtually every country around the globe. LMI stated that the strategic rationale for the merger was to quickly double the Company's revenue within three to four years, to cross-sell products across both customer bases, and to fill gaps that each company had in its product lines.

34. The GoTo merger closed on January 31, 2017. On February 28, 2017, during the Company's Q4'16 earnings call, Defendant Wagner indicated that the integration work had begun and assured investors that LMI was "focused" on avoiding any disruptive customer experience. Defendant Wagner stated: "[I]n February, we began these efforts in earnest, focusing first and foremost on areas where integration would yield quick benefits without disrupting

service." Defendant Wagner stated further: "We don't need to be disruptive and generate any kind of disruptive customer experience, so that is something we are being cautious of as we develop these product strategies."

35. After the merger, most of the GoTo assets were organized into LMI's Communications and Collaboration segment, which accounted for approximately 55-57% of the Company's revenues during the Class Period. This segment includes GoToMeeting, GoToTraining, GoToConference, GoToWebinar, OpenVoice and Grasshopper. The GoToMyPC product was added to the Identity and Access Management ("IAM") segment, which accounted for approximately 28-30% of the Company's revenues during the Class Period. Finally, the GoToAssist product was organized under the Customer Engagement and Support segment, which accounted for approximately 14-17% of the Company's revenues during the Class Period.

36. The core element of Defendants' plan after the merger centered around the transition of former GoTo customers to annual upfront prepaid billing. This was a top, if not the top, priority to LMI and the Individual Defendants.

## B. LMI's Types Of Customers And Accounts

37. During the relevant period, LMI generally had three types of customers. These included: (i) individual customers; (ii) SMBs; and (iii) enterprise customers.

38. LMI generally considered SMBs to be businesses with less than 1,000 employees and enterprise customers to be companies with more than 1,000 employees.

39. Within these groups, LMI generally had two types of accounts: (i) E-commerce; and (ii) corporate.

40. As noted in the Company's 2017 10-K, "Most of our individual and small and medium-sized business, or SMB, customers purchase our services online with a credit card."

41. Typically, LMI's E-commerce customers were individuals and SMBs with lower spend, whereas enterprise customers were larger companies with more employees and a higher spend.

### C. Differences Between GoTo and LMI Contractual Terms And Conditions

42. With respect to the contractual relationships GoTo and LMI maintained with its customers, there were several key areas that are relevant to the events and circumstances during the Class Period: (i) the frequency of billing – annual versus quarterly or monthly billing, which could either occur upfront or in arrears; (ii) the contractual term or commitment – which could be annual or monthly; (iii) the renewal term; and (iv) termination – the ability for the customer to terminate the contract.

43. ***LMI***. Prior to the merger, nearly all of LMI's contracts were annual and approximately 55-65% of their customers paid upfront for the year with a credit card ("e-commerce"). The rest were invoiced. Typically, LMI's annual subscriptions automatically renewed for the same term unless the customer specifically terminated it prior to the end of the subscription period. LMI typically did not permit its customers to cancel or terminate prior to the conclusion of the term.

44. ***GoTo***. Prior to the merger, GoTo customers enjoyed periodic billing and a flexible cancelation arrangement. When the merger closed, 30% of GoTo contracts were year-long contracts, 70% of GoTo customers were invoiced monthly, and GoTo collected cash from credit card sales in only about a third of those transactions. GoTo contracts also contained a "termination for convenience" clause that allowed customers who provided less than 30-day

notice to exit the contract at the end of the month. provided they pay for that month. It also allowed GoTo customers who entered into an annual contract to cancel after the first year with a 30-day notice. Customers could also leave contracts early, especially in the case of a hardship.

### D. LMI Closely Tracked And Managed Customer Renewals Before And During The Class Period

45. LMI tracked renewal rates before and during the Class Period. Gross renewal rate is calculated on an annualized dollar basis across all product lines as of the end of each period. Throughout the Class Period, LMI consistently reported that the gross renewal rate was 75%. The Company internally tracked renewal rates by product but did not report them. It also tracked but did not report its net renewal rate, which would take into account instances in which customers renewed at higher prices or engaged in add-on sales.

46. LMI had employees that focused on account services and billing who handled escalated customer concerns during the Class Period (including the same types of problems LMI finally disclosed at the end of the Class Period). Shortly after the merger, when the termination for convenience clause was removed, there was a lot of backlash from customers. Due to various changes described herein (and later confirmed by LMI at the end of the Class Period), customers were calling in to cancel well in advance of their renewal, sometimes six months or the full year in advance. LMI employees who received these calls were required to enter the future cancellation date into the database. The Company could run a report at any time and see which customers intended to cancel and when the cancellation would take effect.

47. LMI also had an internal team that was responsible for customer care analytics as well as retention analytics. The team tracked and monitored KPIs (key performance indicators) for the Customer Success team, such as, the number of calls/chats (engagements), how long the engagements lasted, and they also analyzed performance from customer satisfaction surveys.

The Customer Success team was responsible for the onboarding of customers and retaining the accounts for customers of a certain size. The size and name of these types of customers changed over time but the spend amount was typically around $50,000 annually and the accounts were called Major Accounts and later changed to Key Accounts.

48. Retention analytics involved looking at individual products and trends and doing predictive modeling. After the merger, the internal Citrix methodology and approach to data analysis indicated retention was declining much sooner than the LMI data analysis. By September 2017, there were significant changes in the metrics, and net new business and quarterly retention were net zero. LMI, however, only focused on renewal rates for customers due for renewal.

**E. LMI Began Converting Former GoTo Customers To Annual Billing And Commitments In Q2'17**

49. On July 27, 2017 Wagner announced that customer conversion to annual prepaid subscriptions was proceeding well. During the Company's earnings call to discuss its Q2'17 financial results, Defendant Wagner stated: "In Q2, we also began testing conversion of existing customers to annual prepaid subscriptions, and ***we are encouraged by the early results***." He added that the conversion this would "not only improves the company's cash flow through revenue predictability, but it also will help improve retention and simplify back-end business processes."

50. On the same call, Herdiech reported that the combined company's gross renewal rate across all products remained at approximately 75% and reassured investors that the transition to annual payment terms was being handled well.

51. Analysts took note of the Company's strategy to purportedly carefully transition GoTo customers from monthly to annual payment terms. As reflected in Piper Jaffray's July 28,

2017 report, analysts believed synergy realization was the primary driver of FCF growth, and migrating GoTo customers to annual payment terms would allow this trend to continue, stating: "Thus far we believe synergy realization has been the primary driver of FCF outperformance but also believe consolidation of payment terms toward annual billings can support continued, sustained FCF margin expansion."

52. Piper Jaffray issued another analyst report on August 6, 2017 after traveling with LMI that expressed a high degree of confidence in LMI's FCF targets due to the Company's purportedly careful transition to annual prepaid subscriptions, stating:

> Our biggest takeaway from travelling with management is a confirmation in our thesis that ***management's targets around FCF margins carry a high degree of confidence***, which we believe will continue to be born out in results. We believe the biggest and most near term driver of FCF margin leverage will be the conversion of the company's entire customer base to annual billings terms. While the company has demonstrated meaningful success (arguably ahead of expectations) in transitioning net new customers (90% of new customers added in the period were on annual terms and 40% of the ecommerce channel), roughly 70% of the GoTo customer base is on monthly billings today. While this will clearly not happen in one fell swoop as ***the company has no interest in meaningfully disrupting retention rates and tarnishing it's shiny new brand***, we believe that this conversion will represent at least as much FCF leverage as the original synergy targets did. We also believe that management will have a better handle on this progress and comment more specifically around the analyst day in December.

## VI. DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT

### A. Defendants False/Misleading Statements During the Class Period Misled Investors About The Manner In Which LMI Was Transitioning Former GoTo Customers To Annual Billing

53. On September 13, 2017, Defendant Bradley represented LMI at the Deutsche Bank Technology Conference. At the conference, Defendant Bradley reassured investors regarding the careful manner in which LMI was transitioning the former GoTo Customers to annual upfront billing and commitments/terms:

> ***[W]e have a very deliberate plan and a specific plan to go out after these contracts, whether they are e-commerce or whether they are touch sales and convert them from a monthly payer 12 times a year to a one-time payer***.
>
> And the first step we did was we took the new business and we changed it from the opportunity to pay it monthly, and we made it annual. And step two now is looking at this large base of renewal business and converting it over the next number of quarters.

**1. The First Materially False/Misleading Statement**

54. At the September 13, 2017 conference, when directly asked about whether the transition would cause customer churn, Defendant Bradley falsely and/or misleadingly assured investors that the Company was only taking "***willing conversions***":

> [R]ight now because there – you have 12 opportunities to collect from these people, you ask the first time. If they get pushed back, you come back to them again. So ***we're just taking the willing conversions right now and down the road there's an opportunity and try to – you increase the monthly price if you don't go annual. That's an opportunity that we haven't implemented***, but certainly, I know companies that we buy subscription software from have utilized techniques like that in the past. And these are – because it's small-medium business, these aren't enormous size deals, with the exception of the customer engagement, they aren't seven-figure deals. They're often four- and five-figure deals.
>
> And so ***it's not necessarily that much of a burden for the end-user*** and in some cases, it's helpful for them as well. Instead of them chasing, 12 invoices a year, it's one. And so we've already – in the low-end it's much – it's – in some cases not even a conversation, people say okay. And we've got that expertise from doing it for 10 years at LogMeIn. So we have confidence that we can do it across a much bigger base.

55. This statement was materially false and/or misleading because it failed to disclose, among others: (i) that LMI was forcing former GoTo customers to transition to annual billing against their will; (ii) that LMI was forcing customers to switch to annual commitments/terms; (iii) that many SMB customers were transitioned without receiving notice; (iv) that, for those customers that did receive advanced notice, these customers were led to believe that they were being forced to convert to annual billing without a choice and the notice

did not clearly indicate that they were being converted to annual commitments/terms; (v) that LMI removed the termination for convenience clause, thereby masking that a significant portion of customers would not renew their contracts; (vi) that LMI had also admittedly forced larger customers to sign new purchase orders rather than auto-renewing or when adding seats/licenses; (vii) that forcing customers to convert to annual billing and commitments/terms against their will was causing increased customer friction and churn; and (viii) that there was a substantial number of customers who, after being forced to convert to annual contracts, immediately notified LMI of their intent to cancel their contracts, which would begin churning off in Q2'18 when the first wave of converted customers reached a full year after being converted to annual contracts.

**2. The Second Materially False/Misleading Statement**

56. During the JP Morgan Global Tech Conference on May 15, 2018, Defendant Wagner falsely and/or misleadingly asserted that the Company was not insisting that former GoTo customers convert to annual payment terms and that it was taking its time in transitioning customers.

> One of the things that we believe – and in SaaS – SaaS is a subscription that people should pay for the subscription upfront. That was LogMeIn's policy. ***The GoTo policy was monthly subscription – or annual subscriptions, but monthly pay. And customers can still do that, but we've incented the sales force to migrate those customers to annual pay***. That's obviously driven significant increase in cash flow, ***but we haven't really insisted that people do that***.
>
> ***So we're also being, I think, taking our time to do it***. We don't need to. We're expanding cash flow and margins as we go nicely. There's still a lot of runway there, but ***we're not telling people when they renew, okay, you have to move to an annual subscription. I mean, we're giving that option, giving incentive. But if people push back and don't want to do it, then that will be okay, at least in the short term***.

57. This statement was materially false and/or misleading because it failed to disclose, among others: (i) that LMI was forcing former GoTo customers to transition to annual

billing against their will; (ii) that LMI was forcing customers to switch to annual commitments/terms; (iii) that many SMB customers were transitioned without receiving notice; (iv) that, for those customers that did receive advanced notice, these customers were led to believe that they were being forced to convert to annual billing without a choice and the notice did not clearly indicate that they were being converted to annual commitments/terms; (v) that LMI removed the termination for convenience clause, thereby masking that a significant portion of customers would not renew their contracts; (vi) that LMI had also admittedly forced larger customers to sign new purchase orders rather than auto-renewing or when adding seats/licenses; (vii) that forcing customers to convert to annual billing and commitments/terms against their will was causing increased customer friction and churn; and (viii) that there was a substantial number of customers who, after being forced to convert to annual contracts, immediately notified LMI of their intent to cancel their contracts, which would begin churning off in Q2'18 when the first wave of converted customers reached a full year after being converted to annual contracts.

58. Additionally, Defendant Wagner's May 15, 2018, statement was materially false and/or misleading because Defendant Wagner omitted that (as he later admitted on July 26, 2018) by May 15 the negative performance trends in Q2'18 arising from the forced conversions were clear and Defendant Wagner had already "recognized the need to take corrective action."

### B. LMI Forced Former GoTo Customers To Switch To Annual Upfront Commitments Against Their Will

59. The conversion of former GoTo customers to annual billing differed slightly between E-commerce (*i.e.*, individual and SMBs with lower number of employees/spend) and enterprise customers (larger companies with more employees and higher spend). In both instances, however, the effect was the same: LMI (i) transitioned customers to annual billing;

and (ii) switched customers from monthly contracts that could be terminated upon 30 days' notice to an annual commitment that renewed for 12-month terms.

60. Although LMI purported to provide advanced notice to all customers, many customers did not receive that notice, and those that did, were misled by its contents.

61. E-commerce customers were transitioned to annual billing against their will as they were led to believe that they were forced to convert and did not have the option to remain with monthly billing. Similarly, LMI admittedly forced larger customers to convert by: (i) forcing the customers to sign new purchase orders when the customers came up for renewal; and/or (ii) forcing customers to sign new purchase orders when adding/increasing licenses to their account while quietly changing the terms and conditions.

62. In addition to transitioning former GoTo customers to annual billing, LMI forced former GoTo customers into renewing their subscriptions for an annual (12-month) commitment/term. This was accomplished by eliminating the termination for convenience clause, which generally had allowed customers the flexibility to terminate their service, at their election, upon 30 days' notice. As a result, even in instances where LMI allowed customers to purported to continue with "monthly" payments, customers were still being forced to commit to an annual term.

### 1. Many Former GoTo Customers Did Not Receive Notice Of The Conversion

63. Various former LMI employees indicated that they believed former GoTo customers were supposed to have been provided some form of advanced notice about the conversion from monthly to annual billing.

64. However, many former GoTo customers did not receive the notice. For example, as alleged further herein, CW2 claimed that a large number of emails "bounced back" as the

Company did not have updated emails for all customers. As such, CW2 said customers were "livid" when charged the full annual amount upfront because they did not see the notification.

65. Irate customers' posts on LMI's online community and on Twitter evidence that a significant number of GoTo customers did not receive advanced notice about the transition to annual billing. For example:

(a) In a January 11, 2018 LMI Community Post, a user named hfi disputes the Company's contention that LMI "sent Email notifications to all affected customers in advance of their renewal date, before the increase was in effect on their account." Specifically, hfi stated "This is not true at all. Ourselves, as well as others received ***no notification whatsoever***, so you are either unaware of this or are outright lying." The same user further affirmed that "Automatically renewing this new price hike in a 12 month contract without notifying us is noth[i]ng short of an outrage."

(b) On April 1, 2018, a user on Twitter (@geekforhireinc) tweeted "… #WTF @citrix You charge us for an entire year of service, rather than the agreed to monthly billing, and then we can't @LogMeIn? Been on hold for over an hour still waiting for your quote #suppport line to answer. #Fraud." In a follow up tweet, the user said they gave up after waiting more than 90 minutes to speak with customer service and requesting that the company contact them. After the GoToAssist twitter account responded and indicated that "[e]mail notifications are always sent in advance of any changes" the customer adamantly stated they had searched their email and spam folders but had not received any notice about the change. The Company's Twitter account later responded and wrote that a customer service representative had subsequently read the text of the message to the customer over the phone that morning. However, the customer responded: "I never received that message. Yes, I checked my spam. The message I received this AM says

'Here is the structure of the email that was sent'. I didn't receive the actual email. It also says 'As of XX/XX/XX your account will be transitioned'. It does not provide the actual date." A week later, on April 8, 2018, the customer sent another tweet to the Company's twitter account indicating that they still had not provided him with a copy of the notice that was purportedly sent to him.

(c) On April 17, 2017, a user on Twitter (@cd1zz) wrote: "@LogMeIn increased my subscription by 4X w/o notice! Now they say I'm locked in for the year. Nice way to treat a long time customer."

(d) On November 17, 2017, a user on Twitter (@torpunuri) wrote "… You switched us from monthly to annual billing. Debited funds today. This was unauthorized. Doesn't make sense. How do you deduct funds without customer approval for services you haven't provided? Refund funds and keep monthly billing."

**2. Customers That Did Receive A Notice Felt Forced To Switch To Annual Billing**

66. Plaintiff has identified what appears to be the standard form notice that LMI purportedly emailed to former GoTo customers in advance of the transition. Plaintiff identified two different internet posts (one from June 2017 and another from August 2017) containing the text of the notice. In both instances, the posts indicated it was a notice that had been emailed to them by LMI. The text of these two notices are substantially identical (with the exception of the date listed in each identifying when the respective customers' accounts would convert to annual billing[4]).

[4] An additional difference between the text of the two notices is the address of a web link, which in one version is to a Citrix website whereas in the other/later version it is to a LMI website.

67. Plaintiff is informed and believes that the notice emailed to former GoTo E-Commerce clients prior to their conversion to annual billing (the "Notice") was substantially identical to the below text (with the main difference being the date for which each clients' account would transition).

68. According to the version of the Notice contained in an August 26, 2017 post on LMI's online community, LMI stated:

> Important Account Update. You asked, we listened! After surveying our valued customers, we're prepared to make your payments easier to manage.
> We are here to create the best, most efficient experience for our customers and are working to streamline this experience with a more effective and predictable billing cycle. As of 10/31/2017 your account will be transitioned to an annual billing cycle.
> What are the benefits of annual payment?
>
> - Efficient, simple, one-time payment
> - Budget-plan with ease
> - Invest time in using your product
>
> Our No.1 priority continues to be delivering great service, and a best-in-class experience for our valued customers. If you have additional questions, please contact Customer Care at https://support.logmeininc.com/.
> We greatly value and appreciate you as a partner!
> Sincerely,
> Chris Guigliano
> Director, Customer Care
> LogMeIn

**a. Customer Complaints Show that GoTo Customers Believed They Did Not Have a Choice About the Contract Changes**

69. The Notice sent to individual and SMB E-Commerce customers was written in a manner to lead customers to believe that they were being forced to transition to annual billing. The Notice did not indicate that the customers had any choice in the matter.[5]

---

[5] In fact, the Notice misleadingly suggests that the transition to annual billing was the result of a purported survey indicating that customers were asking for the change. However, multiple former GoTo customers noted in online posts that they never received any such survey and that

70. The Notice did, in fact, lead customers to believe that they were being forced to transition and that they did not have a choice to remain paying monthly (with the right to cancel upon 30 days' notice). This is confirmed by analysis of customer postings and complaints on both Twitter and LMI's online help website.

71. For example, on August 27, 2017, in response to receiving the Notice, an angry customer going by the username "Cloudeight" expressed their displeasure on LMI's online community. *See* Exhibit A (LMI Community Post on August 26, 2017).[6] In a post entitled, "***Notice about forced annual plan*** for gotoassist," the customer was in disbelief that the change was in response to "surveys" and that there would be "***no monthly option***": "I just got an email notice about annual billing starting in October based on 'surveys'. I have been with gotoassist for years and never received a survey about this. Am I reading this right or perhaps it was sent to my account in error? ***I cannot imagine they are going to charge me for a year in advance starting in October with no monthly option***."

72. Two days later, an LMI customer service representative responded and did not deny that the customer was being forced to annual billing. Rather, the customer service representative merely provided the contact info for customer support if the customer had any "questions or concerns." *See* Exhibit A.

73. A mere two minutes later, a different customer who had not yet received notice of any conversion to annual billing responded and noted the lack of clarity in the response from LMI's customer service representative. When this customer asked for express clarification about

---

the opposite was true (*i.e.*, that it was their preference to continue paying monthly and that it was not easier for them to switch to annual billing). Plaintiff is informed and believes that no such survey occurred.

[6] https://community.logmein.com/t5/GoToAssist-Remote-Support/Notice-about-forced-annual-plan-for-gotoassist/td-p/183301

whether, in fact, LMI was forcing customers to convert to annual billing, LMI's customer service representative responded and ***affirmatively confirmed that LMI was forcing customers to convert to annual billing***: "yes this is a change we are working towards in phases[.]" *See* Exhibit A.

74. Shortly after the LMI representative confirmed that this was in fact a forced transition, the original poster (Cloudeight) expressed anger about being forced to pay upfront for an entire year, especially when there were extensive bugs and problems with LMI's program and underscoring that customers could not afford such an immediate outlay: "You do realize how expensive a one year advance payment is?" *See* Exhibit A.

75. In a similar post, on September 15, 2017, a customer with the username "Brian6" posted on LMI's online community,[7] indicating that the customer had received a Notice via email that "***led me to believe that I had no choice*** -- it was changing to annual" billing. *See* Exhibit B (LMI Community Post on September 15, 2017).[8]

76. The response by LMI's customer service representative suggested that online subscribers would "continue" as "month to month." *See* Exhibit B. The response also stated that corporate accounts "are all annual," acknowledging that all corporate accounts were being transitioned. *Id.*

77. The user, Brian6, angrily responded that the Notice "had no choice" and at least twice indicating his belief that he was being "forced" into annual billing. *See* Exhibit B. The user stated: "[B]eing forced into an annual contract under the guise that it will make billing easier for

[7] The preceding portion of this post and response from LMI's customer service representative is discussed below. *See infra* ¶¶ 82-83.

[8] https://community.logmein.com/t5/GoToWebinar-Discussions/Switch-to-annual-billing/td-p/165935

me is a ruse." and "[F]orcing existing customers into annual billing, and then not refunding any unused portion in case of cancellation, is bad business in my opinion. Frustrating---considering looking for other providers." *Id.*

**b. The Notice Obfuscated That LMI Was Eliminating The Termination For Convenience Clause**

78. The Notice was also silent about the elimination of the termination for convenience clause, which had allowed the former GoTo customers to cancel their subscription upon 30 days notice.

79. In various businesses where customers do make upfront annual payments, it is not unusual for customers to receive a prorated refund if they cancel their account or services before the conclusion of the annual term. For example, credit card companies will frequently refund prorated portions of upfront annual fees if a customer cancels their account during the 12-month period after the annual fee was paid. Similarly, insurance companies will often refund prorated amounts of upfront premiums if the policy holder cancels their policy during the stated policy period.

80. Although the Notice sent to former GoTo customers did say that the customer was being transitioned to an "annual billing cycle," the Notice also described this as applying to "annual payment" and did not separately explain that customers were also being locked into an annual (12-month) commitment. The Notice did not explain that if a customer cancelled after making the annual payment, they would not be entitled to a prorated refund.

81. Based on their then-existing contractual relationship (that afforded customers the option to cancel at their convenience), former GoTo customers had little reason to expect that if they canceled their service after making the upfront payment, they would not be entitled to a

prorated refund of the unused portion of the upfront payment. Analysis of online complaints evidences that this was, in fact, confusing and unclear to customers.

82. For example, one former GoTo customer observed that the Notice was silent about what would happen if the customer cancelled their account after making an upfront annual payment. In a post[9] on LMI's online community, that customer sought confirmation that – as the customer assumed, based on standard business practices – LMI would issue a prorated refund if the customer were to discontinue their service in the following twelve months: "With the switch to annual billing, in the case of a voluntary discontinue, I hope the unused portion of the payment will be refunded. Otherwise, this is simply a money grab by the company." *See* Exhibit B.

83. In response, the customer service representative stated that annual plans "are discounted by 20% in many cases because of the annual commitment" and that "disabl[ing]" the renewal online merely means that the "annual subscription will be up at the end of 365 days." . *See* Exhibit B. The carefully worded response seemingly conceded that LMI would not refund the prorated share of the annual payment, purportedly because annual contracts ***may*** be cheaper.

84. LMI's refusal to refund the payment was apparently without any exceptions. One user on Twitter complained on October 14, 2017, "You took my years [sic] payment 1 month ago and now that I have sold my business won't refund unused portion." Similarly, on August 25, 2017, a Twitter account (@AngelaMuzyka) tweeted at LMI, noting that "@Logmein raises

[9] The text of the posting strongly suggests that the customer received the form Notice detailed above. For example, post the customer notes that it is "painless to pay my monthly bill--it is on autopay." This appears to be a direct reference to the language in the Notice indicating that the switch to annual billing was occurring, in part, based on a purported survey that indicated customers wanted to transition to annual payments to make it easier for them to manage. *See* Exhibit B ("Since I am on auto-pay, it couldn't be any easier.").

their prices to absurd prices, automatically renews, ***& won't cancel & give you refund***. I highly recommend not using it."

**c. Even If Customers Received The Notice, LMI Made It Extremely Difficult To Contact Customer Service To Seek Clarification Or Cancellation**

85. Although the Notice indicated, "If you have additional questions, please contact Customer Care," LMI made it extremely difficult to contact customer service or even cancel their subscription. Plaintiff is informed and believes that LMI intentionally made it difficult to contact the Company so that customers be converting against their will.

86. After the merger, LMI appears to have intentionally made it so that former GoTo customers could no longer disable auto renew online. As one account (@DickeyFuller) on Twitter noted on May 5, 2017, "@GoToMyPC For at least 8 years, Monthly Plan users could turn off Auto-Renew. Now it takes a 15'' call to tech support. What happened?"

87. Review of online customer complaints reflects extensive customer frustration with: (i) exceedingly long wait times or inability to reach anyone when calling LMI's customer service; (ii) the lack of response to messages left on LMI's customer service phone line or to messages sent through LMI's website; and/or (iii) LMI's modification of its online website so that customers could not deactivate the autorenewal function and instead had to call customer service to cancel their account.

88. For example, below is a small sample of various LMI customer complaints on Twitter about the difficulty of trying to cancel/discontinue their service:

(a) On April 17, 2018, Twitter user @sarahsechrist complained that LMI "won't call back or cancel account even though it hasn't been used in 9 month! I've been wasting my time with them for 2 weeks now." When an LMI representative claimed that "the

cancellation request was processed on 13th April 2018," the user replied: "wrong, I just got off the phone with your mgr again. We have been customer for 4 years, ***never notified of any agreement changes*** . . ." Nearly two weeks after the incident, on April 27, 2018, the same user replied "Still have yet to receive the credit they promised!"

(b) On March 5, 2018, a Twitter account (@daranjjohnson) tweeted, "… Hi LogMeIn – You have made it nearly impossible to cancel my subscription. You don't have a cancel option on the site, I cannot get through your phone system & I cannot find an email address. I will use you as an example of how NOT to do customer service." After LMI's account responded, the customer responded, "You really need to have a cancel option on the site. The fact that I have to call to cancel is really poor customer service. BTW, I did call and the auto answer service didn't respond when I pushed the numbers on my phone."

(c) On May 15, 2017, a Twitter account (@Dare2Bala) tweeted, "@Logmein why is there a auto renew option for subscription and can't cancel from the Web? There are so many similar compliants any action."

(d) On March 14, 2018, a Twitter account (@fastloanclose) tweeted, "… Hey Logmein, what's up with your piss poor customer service? You won't let me cancel an acct unless I talk to sales person that's never available???"

(e) On September 20, 2017, a Twitter account (@jjcermeno) tweeted, "@LogMeIn I find quite disturbing that the only way to modify my subscription is by phone. In 21st century, an Internet company. #facepalm"

(f) On March 26, 2018, after reaching out about trying to cancel and being sent the contact info for customer service, a Twitter account (@AnalyticsNinja) tweeted, "You could add a cancellation option in Account Settings too. That'd be nice."

(g) On April 9, 2018, a Twitter account (@MHBFem) tweeted, "@LogMeIn can you please tell me how i can cancel I go to subscriptions on the website and there is no option for cancel …"

(h) On May 3, 2018, after asking about how to cancel their account and being provided the contact info for customer support, a Twitter account (@editblog) tweeted in response, "Seriously? I have to contact someone to do this? I can't just do it online through my account for a company that is AN ONLINE COMPANY?"

(i) On May 2, 2018, a Twitter account (@liezke) tweeted, "@Logmein why is it necessary to call you to cancel my subscription?"

89. Similarly, customer complaints on Twitter also reveal the shocking level of difficulty LMI customers had when attempting to contact LMI's customer service:

(a) On December 5, 2017, a Twitter account (@MyPowerBar) tweeted, "@LogMeIn I am having huge problems with your customer service. How do I get a human who can help me"

(b) On October 2, 2017, a Twitter account (@JackJostes) tweeted, "… After 40 minutes, "Customer Care" let me know they don't have a direct phone number for anyone in the finance"

(c) On September 28, 2017, a Twitter account (@ upst4rt) tweeted, "… Getting the run around when trying to cancel an account. Been on hold 40+ min. your true colors are showing."

(d) On September 19, 2017, a Twitter account (@Eric_Srikandan) tweeted, "I cannot believe how hard it is get someone from LMI to get in touch with us. ***Over 24 hours have passed. Customer retention not needed***?"

(e) On July 27, 2017, 2017, a Twitter account (@jmillermerrell) tweeted, "… I'm trying to cancel my service. No one is being helpful. Can you help?

(f) On May 20, 2017, a Twitter account (@gaebonline) tweeted, "… How do I cancel my account? No Phone works, no Fax, no reaction on mails?"

(g) On April 24, 2017, a Twitter account (@bfluzin) tweeted, "… I want to delete my account. Sent a support request. No news."

(h) On May 4, 2018, a Twitter account (@cmsocietyuk) tweeted, "… Please contact us. We are unable to make contact with you by any means available. Have filled in online form which has phone number. Also requested call via email and held on phone for 40 minutes with no luck! Would appreciate an urgent response by 2pm today."

(i) On April 9, 2018, a Twitter account (@lynnthecoach) tweeted, "Not replying to emails, a promise to resolve something that was not followed up, numerous automated emails despite my cancelling my contract years ago, WHAT DO HAVE TO DO??"

(j) On April 12, 2018, a Twitter account (@boyclover) tweeted, "… Since I am unable to get through to you via the phone … on hold for an amazing 32mins and counting.. you customer service has really gone down hill along with your incredible 50% on year price hikes… please tell me how I get a refund." After LMI's account responded with the contact information for customer service, the customer responded, "… ***If they just answered the phone. [Why] publish phone numbers if you don't use them.***"

(k) On March 15, 2018, a Twitter account tweeted, "@LogMeIn … I've been on hold for over 30 minutes, waiting for someone to cancel a subscription. They claim they have to 'find the person that sold it to you' What the hell?"

90. By making it difficult to even to contact LMI's customer service at all, LMI made it extremely difficult for customers to even raise concerns about forced conversion.

#### d. Customers Who Could Remain "Monthly" Merely Paid Monthly But Were Still Being Converted To Annual Terms/Commitments

91. Even if customers were able to successfully reach LMI's customer service and were offered "monthly" options, this did not mean that GoTo customers only had a monthly commitment/term, as they had been with Citrix. For example, in an October 5, 2017 posting, a customer stated, "I'm trying to resubscribe, but I'm only given annual options. I don't want annual, and am happy to pay a higher monthly fee, but why don't I get that option? I can see monthly pricing still exists on the GoToMeeting website." In response, a LMI representative indicated that "[a]lmost all of our plans are now annual, though there should still be a monthly variation that you can pay in 12 increments." In response, the customer indicated, "I didn't realise [sic] the monthly option was just a payment plan for an annual commitment."

### 3. LMI Admittedly Forced Former GoTo Enterprise Customers To Switch To Annual Billing And Annual Commitments

92. At the end of the Class Period, on July 26, 2018, Defendant Wagner admitted that "business practices [LMI] put in place following the merger were negatively impacting renewal rates" and that these business practices included "[a]ggresively moving customers from monthly to annual payments" and "changing business terms and conditions." Defendant Wagner admitted that these business practices he was referring to were "pushing customers to move from monthly to annual" and "removing things like termination for convenience."

93. Specifically, on July 26, 2018, Defendant Wagner admitted that LMI "***forced customers to sign new purchase orders*** rather than auto renewing." Moreover, he admitted that

the churn issue in Q2'18 related to customers that came up for renewal, effectively conceding that a large number of customers had been "forced" to convert their account in Q2'17.

94. As Defendant Wagner clarified, "[F]or those larger customers, we put a lot of processes in place like ***we made them sign*** -- go back and sign [purchase orders] just to renew what they already had or to add on seats. And as we look back on that, we probably should not have done that."

95. Information from former employees and customer complaints shed further light on what Defendant Wagner admitted during the July 26, 2018, conference call with respect to adding on "seats." Plaintiff is informed and believes that Defendant Wagner was also acknowledging that when large former GoTo customers signed purchase orders to add additional licenses to their accounts -- despite their existing contract or service agreement -- LMI quietly included or referenced updated terms/conditions in purchase orders that required upfront annual billing and a 12 month term for those specific licenses that were being added.

96. For example, CW5, who was a former Enterprise Account Representative, indicated that, after the merger, CW5's autopay accounts were charged automatically for the entire annual amount upfront when adding on licenses. CW5 said that this was surprising to the customers and made them upset. For customers who were invoiced and not on auto-pay, if those customers did not pay the annual upfront payment within the required time period, CW5 said LMI was pursuing collections fairly aggressively.

97. CW5 processed orders from existing customers to add-on products, typically additional licenses, but CW5 but did not handle billing. At LMI, billing (located in Boston) would then issue an invoice for the entire annual payment to be paid upfront. CW5 was not notified by LMI that this was the new practice. CW5 learned of these changes approximately 30

days to 60 days after the merger was finalized in February 2017 when customers began calling CW5 "screaming and yelling" because they were "irate" that they were being billed thousands of dollars – the entire annual payment to be paid upfront.

98. Analysis of online customer complaints further confirms that larger customers were not aware at the time that LMI had changed contract terms. For example, a customer complained on Twitter on June 28, 2017, using the username @momatt77, noted that LMI "transitioned [his company's] account to a 12 month commitment by revising our t&c and expecting us to notice that change." He went on to state: "We only noticed when we tried to change our account. THEN they were really up front [sic] about that little change…after it was too late."

99. CW1, CW3, and CW5 explained that after the merger, GoTo customers contracts were no longer co-terminus, which resulted in cancellations. They explained that under Citrix if a customer signed up for a product or service on a particular date any other products or services purchased at later dates had the same renewal date as the initial contract. For instance, if a contract was entered into on January 1, 2018 any products or services added throughout the year also came up for renewal on January 1, 2019. CW1, CW3, and CW5 said that LMI did not offer co-terminus terms, so each time customers added products or services, the customer entered into a new annual contract with a new start date and corresponding renewal date. CW1, CW3, and CW5 said the various renewal dates made it more difficult for the customer to cancel or terminate its relationship with LMI.

100. CW5 explained that customers might cancel one contract but were then bound to continue the contracts of others not yet up for renewal. CW5 said some customers needed and relied on the product so even if the customer wanted to cancel, it was not that easy.

101. For example, some businesses might require all employees to use the same product to collaborate, and transitioning would require them to either use different products until the transition could be completed as the contracts expired, or they would transition before the added products contract term expired and eat the cost.

### C. The Immediate Flood Of Churned Accounts Exactly One Year After LMI Began The Conversion Is Strong Evidence That LMI Forced Former GoTo Customers To Transition Against Their Will

102. As described by various former employees, *supra*, after the Merger, as LMI transitioned former GoTo customers to annual billing and commitments/terms, there was an immediate increase in customer complaints and cancellation requests.

103. On the July 26, 2018 conference call at the end of the Class Period, Defendant Wagner indicated that the increase in customer churn in Q2'18 was directly tied to the start of the transition to annual billing in Q2'17. Specifically, Defendant Wagner stated:

> … As you know, last year, we put a lot of new practices in place, namely pushing customers to move from monthly to annual, changing business terms, removing things like termination for convenience. We forced customers to sign new purchase orders rather than auto renewing. So I think a lot of that manifest as these customers came up for renewal in their first year, kind of post-transition. We saw that happen in the quarter.

104. The fact that there was an immediate increase (one year after the fact) in churn among the cohort that LMI initially converted to annual billing/commitments, is strong evidence that LMI was forcing former GoTo customers to convert against their will.

105. The language used by Defendant Wagner on the July 26, 2018 conference call about the changes LMI was making to its business practices to improve retention also strongly evidences that LMI had forced many former GoTo customers to transition their accounts and/or made the customers convert against their will. For example, Defendant Wagner said LMI had "overhaul[ed]" its business practices. This "overhaul," as described by LMI's CFO Herdiech,

included "relax[ing] our business rules" and "being really flexible." In other words, prior to Q2'18, LMI was being strict and not flexible. Or as Defendant Wagner admitted, "We forced customers to sign new purchase orders rather than auto renewing."

### D. The Truth Is Revealed: Defendants Admit They Aggressively Forced Customers Into Annual Contracts and Changed Payment Terms, Alienating Customers, and Forcing Them into Competitors' Arms

106. On July 26, 2018 LMI held an earnings call to discuss its Q2'18 financial results. On the Call, Defendant Wagner revealed that, contrary to prior representations, the Company "aggressively mov[ed] customers from monthly to annual payments," alienating those customers and causing them to seek competitors' services when their contracts became due for renewal:

> I'd like to begin my comments discussing an area where our performance in the quarter did not meet our expectations, specifically the traditional Communications & Collaboration business, where ***our combination of imperfect execution and some hangover effects of last year's merger with the GoTo business, led to disappointing renewal rates***.
>
> As we moved through the quarter, it became increasingly clear that some of those business practices we put in place following the merger were negatively impacting renewal rates. ***Aggressively moving customers from monthly to annual payments, changing business terms and conditions and barriers we created to the auto-renewal process all contributed to friction for our customers and made us harder to do business with***.
>
> In addition, we failed to deliver some planned product enhancements, and frankly, were slow to address some product quality issues that crept into the product last year as we merged and realigned engineering teams. The impact of these issues was amplified by ***competitors who took advantage of these execution challenges and successfully targeted our customer base. . . . By the second half of the quarter, these performance trends became clear and we recognized the need to take corrective action***.
>
> Heading into Q3, we made changes in leadership, and ***I personally began to work more closely with the team to overhaul our business practices, made changes to pricing and packaging and increased our engineering team's focus on delivering on key product initiatives for our Collaboration products***. Many of these changes are already in place, with others expected to be fully implemented later in the second half of the year.

> However, we believe it will take several quarters for these actions to meaningfully impact renewal revenue. ***We therefore expect that growth in our Collaboration business will slow in the second half of the year***. This performance, combined with FX headwinds impacting our entire business, has resulted in us taking a more conservative view of the second half of 2018, and thus, we are lowering our outlook for the full year. Ed will provide more details in a few moments.
>
> Again, ***this performance is disappointing, but I feel it's mostly due to our own executional missteps***. We are confident we've identified the specific causes and have already taken steps that we believe will lead to better operational performance exiting the year. Importantly, these execution issues were limited to one area of our business, and we saw very strong performance and encouraging long-term trends across the rest of the company, especially in our key strategic growth drivers.

107. Contrary to the Company's representations that it was only taking the willing conversions and that switching from monthly to annual payment terms was optional, Defendant Wagner revealed that the Company had pushed customers from monthly to annual payments, changed business terms like the termination for convenience, and actually "***forced***" customers to sign new purchase orders rather than auto renewing, stating:

> [T]here are really 3 drivers that we saw really manifest themselves as we worked through the quarter. First was changes to the business practices that we made last year and earlier this year. Number two was some slipping product deliverables. And then third, I would say would be competition and taking advantage by really kind of attacking that base. So let's talk about each of those. So first, business practices. As you know, last year, we put a lot of new practices in place, namely ***pushing customers to move from monthly to annual, changing business terms, removing things like termination for convenience. We forced customers to sign new purchase orders rather than auto renewing. So I think a lot of that manifest as these customers came up for renewal in their first year, kind of post-transition. We saw that happen in the quarter***. So all those things have been addressed and already changed, and we expect to see that effect pretty quickly. On the product side, the second area, we realigned product management and engineering resources last year as part of the merger. And frankly, I think the team was a little slow to introduce the new functionality that we had planned and address some quality issues, as I mentioned in my remarks. So examples like things like connect time and audio quality. We were also late shipping a couple of enhancements that we had planned. So all those things, I think, contributed. Those are the second things that contributed. And those 2 things together, I think did open the door for competition. And keep in mind, as you know, Will, we compete in a pretty fragmented market and that really hasn't changed, from Skype for

> Business, WebEx, Zoom, those are certainly probably the 3 competitors we see most. We compete with them each and every day and we certainly win our fair share. In fact, our hunter teams, our new business teams, performed well in the quarter. ***On the renewal side though, I would say that probably Zoom was especially aggressive in recruiting our ex-salespeople who know our customers and going after them with really low prices and flexible business terms***. So as we work through these changes, I think it's going to take several quarters for them to play out, but a lot of them are already in place and are already in play.
>
> ***
>
> [S]o I made a change in the general manager, kind of the person who's running that business. And that's something which we will be backfilling this quarter. Engineering changes and product changes that we also made in leadership, and those are already done and new people in place in those roles. So – and they've been – they began in June and are working it already. And of course, given the performance, as you can imagine, ***I personally really started digging in and to make sure that we had our arms around exactly what the cause was and we have a really clear plan on how to address them and fix them***.

108. An analyst on the call inquired about whether the Company's changes would be "too-little-too-late." In his response, Defendant Wagner reiterated that the problem was an "execution issue" and that he was confident the issue could be resolved:

> [A]s I said, ***this is an execution issue***. This is not a market issue. This is not a long-term systemic issue. We didn't execute as well as we needed to in the quarter. Long term, this market is a big market. We have -- we think we have a leadership position in this space, with great products, great people and we have a plan to address the short-term execution. So while I think there is headwind in the second half of the year and I'm as disappointed as anyone, certainly, that we had to adjust guidance down. But from a plan to fix that, we feel really confident that, that's in place at a very detailed level. And ***I've been personally involved***, so I feel very comfortable getting on this call and saying we will take care of that.

109. On the call, Herdiech admitted that the Company had visibility into this issue because it was tracking renewals "a couple different ways:"

> **Analyst Daniel Robert Bergstrom**: could you review the efforts around moving the GoTo base from monthly to annual contracts? And then how did that progress over the last year? Is there some measurement or percentage of the user base converted or some way to think about that? And then are we through with that conversion effort at this point?

> **Herdiech**: ***So we were tracking it a couple of different ways with respect to renewals in terms of the kind of the dollar amount that we were converting***. And in Q3, Q4, Q1 and into Q2, ***we converted between $10 million and $15 million a quarter***. ***And that took the renewal base from -- in the 30% kind of annual to in the 50%***. And as you can imagine, we kind of relaxed our business rules. There's still opportunity to do that, but we're being really flexible. And so we would expect that activity to come down in the second half of the year. At the same time, we are also kind of lapping our efforts to do this. ***This would be our -- the second half of the year would have been our second time through the renewal base. So we were originally planning for that to be lower anyway***. And so there'll be some impact, but that's where we're at.

110. Moreover, Defendant Wagner admitted that: (1) customers were renewed at the end of the quarter in 2Q'17 without understanding the new terms, and now, a full year later, they understood and were terminating their contracts; and (2) large customers were being forced to sign new purchase orders to renew:

> **Analyst Alexander Kurtz**: I just want to go back to the business practices that you're mentioning on the call impacting the renewal rates. I mean, I was just going to take the other side of this. ***I mean, obviously, you thought a long time about implementing -- moving customers to annual contracts and the auto renewal. So I just -- it seemed like 6 months ago, these were good strategies that you want to implement in your installed base***. And I'm just wondering if it just seems a little maybe reactive to all of a sudden just stop it or there could be value in that strategy longer term once the products are kind of brought up to speed? So I'd just like your perspective on maybe pivoting away from this stuff that maybe a couple of quarters ago seemed like reasonable business logic.
>
> **Defendant Wagner**: Yes, I mean, first of all, I appreciate the thoughtful question. I think we certainly want to be thoughtful on our approach to this. But look, we also had done the work to identify where the friction was. ***So we actually spent the better part of the second half of the quarter really talking to customers, getting that feedback, and we really knew -- and it wasn't just the monthly to annual payment issue that was driving it, but it was some other things that we did. And really the – one of the things that we uncovered was that the former LogMeIn customers were really conditioned to that. Whereas some of the GoTo customers experienced it for the first time last year and then they came up for renewal, and they found a lot of friction in that process. So that's really where we feel a lot of confidence. And again, we know because the customers told us when we dug in. And so as I dug in, saw that performance, it gave us the confidence that we should modify those business practices and terms***.

***

> **Analyst Raimo Lenschow**: Can I stay on that subject, sorry? One thing that I'm kind of still confused about is why did that show up in Q2, not in Q1, if like it's been going on for a while? Can you talk to that, please?
>
> **Defendant Wagner**: So that's really – we started this process late in – if you remember last year, ***we started converting a lot of those customers late in the second quarter last year. So a lot of those customers now, for the first time, they came up on to their renewal, and we -- they were coming up last year for the renewal late in the quarter. They get a notice like, time to renew and here's your terms, and they didn't have a lot of time to think about it and they renewed. Now they've come back. They've been there for a full year. They know the terms. They know their renewal is coming up, and I think it just gave them more time. In the second half of the quarter, again, is where we first started lapping those customers***. That's why we were – we wanted to adjust guidance down and make sure that we have a plan in place to eliminate that friction.
>
> **Analyst Raimo Lenschow**: Is there – if I think about that, is there also like GoTo was slightly higher in the market – not the enterprise, as you always pointed out, but slightly higher up in the market than you did. So is there a kind of, in a way, you're discovering that there's slightly different behavior, where in the low end of the market, you were just able to squeeze it through and there was no discussion, while here in that mid side of the market, you kind of have more – you needed to be slightly more careful? Is that the right way to think about it?
>
> **Defendant Wagner**: Yes, I think that's a fair comment. The base isn't really that different. But again, ***for those larger customers, we put a lot of processes in place, like we made them sign -- go back and sign POs just to renew what they already had or to add on seats. And as we look back on that, we probably shouldn't have done that, and that's execution that's quickly fixed***. So – but I think that's a good observation.

111. Analysts were stunned by the news, and questioned management credibility regarding the transition. A July 27, 2018 Cowen report noted that "mgmt credibility is likely at all-time lows." It stated, "The 2Q report was a big surprise, and our bullish near-term call was clearly wrong."

112. Similarly, on July 27, 2018, Northland issued a report that noted, as Defendant Wagner admitted during the July 26, 2018 conference call, that LMI had "tried to force customers to accept new contract terms" and even "required [customers] to sign annual contracts":

> While most product lines met or exceeded plan in Q2, the largest product line consisting of the GoToMeeting offering stumbled as ***the company tried to force customers to accept new contract terms*** and missed shipping some product enhancements. The resulting weakness in bookings has driven down revenue guidance for the year by 3% and $0.02 off EPS.
>
> ***
>
> Starting this time last year, renewing GoTo collaboration customers were ***required to sign annual contracts*** (whereas the prior owner, Citirix, allowed monthly billing). Given the limited time to respond, many took the annual contract but some chose not to renew a year later. This impacted billings and revenues going forward and hence the guide. While the company has switched to a "however the customer wants it" billing process, we believe it will be difficult to quickly resign these customers as many went with competitors such as Zoom (which has hired some GoTo sales people).

113. Analysts suspected that "[t]he issues [were] brewing for several quarters now with a departure from the more typical 'beat and raise' results that [analysts and investors] had been used to for years prior to the GoTo acquisition," as noted by an RBC report on July 27, 2018.

## VII. LOSS CAUSATION

114. During the Class Period, as detailed herein, Defendants made materially false and/or misleading statements and omissions, and engaged in a scheme to deceive the market. This course of wrongful conduct operated as a fraud or deceit on the Class and caused the price of LMI securities to be artificially inflated. But for Defendants' misrepresentations and omissions, Plaintiff and the other members of the Class would not have purchased LMI securities or would not have purchased such securities at artificially inflated prices. Later, when Defendants' prior misrepresentations, omissions and fraudulent conduct were disclosed to the market, the price of LMI shares fell significantly as the prior artificial price inflation was dissipated. As a result of their purchases and/or acquisition of LMI securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e. damages, under the

Exchange Act. and the other members of the Class were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

115. The concealed risks began to materialize and/or the truth about the material misrepresentations and omissions was partially revealed to the public after the close of market on July 26, 2018, when LMI announced its financial results for second quarter 2018. In the announcement and corresponding earnings conference call, the Company disclosed, inter alia: (a) that the Company had forced customers to convert to annual billing and contract terms; (b) changed business terms for GoTo contracts from monthly to annual billing; (c) the Company had removed the termination for convenience clause from GoTo contracts; (d) that the Company had created certain "barriers" to the auto renewal process; (e) that, as a result, its customers experienced friction; and (f) that, as a result, the renewal rates for the Collaboration & Communication segment declined 3.5%.

116. On this news, shares of LMI declined $26.60 per share, or approximately 25.47%, to close at $77.85 per share on July 27,2018, on unusually heavy trading volume.

117. The July 27, 2018 price decline was the result of the nature and extent of Defendants' fraud being revealed to investors and the market. Contrary to the Company's prior positive statements, the disclosures revealed that the Company had difficulty integrating the GoTo assets and the changes to GoTo contracts had negatively impacted renewal rates and customer retention.

## VIII. POST-CLASS PERIOD EVENTS

118. On October 25, 2018, LMI hosted a conference call with investors, analysts, and the public to discuss its 3Q'18 results. Therein, Defendant Wagner stated that the Company "eliminate[d] the friction [it] had introduced into the renewal process for many customers."

Specifically, the Company "automated more of the renewal process, while increasing [its] focus on the success of [its] customers earlier in their life cycle" and "introduced more flexible business terms." Defendant Wagner stated that, as a result of the changes, "***overall renewal rates for the Communications & Collaboration business increased to 83%*** versus the 77.5% [the Company] saw in Q2." Herdiech reported, "For the total company, our gross renewal rate across all products on an annualized dollar basis improved to approximately 80%, driven by improved retention rates in our Collaboration business."

119. Defendant Wagner emphasized that "***the business changes we made ourselves had the biggest impact*** in helping our renewal rates go from 77.5% up to 83%," rather than any change in competitors' strategy. When analysts clarified whether he was deemphasizing the competitive challenges that he had stated in the previous earnings call, Defendant Wagner reiterated:

> It was really, as we said last quarter, really 3 things we saw as we dug in. ***It was really the business changes that we made that we expected would have the biggest impact, and that's the way it played out in the quarter. I think the other issues turned out to be less of a long-term driver.*** So we made those changes and we're pleased with the results.

120. On October 26, 2018, research firm Piper Jaffray published a report noted renewal rates increased due to reduced customer friction:

> Management called out stabilizing renewal rates in its Collaboration segment, which increased 550 bps q/q/ from 77.5% to 83% (ex-Jive). ***Overall renewal rates across the company increased for the first time since the merger, from 75% to 80%. The company attributed this to reduced friction*** with a more automated renewal process, engagement with customers ahead of renewals, new pricing and packaging, flexibility with contract terms, and a number of product updates. . . . ***On our call back, management also mentioned that had it maintained annual contracts (for both new customers and renewals), deferred would have otherwise been $15 – 20M higher in the quarter***.

## IX. ADDITIONAL SCIENTER ALLEGATIONS

121. As alleged herein, Defendants acted with scienter because they knew that the public documents and statements issued or disseminated by Defendants, including in the name of the Company, were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly or substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants Wagner and Bradley by virtue of their receipt of information reflecting the true facts regarding LMI, their control over, and/or receipt and/or modification of LMI's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning LMI, participated in the fraudulent scheme alleged herein.

122. Defendants Wagner and Bradley knew or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge and complicit or, at least, the reckless disregard of the personnel at the highest level of the Company, including Defendants Wagner and Bradley.

123. The following additional facts give rise to a strong inference that the Defendants acted with scienter.

### A. Defendants Had A "Deliberate" Plan To Convert Customers

124. Defendants repeatedly emphasized that converting GoTo customers from monthly to annual upfront payments was a key priority for LMI. For example, at LMI's inaugural Analyst Day held on December 19, 2017, Defendant Wagner stated that the Company had "placed a

***priority on converting customers from monthly to annual***. That is our priority for 2017 and 2018." Similarly, during the Q2 2017 earnings call held on July 27, 2017, Herdiech stated that the "push for annual contracts, annual payment terms . . . by far it's the biggest opportunity" for LMI.

125. Defendants also planned the way these customers would be converted and were aware that the plan could create friction with customer relationships, leading to declining retention. Specifically, on September 13, 2017 at the Deutsche Bank Technology Conference, Defendant Bradley admitted: "[W]e have a ***very deliberate plan and a specific plan*** to go out after these contracts, whether they are e-commerce or whether they are touch sales and convert them from a monthly payer 12 months a year to a one-time payer." As the Court has already found, "deliberate" is "used to describe something that results from 'careful and thorough consideration' or 'characterized by awareness of the consequences.'"[10] Defendant Bradley went on to state that the first step of the "deliberate plan" related to "new business" and that "step two is looking at this large base of renewal business and converting it over the next number of quarters."

126. Therefore, Defendants knew how customers were converted to annual upfront subscriptions, with Defendant Wagner stating on July 27, 2017 during the Q2 2017 earnings call that "[i]n Q2, [LMI] also began ***testing conversion*** of existing customers to annual prepaid subscriptions." Further showing that Defendants were aware as to how customers were converted, during the September 13, 2017 Deutsche Bank Conference, Defendant Bradley went so far as to say that LMI had "***perfected*** that [sales and go-to-market strategy] over our tenure [including] ***conversion tactics*** that you'll learn and you'll find over time."

---

[10] *See* Memorandum and Order on Motion to Dismiss, Dkt. No. 72 at 21 n.7.

127. Defendants also reported the progress in converting the GoTo renewal base, implying that they monitored the status of conversion. For example, on July 27, 2017 during the Q2 2017 earnings call, LMI's CFO Herdiech stated that LMI had "started the process of transitioning GoTo's monthly business to annual contracts" and was "just kind of getting underway on e-commerce and renewals," and that "you see the impact in deferred revenue, but for Q2, it's a pretty small number, probably about $5 million." Likewise, Defendant Bradley stated on September 13, 2017 that "of the opportunity, [LMI] probably only converted a small percentage of it." And, at the end of the Class Period during the July 26, 2018 conference call, Herdiech admitted that Defendants "were ***tracking it a couple of different ways with respect to renewals*** in terms of the kind of the dollar amount that we were converting. And in Q3, Q4, Q1 and into Q2, we converted between $10 million and $15 million a quarter."

128. Analysts recognized the "opportunity" presented by converting GoTo customers but also warned that it must be done carefully. For example, a June 28, 2017 note from Northland Capital Markets entitled "Takeaways From Recent Meetings With Management" stated: "Migrating [GoTo] subscribers to the annual model that 99% of LOGM customers are on would increase predictability for revenue recognition as well as pull forward cash flow. However, ***migrating GoTo's over 3 million subscribers is a huge task especially if the migrations are to happen without disrupting business.***" Likewise, an October 27, 2017 report by Piper Jaffray stated: "We believe that the consolidation of payment terms toward annual billings can support continued sustained FCF margin expansion. . . . ***While this will clearly not happen in one fell swoop as the company has no interest in meaningfully disrupting retention rates***, we believe that this conversion can and will represent at least as much FCF leverage as the original synergy targets did (which is at least a 5 point tailwind)."

129. Defendants also touted positive results from early conversions before the Class Period, reflecting that they were attentive to the impact of converting GoTo customers. For example, during the July 27, 2017 during the Q2 2017 earnings call, Defendant Wagner stated that he was "***encouraged by the early results***," and Herdiech stated "***we're seeing good results so far***" from converting the GoTo renewal base. Therefore, Defendants knew or recklessly disregarded the adverse impact on retention rates during the Class Period caused by forcing customers to convert to annual billing terms.

**B. Defendants Reviewed Data Reflecting Declining Retention**

130. Due to Defendants' monitoring of the status and impact of converting GoTo customers, Defendants were well aware during the Class Period about the negative impact from forcing GoTo customers to convert to annual billing. Defendant Wagner belatedly admitted on July 26, 2018, that he knew by May 15, 2018 that forcing GoTo customers to convert to annual billing was causing retention to decline. Specifically, Defendant Wagner admitted during the July 26, 2018 conference call for Q2 2018 that "***[a]s we moved through the quarter [(i.e., March 1 to June 30)], it became increasingly clear that*** some of those business practices we put in place following the merger were negatively impacting renewal rates" and that "***[b]y the second half of the quarter, these performance trends became clear*** and we ***recognized the need*** to take corrective action." By his own admission, it was already "clear" by the second half of Q2 2018 (*i.e.*, by May 16th) that there was a "performance trend" where GoTo customers were not renewing their contracts due to "friction" introduced by Defendants' business practices.

131. The fact that, as Defendant Wagner admitted, these negative performance trends were clear and Defendants recognized the need to take corrective action by May 15, 2018, is supported by a May 23, 2018 analyst report that noted "we believe the company has made a

move to be more flexible on business terms and remove friction from its renewal process" in response to unexpected increased competition.

132. For this "performance trend" to be apparent by the second half of Q2 2018, it is reasonable to infer that LMI experienced higher cancellations than historical rates during the first half of the quarter, if not earlier. Indeed, during the July 26, 2018 conference call, Defendant Wagner stated that LMI "started converting a lot of those customers late in the second quarter last year" and "[i]n the second half of the quarter [i.e. after mid-May 2018], again, is where we first started lapping those customers." Similarly, Herdiech stated during the same call that "we are also kind of lapping our efforts to do this. . . . [T]he second half of the year would have been our second time through the renewal base." Given many GoTo customers would be due for renewal during the second half of Q2 2018, they would have had to provide notice of cancellation in advance of their renewal date (i.e., during the first half of Q2 2018). Not only that, these GoTo customers must have cancelled at above average rates for Defendants to characterize this as a "performance trend" that was visible in the second half of the quarter.

133. Although Defendant Wagner admitted Defendants were aware of the issue by May 15, 2018, Defendants knew well before May 2018 about the adverse impact on retention arising from the forced conversions to annual billing. This was known to Defendants because they continuously tracked retention rates—since before start of the Class Period.

134. According to the publicly available LinkedIn profile of LMI's former Renewal Operations & Strategy Analyst (who was in this position until he left LMI in July 2017), the analyst closely studied the retention data and presented it to the Executive Team. Specifically, the analyst indicates that they met "weekly with a database engineer to enhance Tableau Server Data Sources to increase the accuracy of Retention Reporting, as well as improve Retention self-

service analytics across the company," including by "writing business requirements and assisting in regular data QA [quality assurance] before live deployment." The analyst indicates that this data was "distributed in a monthly presentation to the Executive Team that summarized and gave commentary on how Renewal Bookings and Retention Rates were tracking toward the plan, as well as highlight[ed] important trends." Though this Renewal Operations & Strategy Analyst left LMI before the start of the Class Period, it is reasonable to infer that such data collection and analysis continued, especially in light of Defendants' own statements that they "track[ed conversions] a couple of different ways."

135. Similarly, the LinkedIn profile of LMI's former Senior Director of Go-to-Market Analytics further supports that Defendants continued to track retention and therefore knew of declining retention rates. When describing their job responsibilities between February 2017 and February 2018, the former employee indicates that they "[i]dentified declines in GoTo product retention which initiated a cross-functional mitigation team." Because this was listed under the employee's job description between February 2017 and February 2018, it follows that this clear trend was readily apparent by no later than February 2018 (although likely earlier) and would have been clear in the data and reports reviewed by the Defendants.

136. Confidential witness statements also support that Defendants knew retention was declining since the start of the Class Period. CW4 said LMI executives were warned that the business practices they implemented following the merger would result in decreased retention rates. According to CW4, Romesser fought really hard and objected to the changes; Romesser was looking at the data from "day one" after the implementations and had a team led by Dodge analyzing data in order to illustrate the impact of these changes. CW4 said that Romesser presented this data on numerous occasions to Defendant Wagner, Herdiech, and Chief Sales

Officer Larry D'Angelo. CW4 specifically recalled an instance in March 2018 in Dublin where Romesser showed CW4 numerous emails from these three individuals regarding the data. CW4 stated that when executives were presented with data about the drastic decline in retention, the reaction was "crickets."

137. CW6 prepared slide presentation dated March 2017 which showed the potential impact of shift to annual, including at least a five percent reduction in annualized sales for the GoToMeeting product. CW6 said another presentation dated August 2017 indicated a shift to annual billing could result in a nine percent drop in revenue. CW6 corroborated CW4's statement that Dodge led a team analyzing the impact on the decline in retention, stating the August 2017 presentation was a collaborative effort with Dodge and Josh Apple from marketing analytics. CW6 said these analyses were presented to Ford.

138. CW3 recalled that the drop in retention caused by the change in contract terms was apparent by May 2017 was continually discussed during senior leadership meetings, which were attended by all Director-level and above personnel (in all departments not just sales), including Defendant Wagner.

139. Confidential witness statements also affirm that declining retention was specifically due to the LMI's changes to GoTo customers' contracts. For example, CW2 reviewed hundreds of cancellation requests from customers during the Class Period in response to these changes to contract terms. CW2 sorted emails each day and stated that email cancellation requests increased after LMI began converting GoTo customers to annual billing. Customers included the reason they wanted to cancel in the email request, and CW2 estimated that 80 percent of the cancellation requests were the result of the conversion to annual billing. Similarly, CW1 recalled a meeting with the Director of Renewals and the sales teams in LMI's

Tempe office during the second half of 2017 during which the sales representatives expressed that customers were not happy about the switch from monthly to annual and the requirement to pay annually upfront, as well as that customers were cancelling as a result of these changes.

140. Defendants also recklessly disregarded the problem until it was too late to repair customer relationships. CW4 was assigned to a Task Force assembled to fix the retention issues at the company. CW4 believed this Task Force was formed in May 2018, though customers had been cancelling their contracts for several months. But, as noted by a July 27, 2018 analyst report by Northland Capital Markets, the Company would have difficulty winning back customers who had already fled to LMI's competitors: "***While the company has switched to a 'however the customer wants it' billing process, we believe it will be difficult to quickly resign these customers as many went with competitors such as Zoom*** (which has hired some GoTo sales people)."

141. Therefore, Defendants tracked retention before, during, and after the Class Period, and thus knew that customers were cancelling their contracts because they were forced to convert to annual billing subscriptions.

### C. Defendant Bradley Was Actively Involved in Evaluating Customers' Response To Business Changes

142. Defendant Bradley, as VP of Investor Relations, knew that GoTo customers reacted poorly to the way their contracts were converted to annual billing subscriptions. According to an interview with Nasdaq published on May 11, 2017 entitled "Intro To an IRO: Rob Bradley, LogMeIn, Inc.," Defendant Bradley "[f]requently . . . meet[s] with offices and departments and speak[s] to them about how the company is being received and valued and how each function can make an impact. Whether it's ***renewing customers*** and cross-selling to clients and prospects, ***having a good customer care experience***, or developing new products, all these

efforts have a significant impact on the company." In that same interview, Defendant Bradley noted that the "merger with the GoTo business was a tremendous career experience for [him] and a transformative event in the life of LogMeIn."

143. In fact, due to his capacity as VP of Investor Relations and his meetings about how the company was being received, Defendant Bradley knew or should have known of the adverse impact on retention based on customer complaints received in response to forcing GoTo customers to convert to annual billing. For example, one user stated on Twitter on June 28, 2017 that "If we can't stay with monthly payments, I need to cancel," and another stated that LMI "transitioned our account to a 12 month commitment by revising our t&c and expecting us to notice that change." The Company had customer support staff who reviewed these complaints because one even replied to the user, stating: "Could you please DM me your email address so I can have someone follow up with you?"

144. To the investing public, these may appear as outlier events. But to Defendant Bradley, who also had access to the customer complaints logged internally by LMI's salespeople and to the statistics of customers who had already cancelled their contracts, these Twitter complaints would reinforce what LMI already knew: that GoTo customers tried to cancel their contracts at alarming rates because they were being forced into annual upfront subscriptions they could not afford.

**D. Core Operations Doctrine**

145. The fraud alleged herein, relating to the concealment the Company's aggressive business practices with respect to GoTo contracts and the resulting retention problems, involved LMI's core operations, and knowledge of the fraud may therefore be imputed to Defendants Wagner, Herdiech, and Bradley. Specifically, the retention of GoTo's customers, in particular

those in the Collaboration segment which accounted for more than half of the combined entity's revenues, was undoubtedly crucial to the Company's viability and success. Defendants repeatedly noted the importance of transitioning the GoTo customers to LMI's contract terms, stressing that they were doing so in a way that would not cause customer friction. Defendants discussed the impact of this transition on free cash flow, deferred revenue, EBITDA, and revenue when reporting the Company's financial results and guidance, and indicated they were monitoring churn.

146. The Individual Defendants, as members of LMI's corporate management, had access to and reviewed reports about LMI's sales, renewals, and resulting revenues and cash flows, and represented to the investing public that they were tracking the metrics. Defendant Wagner noted on the October 26, 2017 earnings call that the Company had brought "together the teams, systems and processes that underpin our sales and marketing efforts and provide visibility into our business" and had a "common view of our bookings, ***revenue and renewals, all key performance indicators*** needed to help better manage the business." At the Company's Analyst Day, Defendant Wagner stated that "cash flow per share is an important metric for us that we measure our success, as we think about value creation." At the May 9, 2017 Jefferies Global Tech Conference, Defendant Bradley noted that "as we can convert those [contract] terms, there should be a corresponding improvement with the free cash flow yield."

147. Defendants also emphasized the strength of its integration planning and assured they oversaw the execution of those plans. For example, during the July 27, 2017 conference call regarding Q2 2017 earnings, Herdiech stated that "[i]n advance of the merger close, [LMI] set up and staffed a professional integration management office tasked ***to prepare detailed integration and synergy capture plans and to manage and report against the actual execution of these***

***plans***." He further stated that these preparationsi "enabled [the Company] to accelerate execution ***in a controlled way*** against most initiatives, putting [LMI] significantly ahead of [its] first year synergy targets as evidenced by our margin performance." Moreover, Defendant Wagner affirmed at Analyst Day 2017 that LMI had "placed a priority on converting customers from monthly to annual. That is our priority for 2017 and 2018."

## X. CLASS ACTION ALLEGATIONS

148. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all individuals and entities that purchased or acquired LMI securities (including common stock and options) between September 13, 2017 and July 26, 2018, inclusive, seeking remedies under Sections 10(b) and 20(a) of the Exchange Act. Excluded from the Class are Defendants, the officers and directors of the Company (at all relevant times), members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

149. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, LMI's shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of LMI shares were traded publicly during the Class Period on the NASDAQ. As of December 31, 2017, LMI had approximately 52,564,000 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by LMI or its transfer agent and may be

notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

150. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

151. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

152. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of LMI;

(c) to what extent the members of the Class have sustained damages and the proper measure of damages; and

(d) whether the Defendants acted with scienter.

153. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually

redress the wrongs complained of herein. Moreover, there will be no difficulty in the management of this action as a class action.

## XI. UNDISCLOSED ADVERSE FACTS

154. The market for LMI's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements, LMI's shares traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired LMI's shares relying upon the integrity of the market price of the Company's shares and market information relating to LMI, and have been damaged thereby.

155. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of LMI's shares, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about LMI's business, operations, and prospects as alleged herein.

156. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about LMI's business and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially

false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## XII. APPLICABILITY OF PRESUMPTION OF RELIANCE

157. The market for LMI's shares was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, LMI's securities traded at artificially inflated prices during the Class Period. On February 15, 2018, the Company's shares closed at a Class Period high of $133.80 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's shares relying upon the integrity of the market price of LMI's shares and market information relating to LMI, and have been damaged thereby.

158. During the Class Period, the artificial inflation of LMI's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint, which in turn caused the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about LMI's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of LMI and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's shares at such artificially inflated prices, and each of them has been damaged as a result.

159. At all relevant times, the market for LMI's shares was an efficient market for the following reasons, among others:

(a) LMI shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, LMI filed periodic public reports with the SEC and/or the NASDAQ;

(c) LMI regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) LMI was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports were publicly available and entered the public marketplace.

160. As a result of the foregoing, the market for LMI's shares promptly digested current information regarding LMI from all publicly available sources and reflected such information in LMI's share price. Under these circumstances, all purchasers of LMI's shares during the Class Period suffered similar injury through their purchase of LMI's securities at artificially inflated prices and a presumption of reliance applies.

161. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misrepresentations and/or omissions. Because this action involves Defendants' failure to disclose material adverse

information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XIII. NO SAFE HARBOR

162. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and/or there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of LMI who knew that the statement was false or misleading when made.

## XIV. CLAIMS

**FIRST CLAIM**
**Violations of Section 10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**<u>Against All Defendants</u>**

163. Plaintiff repeats and re-alleges each allegation contained above as if fully set forth herein.

164. This claim is asserted against all Defendants and is based on Section 10(b) of the Exchange Act.

165. During the Class Period, the Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase LMI's shares at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Defendants took the actions set forth herein.

166. The Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for LMI's shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All the Defendants were either primary participants in the wrongful and illegal conduct charged herein or were controlling persons as alleged below.

167. The Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated

in a continuous course of conduct to conceal adverse material information about LMI's financial well-being and prospects, as specified herein.

168. The Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of LMI's value and performance and continued growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about LMI and its business operations and prospects, in light of the circumstances under which they were made, not misleading, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares during the Class Period.

169. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, and operations at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of

information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

170. The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing LMI's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by the Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, the Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

171. Because of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of LMI's shares was artificially inflated during the Class Period. In ignorance of the fact that the market price of the Company's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the shares traded, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Defendants, and not disclosed in public during the Class Period, Plaintiff and the other members of the Class acquired LMI's shares during the Class Period at artificially high prices, and were damaged thereby.

172. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the Company's misrepresentations, which were not disclosed by the Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their LMI shares, or, if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

173. Because of the foregoing, the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

174. As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's shares during the Class Period.

**SECOND CLAIM**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

175. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

176. This claim is asserted against the Individual Defendants and is based on Section 20(a) of the Exchange Act.

177. The foregoing allegations demonstrate a primary violation of Section 10(b) of the Exchange Act.

178. The Individual Defendants acted as controlling persons of LMI within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the

Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

179. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular statements giving rise to the securities law violations as alleged herein and exercised the same.

180. Because of their positions as controlling persons, the Individual Defendants are thus liable pursuant to Section 20(a) of the Exchange Act for LMI's primary Exchange Act Section 10(b) violations. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## XV. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) A determination that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) An award of compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained due to Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) An award to Plaintiff and the Class of their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d) Awarding extraordinary, equitable, and/or injunctive relief as permitted by law; and

(e) Such other and further relief as the Court may deem just and proper.

## XVI. JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 11, 2020

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Robert V. Prongay*
Robert V. Prongay (*admitted pro hac vice*)
Charles H. Linehan
Christopher R. Fallon
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Lead Counsel for Lead Plaintiffs and the Class*

**BLOCK & LEVITON LLP**
Jason M. Leviton (BBO #678331)
155 Federal Street, Suite 400
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile: (617) 507-6020
Email: jason@blockesq.com

*Liaison Counsel for Lead Plaintiffs and the Class*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On November 11, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the District of Massachusetts, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 11, 2020.

*s/ Robert V. Prongay*
Robert V. Prongay