UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| BENJAMIN WASSON, individually and on behalf of all others similarly situated, | * * * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 18-cv-12330-ADB |
| | * | |
| LOGMEIN, INC., WILLIAM R. WAGNER, and ROBERT BRADLEY, | * * | |
| | * | |
| Defendants. | * | |
| | * | |

## MEMORANDUM AND ORDER ON MOTION TO DISMISS

BURROUGHS, D.J.

Lead Plaintiffs Larry Pollock[1] and Robert Daub and named Plaintiff Benjamin Wasson (together with Pollock and Daub, "Plaintiffs") bring this putative shareholder class action against Defendant LogMeIn, Inc. ("LogMeIn" or the "Company"), Defendant William R. Wagner, and Defendant Robert Bradley (with Wagner, the "Individual Defendants," and with LogMeIn and Wagner, "Defendants"), alleging that Defendants violated federal securities laws in connection with LogMeIn's acquisition of GetGo, Inc. ("GetGo") and the transition of former GetGo customers from monthly to annual billing plans.[2] See [ECF No. 75 ("SAC")].  Currently before the Court is Defendants' motion to dismiss the Second Amended Complaint ("SAC").  [ECF No.

---

[1] Mr. Pollock passed away on January 31, 2019.  [ECF No. 53].

[2] Although Edward K. Herdiech was previously a defendant, he is not named in the operative complaint.  Compare [ECF No. 54 (naming Herdiech as defendant)], with [ECF No. 75 (not naming Herdiech as defendant)].

76].  For the reasons set forth below, the motion is <u>GRANTED</u>, and no further amendments will be permitted.

## I.      BACKGROUND

### A.      Factual Background

For purposes of this motion to dismiss, the Court, as it must, "accept[s] as true all well-pleaded facts alleged in the [SAC] and draw[s] all reasonable inferences therefrom in the [Plaintiffs'] favor."  <u>A.G. ex rel. Maddox v. Elsevier, Inc.</u>, 732 F.3d 77, 80 (1st Cir. 2013) (quoting <u>Santiago v. P.R.</u>, 655 F.3d 61, 72 (1st Cir. 2011)); <u>see</u> <u>InterGen N.V. v. Grina</u>, 344 F.3d 134, 145 (1st Cir. 2003) (noting that an amended complaint "supersedes the original complaint").[3]

LogMeIn offers free and fee-based subscription software services to mobile professionals and IT service providers.  [SAC ¶ 31].  It derives revenue principally from subscription fees from customers, including individual consumers, small and medium businesses, and enterprises (i.e., larger companies).  [<u>Id.</u>].  During the class period, Wagner was LogMeIn's President and Chief Executive Officer, and Bradley was its Vice President of Investor Relations.  [<u>Id.</u> ¶¶ 21–22].

In July 2016, LogMeIn announced plans to enter a merger agreement with GetGo, a subsidiary of one of LogMeIn's competitors.  [SAC ¶ 33].  LogMeIn expected the post-merger company to generate revenue exceeding $1 billion and stated that the strategic purposes for the merger were to double the Company's revenue within three or four years, to cross-sell products

---

[3] Plaintiffs base the allegations in the SAC on LogMeIn's public filings and statements, analyst reports concerning the Company, and interviews with former employees.  [SAC ¶ 1].  With respect to former employees, the SAC includes allegations concerning the observations and statements of six confidential witnesses.  [<u>Id.</u> ¶¶ 25–30].

across both companies' customer bases, and to fill in one another's product-line gaps. [Id.]. The merger closed in late January 2017. [Id. ¶ 34].

One of the Company's top priorities after the merger was transitioning existing GetGo customers to the Company's preferred billing model. [SAC ¶ 36]. Prior to the merger, nearly all of LogMeIn's customers had annual contracts and most paid upfront for the entire year with a credit card. [Id. ¶ 43]. Additionally, its customers' annual subscriptions would automatically renew unless specifically terminated by a customer, and LogMeIn typically did not permit its customers to cancel or terminate early. [Id.]. GetGo, on the other hand, took a more flexible approach. See [id. ¶ 44]. Seventy percent of its customers were invoiced monthly, and its customers were generally permitted to end their contracts early. [Id.].

LogMeIn began transitioning GetGo's former customers to the LogMeIn billing model in Q2 2017, and it did not go well. [SAC ¶¶ 7, 46, 48]. Customers complained, on social media and to the Company, about how the Company handled the transition. [Id. ¶¶ 65–91]. Customers were dissatisfied, among other reasons, because (1) they did not receive adequate notice of the transition, [id. ¶ 65]; (2) notices that were sent led them to believe that they were being forced to transition to annual billing, [id. ¶¶ 69–77]; (3) notices were silent about the elimination of termination for convenience clauses, [id. ¶¶ 78–82]; and (4) the Company's customer service representatives were unhelpful, difficult to contact, and slow to act, [id. ¶¶ 85–90]. Some customers, unhappy with the new regime, canceled their subscriptions. [Id. ¶¶ 10, 46]. For customers with annual subscriptions, cancelation meant that the subscription would end at the conclusion of the annual period (i.e., not be renewed). [Id. ¶ 10].

Before and during the class period, LogMeIn tracked its renewal rates, both for specific products and across all product lines, but publicly reported only its gross renewal rate across all

products.  [SAC ¶ 45].  In late July 2018, the Company reported its Q2 2018 financial results,

noting that customer churn (i.e., existing customers leaving the Company) had increased, and

acknowledging that customers had not responded well to the Company's transition efforts.  [Id.

¶ 12].  LogMeIn downwardly adjusted its revenue projections, and its share price decreased

significantly.  [Id. ¶ 13].

  **B.**  **Procedural Background**

  Plaintiffs filed their first amended complaint ("FAC") on March 1, 2019.  [ECF No. 54

("FAC")].  On October 7, 2020, the Court granted Defendants' motion to dismiss but gave

Plaintiffs leave to amend with respect to two of the forty-five allegedly fraudulent statements

contained in the FAC (the "Conversion Policy Statements").  [ECF No. 72 at 35].  In its Order

granting the motion (the "MTD Order"), the Court found that Plaintiffs' allegations regarding

those two statements, which both concerned the transitioning of customers to annual payment

plans, presented "close call[s]," but ultimately concluded that Plaintiffs' factual allegations, with

respect to both falsity and scienter, were insufficient to withstand Defendants' motion.  [Id. at

28–34].

  On November 11, 2020, Plaintiffs filed the SAC, which brings a claim against

Defendants for violations of § 10(b) of the Securities and Exchange Act of 1934 (the "Exchange

Act") and a claim against the Individual Defendants for a violation of § 20(a) of the Exchange

Act.  [SAC ¶¶ 2, 148, 163–80].  Plaintiffs' core assertion is that the Company used overly

aggressive methods to transition customers to an annual subscription plan, quickly realized that

customers were dissatisfied with that approach and, as a result, were canceling their

subscriptions, but nonetheless publicly reported that the transition was going well until finally

coming clean in July 2018.  See [id. ¶¶ 4–14].  Defendants moved to dismiss on December 16,

2020, [ECF No. 76], Plaintiffs opposed on January 20, 2021, [ECF No. 80], and Defendants

replied on February 9, 2021, [ECF No. 83].

## II.      LEGAL STANDARD

Section 10(b) of the Securities Exchange Act of 1934 forbids the "use or employ, in connection with the purchase or sale of any security . . . , [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 318 (2007) (alterations in original)

(quoting 15 U.S.C. § 78j(b)).  In turn, SEC Rule 10b-5 implements § 10(b) by declaring it

unlawful, "in connection with the purchase or sale of any security,"

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b-5.  Therefore,

a complaint alleging securities fraud under section 10(b) of the Exchange Act and Securities and Exchange Commission Rule 10b-5 must plead six elements: "(1) a material misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."

Kader v. Sarepta Therapeutics, Inc., 887 F.3d 48, 56 (1st Cir. 2018) (quoting ACA Fin. Guar.

Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008)).[4]

---

[4] "Claims brought under section 20(a) of the [Securities Exchange] Act, 15 U.S.C. § 78t(a), are derivative of 10b-5 claims." Hill v. Gozani, 638 F.3d 40, 53 (1st Cir. 2011).  Section 20(a) provides that once a company has been found to have violated the Exchange Act's substantive provisions, "[e]very person who, directly or indirectly, controls" the company "shall also be liable jointly and severally with and to the same extent as [the company] . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).  Accordingly, to plead a viable

To survive a motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Further, Plaintiffs must satisfy the Federal Rule of Civil Procedure 9(b) standard for alleging fraud with particularity and comply with the heightened pleading requirements imposed by the Private Securities Litigation Reform Act (the "PSLRA"). Advest, Inc., 512 F.3d at 58. "The PSLRA requires plaintiffs' complaint to 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading.'" Id. (alteration in original) (quoting 15 U.S.C. § 78u-4(b)(1)).

> Scienter is a mental state embracing intent to deceive, manipulate, or defraud. The scienter element may be satisfied by showing that the defendant engaged in intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities. A plaintiff can also demonstrate scienter by showing that defendants acted with a high degree of recklessness. Under the recklessness standard, a defendant can be held liable for a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.
>
> The PSLRA mandates a special standard for measuring whether allegations of scienter survive a motion to dismiss. A complaint alleging securities fraud must, with respect to each alleged act or omission, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. A plaintiff must allege facts that make an inference of scienter more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. When there are equally strong inferences for and against scienter, the draw is awarded to the plaintiff.

City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp., 632 F.3d 751, 757 (1st Cir. 2011) (citations and internal quotation marks omitted). The First Circuit has

---

Section 20(a) claim against the Individual Defendants, Plaintiffs must first plead an actionable claim under Section 10(b) of the Exchange Act and Rule 10b-5. See Winters v. Stemberg, 529 F. Supp. 2d 237, 247 (D. Mass. 2008) (quoting In re Focus Enhancements, Inc. Sec. Litig., 309 F. Supp. 2d 134, 157 (D. Mass. 2001)).

found this demanding [scienter] standard met where a complaint "contains clear allegations of admissions, internal records or witnessed discussions suggesting that at the time they made the statements claimed to be misleading, the defendant[s] were aware that they were withholding vital information or at least were warned by others that this was so."

Mehta v. Ocular Therapeutix, Inc., 955 F.3d 194, 206–07 (1st Cir. 2020) (alteration in original)

(quoting Brennan v. Zafgen, Inc., 853 F.3d 606, 614 (1st Cir. 2017)).

## III.      DISCUSSION

### A.      Motion for Reconsideration

In their opposition to Defendants' motion to dismiss, Plaintiffs ask the Court to reconsider its prior ruling that the Conversion Policy Statements were not actionable, claiming that the statements are, in fact, actionable "based on the Court's own analysis of the FAC's allegations and the applicable First Circuit standards for pleading falsity."  [ECF No. 80 at 12]. Defendants respond that Plaintiffs' request is both procedurally deficient and substantively unwarranted.  [ECF No. 83 at 6–8].

Although Plaintiffs do not identify the precise basis for their request, and the Federal Rules of Civil Procedure do not specifically provide for the filing of motions for reconsideration, such motions are typically evaluated pursuant to either Federal Rule of Civil Procedure 59(e) or Federal Rule of Civil Procedure 60(b).  Lyons v. Fed. Nat'l Mortg. Ass'n, No. 18-cv-10365, 2019 WL 1961072, at *2 (D. Mass. May 1, 2019).  Regardless of which rule Plaintiffs rely on, the Court has substantial discretion to grant or deny their request, Ruiz Rivera v. Pfizer Pharms., LLC, 521 F.3d 76, 81 (1st Cir. 2008), and "[t]he granting of a motion for reconsideration is 'an extraordinary remedy which should be used sparingly,'" Palmer v. Champion Mortg., 465 F.3d 24, 30 (1st Cir. 2006) (quoting 11 Charles Alan Wright et al., Federal Practice and Procedure § 2810.1 (2d ed.1995)).  Courts "appropriately may grant a motion for reconsideration 'where the movant shows a manifest error of law or newly discovered evidence.'  Likewise, a motion for

reconsideration should be granted if the court 'has patently misunderstood a party . . . or has made an error not of reasoning but apprehension.'" Id. at 81–82 (first quoting Kansky v. Coca-Cola Bottling Co. of New Eng., 492 F.3d 54, 60 (1st Cir. 2007); then quoting Sandoval Diaz v. Sandoval Orozco, No. 01-cv-01022, 2005 WL 1501672, at *2 (D.P.R. June 24, 2005)).

The Court declines to reconsider its prior ruling. The Court does not believe that there has been a manifest error of law, Plaintiffs have pointed to no newly discovered evidence, and the Court is confident that it understood Plaintiffs' position when it decided Defendants' initial motion to dismiss.

### B.    Motion to Dismiss

In the MTD Order, the Court permitted Plaintiffs to amend their complaint as it related to the Conversion Policy Statements. Bradley made the first allegedly fraudulent statement at the September 13, 2017 Deutsche Bank Technology Conference, in response to a question regarding whether the transition of GoTo customers could be a source of churn[5]:

> It would be, but right now because there – you have 12 opportunities to collect from these people, you ask the first time. If they get pushed back, you come back to them again. So we're just taking the willing conversions right now and down the road there's an opportunity and try to – you increase the monthly price if you don't go annual. That's an opportunity that we haven't implemented, but certainly, I know companies that we buy subscription software from have utilized techniques like that in the past. And these are – because it's small-medium business, these aren't enormous size deals, with the exception of the customer engagement, they aren't seven-figure deals. They're often four- and five-figure deals.
>
> And so it's not necessarily that much of a burden for the end-user and in some cases, it's helpful for them as well. Instead of them chasing, 12 invoices a year, it's one. And so we've already – in the low-end it's much – it's – in some cases not even a conversation, people say okay. And we've got that expertise from doing it for 10

---

[5] The Court notes that while Plaintiffs maintain that the question was about whether the transition was "a potential source of churn," [ECF No. 80 at 10], the transcription of the conference that Plaintiffs have annexed to their SAC does not clearly state what the question leading to Bradley's answer was, see [ECF No. 81-1 at 10 ("Is that a potential source of [ph] churned up [indiscernible] ?")].

years at LogMeIn. So we have confidence that we can do it across a much bigger base.

[SAC ¶ 54; ECF No. 81-1 at 10].  Wagner made the second at the JPMorgan Global Tech

Conference on May 15, 2018:

> One of the things that we believe – and in SaaS – SaaS is a subscription that people should pay for the subscription upfront.  That was LogMeIn's policy.  The GoTo policy was monthly subscription – or annual subscriptions, but monthly pay.  And customers can still do that, but we've incented the sales force to migrate those customers to annual pay.  That's obviously driven significant increase in cash flow, but we haven't really insisted that people do that.
>
> So we're also being, I think, taking our time to do it. We don't need to. We're expanding cash flow and margins as we go nicely. There's still a lot of runway there, but we're not telling people when they renew, okay, you have to move to an annual subscription. I mean, we're giving that option, giving incentive. But if people push back and don't want to do it, then that will be okay, at least in the short term.

[SAC ¶ 56; ECF No. 81-2 at 10].  Plaintiffs claim that each statement was materially false and/or

misleading because

> it failed to disclose, among others: (i) that LMI was forcing former GoTo customers to transition to annual billing against their will; (ii) that LMI was forcing customers to switch to annual commitments/terms; (iii) that many [small-medium business] customers were transitioned without receiving notice; (iv) that, for those customers that did receive advanced notice, these customers were led to believe that they were being forced to convert to annual billing without a choice and the notice did not clearly indicate that they were being converted to annual commitments/terms; (v) that LMI removed the termination for convenience clause, thereby masking that a significant portion of customers would not renew their contracts; (vi) that LMI had also admittedly forced larger customers to sign new purchase orders rather than auto-renewing or when adding seats/licenses; (vii) that forcing customers to convert to annual billing and commitments/terms against their will was causing increased customer friction and churn; and (viii) that there was a substantial number of customers who, after being forced to convert to annual contracts, immediately notified LMI of their intent to cancel their contracts, which would begin churning off in Q2'18 when the first wave of converted customers reached a full year after being converted to annual contracts.

[SAC ¶¶ 55, 57].

In granting Defendants' motion to dismiss the FAC, the Court made observations intended to guide Plaintiffs' efforts to amend.  First, that Plaintiffs' allegations, "taken together, indicate[d] that the Company was employing aggressive techniques to transition customers but d[id] not indicate that the Company was unilaterally transitioning customers from monthly to annual payment plans against their will or without other options."  [ECF No. 72 at 30].  Second, that "[m]aking it challenging for customers or otherwise aggravating them is not the same as transitioning unwilling customers."  [Id.].  Third, the fact "[t]hat the choice was made difficult by the Company's abrasive techniques does not mean that it was not a choice."  [Id. at 31].  Fourth, "[t]aking all the factual allegations as true, Plaintiffs make out a convincing story of corporate mismanagement and poor customer service but fall short of making out a claim for securities fraud."  [Id. at 34].  The SAC does not cure these deficiencies and although Plaintiffs' new allegations paint a more detailed picture of potential corporate mismanagement and poor customer service, they still do not make out a claim for securities fraud.  See City of Dearborn Heights, 632 F.3d at 760 ("Allegations of corporate mismanagement are not actionable under Rule 10b-5.").  Accordingly, for the reasons detailed below, Defendants' motion to dismiss is GRANTED.

        1.        <u>Plaintiffs Have Failed to Adequately Allege that the Statements Were Materially False or Misleading</u>

On September 13, 2017, Bradley announced that LogMeIn was in the process of transitioning GetGo's former customers and that, at that time, only willing customers were being transitioned, [SAC ¶ 54], and on May 15, 2018, Wagner stated that the Company was still not requiring its customers to switch payment plans although it was incentivizing them to do so, [id. ¶ 56].  The allegations in the SAC do not suggest that these statements were false or misleading.

First, the allegations in the SAC, and documents referenced therein, demonstrate that customers did, in fact, have a choice as to how they would be billed.  See, e.g., [SAC ¶ 68 (email inviting customers to contact Company with questions about annual billing cycle); id. ¶ 91 (customer indicating that monthly pricing existed on website and customer service representative acknowledging that customer could pay monthly); ECF No. 75-1 at 6 (Company representative noting that transition was underway "in phases"); ECF No. 75-2 at 3 (noting that monthly plans were "more expensive because of the shorter commitment period"); id. at 4 (noting that month-to-month subscribers could continue to pay month to month)].

Second, the fact that the notices sent to customers outlining the transition were "written in a manner to lead customers to believe that they were being forced to transition to annual billing," [SAC ¶ 69], does not mean that customers were, in fact, being forced to transition. Plaintiffs' allegations suggest only that the Company used an opt-out model instead of an opt-in model for the switch to annual billing, see [ECF No. 80 at 16 (describing LogMeIn's approach as "opt in")], not that the Company mandated that its customers make the switch.  Nor is there any allegation that customers who chose to opt out (i.e., pushed back against the Company) were actually prevented from doing so.

Third, because the Conversion Policy Statements do not reference termination for convenience or prorated refunds for early cancellation, Plaintiffs' allegations regarding the Company's decision to eliminate the termination for convenience clauses and its refund policy, [SAC ¶¶ 78–84], are not relevant.  Although the SAC is replete with allegations suggesting that the Company bungled the transition which caused customers to be disgruntled and angry, those facts do not suggest that the Conversion Policy Statements were false or misleading.

Fourth, the customer complaints included in the SAC demonstrate dismal customer service, see, e.g., [SAC ¶ 65(a) (noting failure to provide notice); id. ¶ 65(b) (noting ninety-minute wait to speak with customer service regarding billing transition); id. ¶ 86 (noting that customers were required to call tech support to turn off auto-renew); id. ¶ 88(b) (noting inability to cancel subscription online); id. ¶ 88(c) (same); id. ¶ 88(d) (noting unavailability of salespeople); id. ¶ 88(e) (noting inability to modify subscription online); id. ¶¶ 88(f)–(i) (same); id. ¶¶ 89(a)–(k) (noting long wait times for, and general unresponsiveness of, customer service)], but making it difficult for customers to express their dissatisfaction with the Company's preference for annual billing and/or maintain their monthly billing plans is not the same as transitioning unwilling customers and none of Plaintiffs' allegations suggest that unwilling customers were transitioned or that the Company "insist[ed]" on transitioning customers.

Finally, LogMeIn forcing certain customers to sign new purchase orders, as opposed to allowing them to auto-renew, see [SAC ¶¶ 93–94], speaks to the manner in which customers could renew, but does not suggest that the Conversion Policy Statements, which do not reference purchase orders or auto-renewal, were false or misleading.

In sum, the SAC does not adequately demonstrate that the Conversion Policy Statements were false or misleading because the allegations do not plausibly suggest that the Company was transitioning unwilling customers.

As an alternative to their primary argument that the Conversion Policy Statements were literally false, Plaintiffs argue that they were "misleading 'half-truths' due to their omission of material information about LogMeIn's conversion practices." [ECF No. 80 at 14–15]. Plaintiffs are correct that "the fact that a statement is literally accurate does not preclude liability under

federal securities laws." Lucia v. Prospect Street High Income Portfolio, Inc., 36 F.3d 170, 175

(1st Cir. 1994).

> "Some statements, although literally accurate, can become, through their context
> and manner of presentation, devices which mislead investors.  For that reason, the
> disclosure required by the securities laws is measured not by literal truth, but by the
> ability of the material to accurately inform rather than mislead prospective buyers."
> Under the foregoing standards, "emphasis and gloss can, in the right circumstances,
> create liability."

Id. (first quoting McMahan & Co. v. Wherehouse Ent., Inc., 900 F.2d 576, 579 (2d Cir. 1990);

then quoting Isquith ex rel. Isquith v. Middle S. Utils., Inc., 847 F.2d 186, 203 (5th Cir. 1988)).

Here, however, Plaintiffs' factual allegations do not plausibly suggest that the Conversion Policy

Statements were misleading based on context.  In the Conversion Policy Statements, Bradley and

Wagner did not opine on: (1) the manner in which the Company was seeking conversions;

(2) how aggressively the Company was seeking conversions; (3) how customers were responding

to the Company's transition-related overtures; or (4) the Company's customer service policies.

Accordingly, Bradley and Wagner were under no duty to disclose the aggressive, abrasive, and

aggravating techniques that the Company appears to have been employing or customers'

reactions to those techniques.  See City of Dearborn Heights, 632 F.3d at 760 ("A company does

not commit securities fraud merely by failing to disclose all non-public material information that

it knows."); In re Parametric Tech. Corp. Sec. Litig., 300 F. Supp. 2d 206, 221 (D. Mass. 2001)

("There is no duty to disclose broader information; a company is not called upon to give a

general business review whenever it accurately discloses a particular, discrete fact.").  See

generally Gross v. Summa Four, Inc., 93 F.3d 987, 992 (1st Cir. 1996) (discussing the limits of

the duty to disclose).

2.      <u>Plaintiffs Have Failed to Adequately Allege Scienter</u>

Even if Plaintiffs' allegations were sufficient with respect to falsity, their claims would still fail.  Plaintiffs have a weighty burden with respect to scienter, <u>see</u> <u>supra,</u> Section II, and they have not met it.  As an initial matter, Plaintiffs cannot establish scienter because doing so would require them to demonstrate that LogMeIn's executives intentionally or recklessly misled investors regarding forced conversions notwithstanding the fact that Plaintiffs have failed to plead facts plausibly suggesting that such forced conversions actually occurred.  Even assuming there were forced conversions, or that the Conversion Policy Statements were otherwise misleading, Plaintiffs have still failed to adequately plead scienter.  Plaintiffs argue that, viewed holistically, their factual allegations are sufficient.  [ECF No. 80 at 23–32].  As explained further below, the Court finds Plaintiffs' argument unpersuasive and concludes that the "opposing inference of nonfraudulent intent" is more compelling.  <u>See</u> <u>Tellabs</u>, 551 U.S. at 314.

To meet their burden with respect to the Conversion Policy Statements, Plaintiffs must allege facts giving rise to a strong inference that on September 13, 2017 and May 15, 2018, Bradley and Wagner, respectively, either intentionally deceived investors or acted in manner that was "an extreme departure from the standards of ordinary care, and which present[ed] a danger of misleading buyers or sellers that [wa]s either known to [him] or is so obvious [he] must have been aware of it."  <u>City of Dearborn Heights</u>, 632 F.3d at 757.  Plaintiffs' allegations as to both statements fall short.

a.      Sept. 13, 2017 Statement

First, Plaintiffs' argument that prior to and during the class period, Defendants paid close attention to (1) the risks of customer churn connected to the conversion of GetGo customers to annual payment plans and (2) the conversion tactics being employed to manage those risks, [ECF No. 80 at 23–27], is unavailing.  They seem to be arguing that because the transition from

monthly to annual payment plans was important to the Company, any statements about the transition were made with the requisite scienter.  That argument fails to establish scienter.  Cf. In re Wayfair, Inc. Sec. Litig., 471 F. Supp. 3d 332, 345 (D. Mass. 2020) ("Plaintiffs' argument, essentially, is that because Defendants said that they paid close attention to their financial position and their financial position ended up being different than Defendants said it was, Defendants must have been lying and/or were recklessly indifferent about Wayfair's financial position.  That is akin to saying that any time a company's financial projection is wrong, the speaker has engaged in securities fraud.  But that is not the law.").  Notably, Plaintiffs do not point to any statements from Bradley (or Wagner) describing conversion tactics with any specificity or allege that either participated in any discussions regarding the same.

Second, contrary to Plaintiffs' assertions, [ECF No. 80 at 23–24], Bradley's other September 13, 2017 statements, [SAC ¶¶ 53, 126], do not give rise to a strong inference of scienter.  Bradley's acknowledgment that the Company had a "deliberate" and "specific" plan regarding the transition, [id. ¶ 53], and general statement concerning conversion tactics,[6] [id.

---

[6] Additionally, it remains unclear what precisely Bradley meant.  According to the transcription of the Deutsche Bank conference filed by Plaintiffs, the exchange was as follows:

> Q. . . . And again, back to the question about the new portfolio, do you have to make any changes to your go-to-market [] because the mid market is hard to reach[]?

> A. Sure. So what we really liked about LogMeIn kind of legacy was our sales and go-to-market motion.  We've kind of, in some regards, perfected that over our tenure leveraging premium, leveraging more modern and technical go to market, utilizing search pretty effectively, utilizing the trial flow and conversion tactics that you'll learn and you'll find over time.  And the GoTo asset principally focused on more of a traditional go-to-market, meaning legacy campaigns, print, media, television and that's a go-to-market approach that we've kind of – we're leaning now more towards the more modern approach.  And that's one of the areas where there's a tremendous amount of the cost savings.

[ECF No. 81-1 at 6].

¶ 126; ECF No. 81-1 at 6], in no way suggest that the statement at issue here was made with the requisite scienter.  The fact that Bradley was aware that the conversion was proceeding pursuant to a plan, which included tactics, does not imply that his statement regarding the transition was intentionally fraudulent or recklessly incomplete.

Third, there are not specific factual allegations in the SAC regarding Bradley's knowledge, as of September 13, 2017, supporting a strong inference of scienter.  Contra Mehta, 955 F.3d at 206–07 (noting that demanding scienter standard has been met where complaint contained "clear allegations of admission, internal records or witnessed discussions" (quoting Brennan, 853 F.3d at 416)).  Instead, Plaintiffs make general assertions seeking to imply that because of Bradley's position in the Company, he must have made the statement with scienter. For instance, Plaintiffs allege that, "as VP of Investor Relations, [Bradley] knew that GoTo customers reacted poorly to the way their contracts were converted to annual billing subscriptions," and in support cite a May 2017 Nasdaq-published interview which stated that Bradley met with different departments and offices to discuss, among other topics, "having a good customer care experience," and considered the merger to be a "tremendous career experience . . . and a transformative event in the life of LogMeIn."  [SAC ¶ 142].  The fact that Bradley was generally involved with customer service and considered the merger important does not, however, suggest that on September 13, 2017, he possessed information regarding the conversion that rendered his statement reckless or intentionally fraudulent.  See Isham v. Perini Corp., 665 F. Supp. 2d 28, 35–36 (D. Mass. 2009) (noting that allegations that an individual defendant attended unspecified meetings fail to give rise to a strong inference of scienter).

Plaintiffs' suggestion that because LogMeIn had a "customer support staff who reviewed [customer] complaints" and because Bradley was the Company' VP of Investor Relations, [SAC

¶ 143], he must have been aware of those customer complaints is also misguided.  See Sousa v. Sonus Networks, Inc., 261 F. Supp. 3d 112, 120 (D. Mass 2017) ("A vague assertion that defendants must have known something by virtue of their position of authority does not suffice to adequately allege a strong inference of scienter.").  Nowhere in the SAC do Plaintiffs identify a specific meeting that Bradley attended, or a specific conversation that Bradley had, where he was told that his statement posed a risk of being misleading or was otherwise presented with information or data that would make it so obvious that his statement could be misleading that he must have been aware of it.  See City of Dearborn Heights, 632 F.3d at 758.

Fourth, Plaintiffs' reliance on the "core operations" doctrine is misplaced.  [SAC ¶¶ 145–47; ECF No. 80 at 27–28].  Essentially, Plaintiffs maintain that because the transition of GetGo customers was "critical to the success of the acquisition," knowledge of all facts related to the transition can be imputed to the Individual Defendants.  [ECF No. 80 at 27–28].  First, "courts have been hesitant to apply significant weight to 'core operations' allegations without other significant evidence of a defendant's intent or recklessness, or a 'plus factor.'"  Metzler Asset Mgmt. GmbH v. Kingsley, 305 F. Supp. 181, 219 (D. Mass. 2018), aff'd, 928 F.3d 151 (1st Cir. 2019).  Plaintiffs have failed to adduce other significant evidence of scienter or a plus factor.  Second, the doctrine is generally applied only when the subject of the allegedly fraudulent statement is "central to [the company's] survival as a business entity."  Id. at 219 n.32 (alteration in original) (quoting Lenartz v. Am. Superconductor Corp., 879 F. Supp. 2d 167, 183 n.9 (D. Mass. 2012)).  Here, Plaintiffs have alleged that the transition was important but have not alleged that it was central to the Company's survival (nor could they credibly do so given their allegation that the transition was completely bungled, and the fact that the Company nonetheless survived).

b.      May 15, 2018 Statement[7]

First, Wagner's other statements during and after the class period, [SAC ¶¶ 7, 34, 49,

92–94, 103, 105–08, 110, 112, 118–19, 129–30], do not give rise to a strong inference of

scienter.  Taken together, the statements suggest that LogMeIn sought to transition customers

with minimal disruption, [id. ¶ 34]; began the transition in Q2 2017 with promising initial

results, [id. ¶¶ 7, 49, 129]; employed aggressive techniques, which alienated customers and

caused them to cancel and/or elect not to renew, [id. ¶¶ 92–94, 106–08, 110, 112, 130,];

concluded in Q2 2018—based, in part, on Wagner taking a more hands-on role—that the adverse

customer response to the Company's transition efforts was a sustained trend, which necessitated

an amended approach, [id.]; and successfully implemented a new approach in Q3 2018, [id.

¶¶ 105, 118–19].  They do not suggest that Wagner's May 15, 2018 statement regarding the

transition was intentionally fraudulent or recklessly misleading.[8]

---

[7] Plaintiffs' arguments regarding the attention paid to the transition and the core operations doctrine are applicable to both allegedly fraudulent statements.  The Court finds them unconvincing with respect to Wagner's May 15, 2018 statement for the same reasons it finds them unconvincing with respect to Bradley's September 13, 2017 statement.  See supra, Section III.B.2.a.

[8] Plaintiffs maintain that because Wagner stated on July 26, 2018 that the trend of increased churn due to aggressive transitioning tactics had become apparent in the second half of Q2 2018, [SAC ¶ 106 (statement)], his May 15, 2018 statement, made in the middle of Q2 2018, must have been made with scienter, [ECF No. 80 at 26].  This argument misses the mark.  For one, Wagner's July 26, 2018 statement does not make clear to *whom*, at the Company, the trend became apparent in the second half of Q2 2018.  Additionally, even if Wagner were aware of the negative trend on May 15, 2018, that fact does not create a strong inference of scienter because his May 15, 2018 statement did not relate to conversion tactics or customer churn.  Put differently, it would not be "an extreme departure from the standards of ordinary care" for Wagner to have made the May 15, 2018 statement with knowledge of the negative trend.  City of Dearborn Heights, 632 F.3d at 757 (quoting Greebel v. FTP Software, Inc., 194 F.3d 185,198 (1st Cir. 1999)).

Second, the SAC lacks specific factual allegations concerning Wagner's knowledge, as of May 15, 2018, to create a strong inference of scienter.  See Mehta, 955 F.3d at 206–07. Plaintiffs make general allegations about Wagner's role in the company, position of authority, and receipt of data, see, e.g., [SAC ¶¶ 27–30 (noting that confidential witnesses indirectly reported to Wagner); id. ¶ 136 (relaying Confidential Witness 4's secondhand account that his supervisor presented "data" regarding declining retention in connection with aggressive transition techniques to Wagner in March 2018); ¶ 138 (noting that drop in retention was discussed during "senior leadership meetings" which Wagner attended)], but fail to allege facts specific enough to create a strong inference of scienter.  Notably, Plaintiffs do not allege that Wagner attended a specific meeting, or had a specific discussion, where he was told or otherwise learned (or should have learned) that his statement presented a danger of misleading investors. See City of Dearborn Heights, 632 F.3d at 758.

c.     Opposing Inference and Summary

The Court must also consider "competing inferences rationally drawn from the facts alleged."  Tellabs, 551 U.S. 314.  As Defendants point out, [ECF No. 77 at 22–23], there are additional facts that suggest a non-fraudulent state of mind.  First, as discussed in the MTD Order, Defendants' disclosures before, during, and after the transition, undermine the inference of scienter.  [ECF No. 72 at 34 (citing Kader, 887 F.3d at 58)].  Wagner's candor and acceptance of responsibility regarding the flawed transition, see [SAC ¶¶ 106–08], also undercut any inference of fraudulent intent.  Second, although not dispositive, it is notable that there are no allegations of insider trading or sudden stock sales by Wagner or Bradley (or any other insiders). Smith v. First Marblehead Corp., 55 F. Supp. 3d 223, 231 (D. Mass. 2014) ("Insider trading, or sudden sales of shares by the defendants, is also highly probative of scienter.  The absence of any

19

such allegations can weigh against a finding of scienter." (citation omitted)); see Toussaint v. Care.com Inc., No. 19-cv-10628, 2020 WL 5751527, at *6 (D. Mass. Sept. 25, 2020) (noting lack of insider trading or personal gain in conducting scienter analysis).

Thus, after considering the SAC as a whole, see Mehta, 955 F.3d at 206, the Court finds that the inference of scienter urged by Plaintiffs is not as cogent and compelling as the "opposing inference of nonfraudulent intent," Tellabs, 551 U.S. at 314.  Specifically, rather than demonstrating that either Bradley or Wagner was "aware that [he was] withholding vital information" or had been "warned by others that this was so," Mehta, 955 F.3d at 207 (quoting Brennan, 853 F.3d at 614), Plaintiffs' allegations suggest that LogMeIn began the transition in Q2 2017 with high hopes, miscalculated how aggressively it could push annual billing on GoTo's customers without alienating them, recognized the error of its ways once negative trends solidified, and, in July 2018, disclosed that it had mishandled the transition.  As noted in the MTD Order and above, Plaintiffs tell a story of corporate mismanagement and poor customer service but do not make out a viable claim for securities fraud.

3.    "Control" Person Liability Under § 20(a)

Because Plaintiffs have failed to state a claim under § 10(b), the Court must dismiss the related § 20(a) claim against the Individual Defendants.  See City of Dearborn Heights, 632 F.3d at 762 ("Because the plaintiff's Section 20(a) claim was derivative of the Rule 10b-5 claim, it was properly dismissed as well." (citing 15 U.S.C. §§ 78t(a), 78t-1)).

## IV.    CONCLUSION

Accordingly, for the reasons stated above, Defendants' motion to dismiss, [ECF No. 76], is GRANTED and the SAC, [ECF No. 75], is DISMISSED with prejudice.

**SO ORDERED.**

March 18, 2021                                        /s/ Allison D. Burroughs
                                                     ALLISON D. BURROUGHS
                                                     U.S. DISTRICT JUDGE